# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALTSHARES EVENT-DRIVEN ETF, on behalf of themselves and all others similarly situated, | Case No.   23-cv-1466-MN |
| Plaintiff, | CLASS ACTION |
| vs. | |
| | JURY TRIAL DEMANDED |
| FOCUS FINANCIAL PARTNERS, INC., RUEDIGER ADOLF, RAJINI SUNDAR KODIALAM, JAMES D. CAREY, FAYEZ S. MUHTADIE, GEORGE S. LEMIEUX, ELIZABETH R. NEUHOFF, JOSEPH FELICIANI, Jr., JAMES SHANAHAN, LEONARD CHANG, and J. RUSSELL MCGRANAHAN, | REDACTED VERSION |
| Defendants. | |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................2

JURISDICTION AND VENUE ..........................................................................................7

PARTIES ............................................................................................................................8

    A.    Plaintiff ..................................................................................................8

    B.    Defendants ............................................................................................8

        1.    Focus Financial ........................................................................8

        2.    The Special Committee Defendants..........................................8

        3.    The Other Board Defendants ....................................................9

    C.    Relevant Non-Parties ..........................................................................10

SUBSTANTIVE ALLEGATIONS ....................................................................................10

I.    BACKGROUND OF FOCUS AND STONE POINT'S SIGNIFICANT INFLUENCE OVER THE COMPANY ..................................................................10

II.    BACKGROUND OF THE TRANSACTION ..................................................13

    A.    The Key Participants in the Transaction Process Harbored Significant Conflicts of Interest Inclining Them to Favor a Sale of Focus to a Private Equity Buyer ................................................................................14

        1.    Stone Point's Conflicts of Interest ............................................14

        2.    Management's Conflicts of Interest..........................................16

        3.    The Board Defendants' Conflicts of Interest ............................17

        4.    Goldman Sachs' Conflicts of Interest ......................................20

        5.    Jefferies' Conflicts of Interest..................................................23

    B.    Consistent With Their Conflicts of Interest, Focus's Directors Negotiated and Approved a Sale to CD&R on Unfair Terms ..................................24

        1.    Focus's Directors Prematurely Homed in On a Deal With CD&R Without Adequately Canvassing the Market of Potential Buyers .............24

        2.    Focus's Directors Unduly Favored CD&R over Party I and Other Potential Buyers, Even After Party I Offered Higher Consideration.........28

3.      Defendants Favored The Transaction Given the Enormous TRA
         Payments Triggered by a Change of Control.................................................31

4.      The Final Merger Terms Were Unfair to Focus's Unaffiliated
         Stockholders.................................................................................................32

C.      Defendants Announce the Merger and Issue a Materially False and
         Misleading Proxy Statement to Focus Stockholders .............................................34

D.      At the Eleventh Hour, Defendants Issue a Belated Proxy Supplement
         Revealing Serious Conflicts of Interest—Including Those Harbored by the
         Special Committee ....................................................................................................35

E.      The Board and Focus Stockholders Approve the Merger......................................36

III.    DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMISSIONS
        OF MATERIAL FACT..........................................................................................................36

A.      Misstatements on February 27, 2023 .....................................................................36

B.      Misstatements in the Proxy.....................................................................................37

1.      The Proxy Falsely Reported That the Special Committee Was
         Independent and Concealed Material Conflicts of Interest
         Harbored by the Special Committee ...........................................................37

2.      The Proxy Falsely Touted the Adequacy of the Merger Process...............40

3.      The Proxy Falsely Reported That the Special Committee and
         Board Believed the Merger Consideration Was More Favorable
         Than Reasonably Available Alternatives.....................................................43

IV.     ADDITIONAL ALLEGATIONS OF SCIENTER............................................................44

V.      LOSS CAUSATION..............................................................................................................45

VI.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ...............................................46

VII.    CLASS ACTION ALLEGATIONS .....................................................................................47

VIII.   PRESUMPTION OF RELIANCE........................................................................................49

COUNT I  Against All Defendants for Violations of Section 10(b) of the Exchange Act
         and Rule 10b-5 Promulgated Thereunder ..........................................................................50

COUNT II  Against All Defendants for Violations of Section 14(a) of the Exchange Act
         and Rule 14a-9 Promulgated Thereunder ..........................................................................52

COUNT III  Against the Special Committee Defendants, Board Defendants and Officer
        Defendants for Violations of Section 20(a) of the Exchange Act ....................................53

IX.     PRAYER FOR RELIEF ................................................................................................55

X.      JURY DEMAND ..........................................................................................................56

Plaintiff AltShares Event-Driven ETF, brings this class action (the "Action") for violations of:

(i)  Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), on behalf of itself and other shareholders of Focus Financial Partners, Inc. ("Focus Financial" "Focus," or the "Company") as of the June 9, 2023 record date (the "Record Date") who were entitled to vote on the "take-private" acquisition (the "Merger" or the "Transaction") of Focus Financial by Clayton, Dubilier & Rice, LLC (together with its affiliates, "CD&R"); and

(ii)  Sections 10(b) and 20(a) of the Exchange Act, on behalf of itself and all other persons or entities, excluding Defendants (defined more fully below), that sold shares of Focus Financial common stock from February 27, 2023, the announcement date of the Merger, through the close of the Merger on August 31, 2023, (the "Class Period"), including investors who sold their shares of Focus Financial common stock into the Merger and were damaged thereby.

These claims are asserted against: (i) Focus Financial; (ii) members of Focus Financial's Board of Directors (the "Board Defendants"); (iii) members of the special committee of Focus Financial's Board of Directors established on November 1, 2022 in connection with the Merger (the "Special Committee Defendants"); and (iv) certain Focus Financial executives (the "Officer Defendants" and together with Focus Financial, the Board Defendants, and Special Committee Defendants, "Defendants"), as defined more fully below.

Plaintiff's allegations are based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters. Plaintiff's information and belief is based upon, *inter alia*, the investigation conducted by, or at the direction of, undersigned counsel for Plaintiff. This investigation includes, among other things, a review and analysis of: (i) internal Focus Financial documents, including minutes and related materials from relevant meetings of the Focus Financial Board and Special Committee;[1] (ii) publicly filed pleadings in other proceedings;

---

[1] Citation to bates-stamped documents herein refer to internal Focus Financial documents produced to Plaintiff pursuant to its challenge to confidential treatment filed under Delaware Chancery Rule 5.1 in the Delaware Court of Chancery case captioned *Anchorage Police & Fire*

(iii) press releases, presentations, and other public statements issued by Focus Financial; (iv) Focus Financial's filings with the U.S. Securities and Exchange Commission ("SEC"), including its Definitive Proxy Statement ("Proxy") filed on June 12, 2023 in connection with the Merger, and amendments thereto; (v) media and analyst reports about the Company; and (vi) other information and data concerning Focus Financial.  Plaintiff's investigation is ongoing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control.

## **INTRODUCTION**

1.      This is a stockholder class action brought on behalf of the former shareholders of Focus Financial against the Company and certain of its current and/or former officers and directors for violations of the federal securities laws arising out of Defendants' false and misleading statements and dissemination of a false and misleading Proxy in violation of Sections 10(b), 14(a) and 20(a) of the Exchange Act and SEC Rules s 10b-5 and 14a-9 promulgated thereunder.

2.      Focus is an investment firm that holds ownership interests in independent fiduciary wealth management firms.   Focus began trading on the Nasdaq Global Select Market ("NASDAQ") in 2018, but, pursuant to a transaction announced in February 2023 and completed in August 2023 (the "Transaction"), Focus is now a privately held company whose shares are predominantly held by CD&R.   Prior to the Transaction, Focus's largest shareholder was the private equity firm Stone Point Capital LLC ("Stone Point") who held approximately 20.6% of Focus's voting power and controlled Focus's Board of Directors ("Board").

---

*Retirement Sys. v. Focus Financial Partners, Inc.*, C.A. No. 2023-0711-SEM, and a confidentiality agreement executed between Plaintiff and Focus Financial.  All emphasis herein is added unless otherwise noted.

3.      The Transaction was the outcome of an unfair and conflicted process—negotiated and approved by conflicted directors, influenced by conflicted management, with the assistance of conflicted advisors—all of which resulted in the Company accepting an unfair price from CD&R.

4.      Indeed, while common shareholders received $53 per share via the Transaction ("Merger Consideration"), Stone Point, the Board, and members of Focus's senior management team, including Focus's former Chief Executive Officer ("CEO"), Rudy Adolf, and Chief Operating Officer ("COO"), Rajini Kodialam, received additional benefits unavailable to other shareholders, including over $130 million as beneficiaries of certain Tax Receivable Agreements ("TRA Payments"), the acceleration of millions of dollars' worth of unvested equity awards, and the ability to participate in the equity of the highly promising post-Transaction private company.

5.      From the beginning of the sale process in the summer of 2022, the Board excluded strategic buyers as potential bidders, as only financial buyers would allow Stone Point to retain equity post-merger.  CD&R immediately emerged as a potential acquirer and met with Adolf on June 16, 2022.  To help locate other potential financial buyers, the Board retained Goldman Sachs & Co. LLC ("Goldman" or "Goldman Sachs"), despite Goldman's extensive ties to Stone Point and CD&R, and despite the fact that Goldman was conflicted from the engagement as it was already running a competing sale process for one of Focus's subsidiaries—NKSFB LLC—which directly obstructed Goldman's ability to run an adequate and robust sale process for Focus.

6.      After more than four months of negotiations with CD&R, the Board acknowledged that it was conflicted due to the large TRA Payments promised to Focus management and the Board.  The Board accordingly created the purportedly "independent and disinterested" special committee of the Board (the "Special Committee")—disregarding the blatant fact that its members

suffered the exact same conflicts, as they were similarly promised substantial TRA Payments and accelerated equity awards from a potential Transaction.

7.      The Special Committee then retained Jefferies LLC ("Jefferies") as a second banker to "chaperone" Goldman, despite Jefferies' conflicts stemming from its prior work for both CD&R and Stone Point.   Jefferies decided to extend Goldman's subpar search to include additional financial buyers and a *single* strategic buyer, but even that recommendation only came after the Special Committee belatedly learned that the strategic buyer proactively proposed a potential merger to Focus's CEO weeks earlier.

8.      Against this skewed process favoring CD&R and other financial buyers, the strategic bidder emerged with an offer substantially higher than CD&R's.  Nonetheless, the Special Committee refused to provide the strategic bidder with access to certain due diligence or grant it exclusivity, even though the Special Committee had acquiesced to CD&R's identical demands based on its lower-priced offer.  In the end, the Special Committee and the Board accepted CD&R's inferior bid because of the unique benefits it provided Stone Point and Focus management, while still delivering the Special Committee members their TRA Payments and accelerated equity awards.

9.      On February 27, 2023, Focus issued a press release, which it filed with the SEC on Form 8-K, announcing the Transaction.  Despite the issues plaguing the sale process, the press release assured shareholders and investors that "[t]his transaction results from a robust process conducted by a Special Committee of all the independent directors of Focus that included a pre-announcement market check and provides for a 40-day go-shop provision, to help ensure value maximization for public stockholders."  The press release made sure to tell shareholders that the "Special Committee is composed entirely of independent and disinterested directors."

10.     On June 12, 2023, to gain shareholder approval for the unfair Transaction, Defendants issued the materially false and misleading Proxy pursuant to Section 14(a) of the Exchange Act.

11.     The Proxy contained numerous materially misleading statements and omissions in an attempt to secure shareholder approval of the underpriced Transaction.   In particular, the Proxy—like the initial press release announcing the Merger—portrayed a robust arms-length negotiating process overseen by a purportedly "independent and disinterested" Special Committee who "did not have a material interest in any Potential Transaction that [was] different from, or in addition to, the interests of the public stockholders."  In addition, the Proxy assured shareholders that all other potential bidders "did not have either the interest in, or capability to acquire the Company on the terms and conditions offered by CD&R."  The Proxy further claimed that given the supposed "thorough" sale process, the Special Committee believed the Transaction was "fair to, and in the best interests of" the public shareholders, and the Board believed it represented the best way to create "value for the stockholders of the Company."

12.     The representations in the Proxy were false.  The Special Committee was not disinterested, as its members were conflicted by the significant non-ratable benefits they received. The sale process was not "thorough" as Goldman and Jefferies refused to adequately canvass strategic buyers, the strategic buyer who broke through the blockade was denied critical due diligence, and its higher-priced merger proposal went ignored.  The Transaction was not fair and did not present the best value for shareholders because the Special Committee knew that the myriad conflicts of interest, the non-ratable incentives, and the shoddy sale process caused Focus to obtain underpriced proposals, yet Defendants endorsed the deal anyway.

13.     On July 6, 2023, in a belated eleventh-hour attempt to cure some of the Proxy's substantial deficiencies, Defendants filed a Supplement to the Proxy ("Supplemental Proxy"), that disclosed the Special Committee members—which the Proxy had described as "independent and disinterested"—would each receive cash payments ranging from approximately $489,000 to approximately $703,000 as a result of the Transaction.  This was a far cry from the Proxy's representation that the Special Committee members "did not have a material interest in any Potential Transaction that [was] different from, or in addition to, the interests of the public stockholders."  Yet, the Supplemental Proxy did not retract or correct any of the Proxy's statements coining the Special Committee "disinterested" or claiming that its members' interests were fully aligned with Focus shareholders.  Importantly, the Supplemental Proxy was filed the week before the shareholder vote on the Transaction and just after the July Fourth holiday–denying shareholders sufficient time to digest the highly material information disclosed therein, which effectively discredited numerous of the most important representations made in the actual Proxy. Furthermore, this was not new information that could not have been disclosed in the Proxy.  It was highly-material information that was available to Defendants from day one, but held back until the eleventh hour because Defendants knew it would cast serious doubt on the Transaction and the process leading thereto.

14.     The Proxy's misstatements and failure to properly disclose all pertinent facts caused the Proxy to be materially false and misleading because that information would affect a reasonable shareholder's decision as to whether to vote in favor of the Merger.

15.     Plaintiff brings this action under Sections Section 10(b), 14(a) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5 and 14a-9 promulgated

thereunder by the SEC, 17 C.F.R. § 2401.10b-5 and 17 C.F.R. § 240.14a-9, to recover for materially false and misleading statements and omissions made by Defendants.

<u>**JURISDICTION AND VENUE**</u>

16.    The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5 and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 2401.10b-5 and 17 C.F.R. § 240.14a-9.  This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.    Personal jurisdiction exists over each Defendant either because: (i) the Defendant conducts business in or maintains operations in this District; or (ii) is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  At all relevant times, Focus Financial was incorporated in this District, and many of the acts and conduct that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in and from this District.

19.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.      Plaintiff

20.     Plaintiff Altshares Event-Driven ETF ("AltShares") is an exchange-traded investment fund organized under Delaware law.  AltShares is advised by its investment advisor Water Island Capital, LLC, a New York domiciled SEC registered entity.  AltShares held and was beneficial owner of Focus Financial common stock as of the Record Date for the Merger and was entitled to vote on the Merger, as set forth in the attached certification.  AltShares continued to hold Focus Financial common stock through the closing date of the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.  As set forth in the attached certification, AltShares also sold shares of Focus Financial common stock during the Class Period and was damaged thereby.

### B.      Defendants

#### 1.      Focus Financial

21.     Focus is a Delaware corporation with a principal place of business located at 875 Third Avenue, New York, N.Y. 10022.  Focus traded on the NASDAQ under the ticker symbol "FOCS" until the Transaction closed, after which it was delisted from the exchange.  Focus continues to exist as a subsidiary of CD&R.

#### 2.      The Special Committee Defendants

22.     George S. LeMieux was a Focus director at the time of the Transaction and was appointed Chairman of the Special Committee on November 1, 2022 through the closing of the Transaction.

23.     Elizabeth R. Neuhoff was a Focus director at the time of the Transaction and was also a member of the Special Committee through the closing of the Transaction.

24.     Greg S. Morganroth was a Focus director at the time of the Transaction and was also a member of the Special Committee through the closing of the Transaction.

25.     Joseph Feliciani, Jr. was a Focus director at the time of the Transaction and was also a member of the Special Committee through the closing of the Transaction.

26.     Defendants LeMieux, Neuhoff, Morganroth, and Feliciani are collectively referred to herein as the "Special Committee Defendants."

### 3.     The Other Board Defendants

27.     Ruediger Adolf was Chairman of the Focus Board and Company CEO at the time of the Transaction.  Mr. Adolf had been a Focus Board member since the Company's formation in 2015.

28.     Rajini Sundar Kodialam was a Focus Board member and Company COO at the time of the Transaction.

29.     James D. Carey was a member of the Focus Board at the time of the Transaction. Mr. Carey is the President of Stone Point and was a Managing Director of Stone Point at the time of the Transaction.  Mr. Carey was appointed to the Focus Board by Stone Point in 2018.

30.     Fayez S. Muhtadie was a  member of the Focus Board at the time of the Transaction. Mr. Muhtadie is a Managing Director of Stone Point and was appointed to the Focus Board by Stone Point in 2018.

31.     Defendants Adolf, Kodialam, Carey, and Muhtadie are collectively referred to herein as the "Board Defendants."

### 4.     The Officer Defendants

32.     James Shanahan was Focus's Chief Financial Officer ("CFO") at the time of the Transaction, a position he held since the Company's formation in 2015.

33.     Leonard Chang was a Senior Managing Director and Head of Mergers & Acquisitions at Focus at the time of the Transaction.

34.     J. Russell McGranahan was Focus's General Counsel and Corporate Secretary at the time of the Transaction, positions he held since the Company's formation in 2015.

35.     Defendants Shanahan, Chang, McGranahan, Adolf, and Kodialam are collectively referred to herein as the "Officer Defendants."

**C.     Relevant Non-Parties**

36.     CD&R is a Delaware limited liability private equity company headquartered in New York City.  CD&R was founded in 1978 and has approximately $58 billion in assets under management.  CD&R specializes in acquiring corporate divisions and family enterprises, as well as whole businesses from other private and public owners.

37.     Goldman is a New York limited liability company that served as a financial advisor to the Board and the Special Committee in connection with the Transaction.

38.     Jefferies is a Delaware limited liability company that served as a financial advisor to the Special Committee in connection with the Transaction.

39.     Stone Point is a private equity company that invests in the global financial services industry.  Stone Point also invests in alternative asset classes, including private equity through its Trident Funds.  At the time of the Transaction, Stone Point was Focus's largest stockholder and owned approximately 20.6% of the voting power in the Company's outstanding Class A and Class B common stock.

**SUBSTANTIVE ALLEGATIONS**

**I.     BACKGROUND OF FOCUS AND STONE POINT'S SIGNIFICANT INFLUENCE OVER THE COMPANY**

40.     Focus is headquartered in New York City and has ownership interests in over 85

independent wealth management firms that provide investment and financial services to high and ultra-high net worth individuals and families.  Most of Focus's partner firms are registered with the SEC under the Investment Advisors Act of 1940.  On July 26, 2018, Focus went public through an initial public offering ("IPO"), and its Class A common stock began trading on the NASDAQ under ticker symbol "FOCS."

41.     After the Company's IPO, Focus was controlled by Stone Point, who had control of 20.6% of Focus's shareholder voting power.  Indeed, Focus acknowledged in its 2022 Annual Report on Form 10-K filed with the SEC on February 16, 2023 that Stone Point's significant stock ownership allowed Stone Point "to strongly influence all matters requiring shareholder approval, regardless of whether or not other shareholders believe that a potential transaction is in their own best interests."

42.     Pursuant to a Nominating Agreement executed in connection with the IPO, Stone Point placed Defendants Carey and Muhtadie, two of Stone Point's Managing Directors, on Focus's eight member Board, with Muhtadie as the purported "lead independent director" at Focus.

43.     Stone Point also controlled all significant compensation decisions over Focus's management.  Defendants Carey and Muhtadie made up two-thirds of Focus's Compensation Committee, with Defendant LeMieux as the final member.  As the Company described in its April 14, 2022 proxy statement, the "Compensation Committee oversees our executive compensation and employee benefit programs, and reviews and approves *all compensation decisions* relating to our NEOs [Named Executive Officers]."  The Compensation Committee also "approve[d] the amount of [Focus's] annual incentive cash pool, and any and all awards to [the Company's] NEOs from this pool."  Thus, Stone Points's ability to control compensation over key employees—

including Focus's CEO and COO who also sat on Focus's Board—gave Stone Point direct control over at least four of the eight Focus Board members and outsized control over Company management.

44.     In addition to its large equity investment in Focus, Stone Point had a keen interest in the sale of Focus because Stone Point—along with the Officer Defendants and all members of Focus's Board other than Messrs. Muhtadie and Carey—had the right to receive significant payments under Tax Receivable Agreements ("TRAs") previously executed with the Company. In 2018 and 2020, Focus entered into three separate TRAs with Stone Point-affiliated funds and other parties (the "TRA Holders").  The TRAs provide for the payment by Focus to each TRA Holder of 85% of the net cash savings in a given year in U.S. federal, state, and local income and franchise tax that the Company realized, or was deemed to realize, with Focus retaining the remaining 15% of the cash savings.  In Focus's 2022 Form 10-K, the Company indicated that it expected future payments to the TRA Holders to be $224.6 million in the aggregate.

45.     Importantly, the TRAs provided that if Focus were sold, the TRA Holders would be entitled to an "Early Termination Payment" calculated by using the present value of future tax savings payable under the TRAs.  This present value was calculated by using a discount rate of one-year LIBOR plus 150 basis points (*i.e.*, 1.5%), defined as the "Early Termination Rate" under the TRAs.  The application of a lower discount rate to measure the present value of the Company's future tax savings resulted in significant additional payments under the TRAs.  Furthermore, in a change of control transaction involving Focus, the Company's payment obligations under the TRAs would accelerate and become payable in a lump-sum payment due at the time of the transaction.

46.     As detailed further below, the TRA Payments to Stone Point, the Special Committee Defendants, and Officer Defendants undermined the sale process by further incentivizing these parties to push for the Transaction in order to receive the increased and accelerated lump-sum payments under the TRAs.

## II.     BACKGROUND OF THE TRANSACTION

47.     In the summer of 2022, Focus's Board determined to pursue potential strategic options for the Company, including a potential sale.  At all relevant times, however, the sale process was plagued by the conflicted personal interests of Stone Point—who controlled at least half the Board—Focus's management, and the Special Committee.  The process was also undermined by conflicted financial advisors, who were more concerned with protecting their lucrative and long-term clients, CD&R and Stone Point, than with maximizing value for Focus shareholders.

48.     At the outset of the process, the Board and its favored financial advisor, Goldman Sachs, were determined to pursue only private equity buyers and shunned the idea of selling Focus to a strategic partner.  CD&R, a loyal Goldman client, quickly materialized as a potential candidate, which pleased Stone Point and Company management, as a financial buyer meant they would likely be able to negotiate the ability to roll over equity into the post-Transaction Company.  The Board and management negotiated with CD&R for months despite the fact that they were obviously conflicted in consummating a merger due to their equity aspirations, the TRA Payments, and because each Board member and Officer Defendant would receive significant payments via an acceleration of unvested equity awards through a merger.

49.     To attempt to rectify the tainted process, the Board created the purportedly independent and disinterested Special Committee, but its members were subject to the exact same

conflicts, as they were also promised significant TRA Payments and accelerated equity awards through the Transaction.  The Special Committee then retained Jefferies who, like Goldman, was conflicted by its substantial prior work for both CD&R and Stone Point, and who, like Goldman, ran a subpar sale process that only contacted a *single* strategic buyer.  The Special Committee also attempted damage control by asking Stone Point and Focus management to waive their TRA Payments, to no avail.

50.     Eventually, CD&R submitted a bid for $53 per share for Focus.  Despite the uphill battle, a strategic bidder still came through with an offer of $55 per share—$2 per share higher than CD&R's price.  The Special Committee nevertheless accepted CD&R's inferior bid because CD&R allowed Stone Point and Focus management to roll over their equity in Focus while allowing the Special Committee to receive their non-ratable benefits from the Merger.

**A.     The Key Participants in the Transaction Process Harbored Significant Conflicts of Interest Inclining Them to Favor a Sale of Focus to a Private Equity Buyer**

**1.     Stone Point's Conflicts of Interest**

51.     Stone Point's interests were not aligned with the Company's unaffiliated public stockholders.  As a private equity firm with a significant investment in Focus, Stone Point recognized that Focus was undervalued and would be more valuable as a private entity.

52.     Focus's insiders knew the Company could realize greater value as a private entity by increasing its leverage ratio—an option that would be unavailable to Focus as a publicly traded company.  The Proxy states that the Company projections of November 28, 2022—prepared by management and shared with the Special Committee, Stone Point, and CD&R—included two scenarios: one which assumed a more substantial amount of merger and acquisition activity with a target net leverage ratio of approximately 4.25x in the projection years, and a second set assuming

fewer mergers, ultimately yielding a net leverage ratio of less than 4.25x.  Company management

determined that operating as a public company with a net leverage ratio of approximately 4.25x in

the long term was not feasible.  Thus, going private allowed the Company to increase its leverage,

engage in more mergers, and outperform a similarly situated public company.  The forecasts below

compare the projected performance of Focus as a private company versus as a public company:

| | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|
| Forecasts with 4.25x leverage (*i.e.* private company) (Adjusted EBITDA in millions) | $628 | $792 | $1,020 | $1,339 | $1,741 |
| Forecasts with lower leverage (*i.e.* public company) | $614 | $778 | $1,013 | $1,279 | $1,579 |
| Difference | $14 | $14 | $7 | $60 | $162 |

53.     Stone Point and Company management understood the upside of the post-

Transaction Company and thus sought to retain an ownership interest in the Company by rolling

over their equity.  Stone Point knew that if Focus agreed to be acquired by a strategic buyer, this

option would almost certainly not be made available.  Accordingly, Stone Point supported the deal

with CD&R.  In return for agreeing to support the Merger, Stone Point entered into a Support

Agreement with CD&R, whereby Stone Point could roll over a portion of their investment in Focus

and provide new equity financing for the Transaction, which would allow Stone Point to "maintain

an interest in the potential future earnings, growth or value realized by the Company" after the

Transaction.  Proxy at 99.  This rollover option was not available to the other public stockholders,

who would be cashed out as a result of the Transaction.

54.     Stone Point also uniquely benefited from the Transaction's treatment of the TRAs.

Under the terms of the TRAs, a "Change of Control" (which included the Transaction) would

result in a lump-sum payment generally equal to the present value of hypothetical future payments

that would be made by the Company for certain tax benefits.  In connection with the Transaction, Stone Point and certain members of the Company's senior leadership team entered into TRA Waiver and Exchange Agreements ("TRA Waiver Agreements"), whereby these parties agreed to receive their portion of the TRA Payments in the form of a promissory note at closing of the Transaction (the "TRA Note"), with a principal amount equal to their respective portion of the TRA Payments they were otherwise entitled to receive in cash at the closing of the Transaction. The TRA Note matures on September 30, 2028 and accrues interest at the highly favorable rate of 8% per annum, with the interest payable on each three month anniversary of the closing and 25% of the original principal amount due on each anniversary of the closing.

55.      It is estimated that Stone Point will receive approximately $90,265,728 as a result of entering into the TRA Waiver Agreements.

### 2.      Management's Conflicts of Interest

56.      Like Stone Point, the Company's senior executives received unique benefits from the Transaction that were not shared by the unaffiliated public stockholders.  By entering into the deal with CD&R, a private equity firm that would likely continue to employ existing management, these executives did not risk the employment uncertainty that would accompany an acquisition by a strategic buyer, who may be inclined to terminate management in favor of their own existing leadership.

57.      Similar to Stone Point, Focus CEO Adolf and COO Kodialam are parties to TRAs with the Company.  As a result of entering into the TRA Waiver Agreements in connection with the Transaction, Adolf is expected to receive approximately $33,548,882, and Kodialam is expected to receive $16,546,182.

58.     The Transaction also caused the acceleration of unvested equity awards previously provided to Company management.  Through a merger, Adolf and Kodialam were set to receive significant cash payments for their unvested Common Units and Incentive Units.  As a result of the acceleration of these unvested units, Adolf will receive $16,441,483, and Kodialam will receive $12,241,887.  The chart below summarizes the total unique benefits these executives will receive as a result of the Transaction:

| Officer/Director | TRA Payments | Accelerated Unvested Units | Total Unique Proceeds from Transaction |
|------------------|--------------|----------------------------|----------------------------------------|
| Adolf | $33,548,882.00 | $16,441,483.00 | $49,990,365.00 |
| Kodialam | $16,546,182.00 | $12,241,887.00 | $28,788,069.00 |

59.     Additionally, all of Focus's senior management team are beholden to Stone Point. As noted, Stone Point had the right to appoint two directors to the Board, and appointed its President, Carey, and Managing Director Muhtadie.  Carey and Muhtadie comprise two of the three members of the Compensation Committee of the Board, with Muhtadie serving as Chair. With Stone Point's Board appointees having voting command over compensation matters, Stone Point wielded significant power over Focus's Board and management, specifically the CEO and COO—who were fellow Board members.

### 3.     The Board Defendants' Conflicts of Interest

#### (a)     Non-Special Committee Directors

60.     As noted above, Defendants Adolf and Kodialam will receive massive payments from the TRA Waiver Agreements and accelerated unvested units in connection with the Transaction.  Further, Adolf and Kodialam are beholden to Stone Point, the Company's largest investor, based on the compensation they have received in past years as officers of the Company.

17

61.     In addition, Directors Carey and Muhtadie are senior executives at Stone Point. Stone Point is rolling over equity in the Company and will receive approximately $90,265,728 in payments associated with the TRA, and Carey and Muhtadie will benefit indirectly from those payments.

### (b)     Special Committee Directors

62.     Though depicted as independent and disinterested in the Proxy, the members of the Special Committee stood to receive substantial payments in connection with a sale of Focus.  The Proxy represented that the Special Committee was formed because "certain directors of the Company may be deemed to have material interests in a potential take private transaction with CD&R that were different from, or in addition to, the interests of the public holders of Class A Common Stock."  Notably, none of the four Special Committee members—LeMieux, Neuhoff, Morganroth, and Feiliciani—held *any* Focus Class A common stock.  This is highly unusual for directors of a publicly traded company and demonstrates that these directors had no interests that were aligned with those of Focus's unaffiliated public stockholders.

63.     The Supplemental Proxy discloses that the members of the Special Committee are estimated to receive TRA Payments as follows: (i) Feliciani: $255,522; (ii) Morganroth: $183,307; (iii) LeMieux: $79,375; and (iv) Neuhoff: $79,375.  While the Proxy described these amounts as "not material" for purposes of confirming the Special Committee members' purported independence and disinterestedness, that characterization is not credible given the sums involved. According to the minutes from a November 10, 2022 Special Committee meeting, the Special Committee Members "affirmed that [the TRA] payments would represent less than *five percent* of such member's *overall net worth*."  November 10, 2022 Special Committee Meeting Minutes, at FOCAP00000083.  The Special Committee members did not affirm that these payments were insignificant as compared to their annual *income*.  Nor did they claim the TRA Payments were

minuscule as compared to their overall finances (*e.g.*, less than 1% of their net worth).  Instead, relying on the Directors' own say-so, the Company concluded that these payments were immaterial because they were not more than 5% of the Special Committee member's entire fortune.

64.     Based on the 5% figure used by the Company—the only substantive information provided about the Special Committee Defendants' finances—it is inferable that LeMieux and Neuhoff have a net worth of approximately $1.6 million, Morganroth's net worth is approximately $3.7 million, and Feliciani's net worth is approximately $5.2 million.  TRA Payments ranging from $73,000 to $255,000 were material, as all indications were that these Directors were not fabulously wealthy.  If these sums were truly immaterial to these Directors, they could have waived them, just as the Special Committee had asked of Stone Point and Company management, and thereby eliminated any potential appearance of a conflict.  In the real world, however, nobody would decline to accept payments that are worth up to 5% of their overall net worth, demonstrating the materiality of these payments.  Indeed, it is easy to see how payments of this size could influence a director's decision-making.  They created a classic conflict of interest.

65.     In addition, the Supplemental Proxy discloses that the members of the Special Committee are estimated to receive cash payments for unvested equity awards as follows: (i) Feliciani: $295,183; (ii) Morganroth: $520,383; (iii) LeMieux: $410,092; and (iv) Neuhoff: $410,092.  The chart below summarizes the total unique benefits these Directors will receive as a result of the Transaction:

| Special Committee Member | TRA Payments | Accelerated Unvested Units | Total Unique Proceeds from Transaction |
|---|---|---|---|
| LeMieux | $79,375.00 | $410,092.00 | $489,467.00 |
| Neuhoff | $79,375.00 | $410,092.00 | $489,467.00 |
| Morganroth | $183,307.00 | $520,383.00 | $703,690.00 |
| Feliciani | $255,522.00 | $295,183.00 | $550,705.00 |

66.     Thus, between the TRA Payments and the acceleration of unvested equity awards, each of the Special Committee members received cash payments from the Transaction that ranged from $489,000 to $703,000.  To put this in perspective, the payments from the Transaction alone provided each Special Committee member with income that would rank in the top 1% of all single earners in 2023 in the entire United States.[2]

### 4.     Goldman Sachs' Conflicts of Interest

67.     Goldman's conflicts of interest with respect to the Transaction are on an order of magnitude greater than those faced by a financial advisor in a typical corporate transaction.  As a preliminary matter, Stone Point has deep and longstanding ties to Goldman.  The Proxy identified the owners of the five Stone Point-affiliated single member limited liability companies that own the investments in Focus, each of whom have strong ties to Goldman:

- *Charles Davis*.  Davis is the CEO of Stone Point.  He spent 23 years at Goldman, where he served as Head of Investment Banking Services Worldwide, as Co-Head of Americas Group, as Head of Financial Services Industry Group, and as a Member of the International Executive Committee.

---

[2] *See* Who Are the Top One Percent by Income or Net Worth in 2023? - DQYDJ

- *Stephen Friedman*.  Friedman is the Senior Chairman at Stone Point.  He spent almost 30 years at Goldman, where he served as Chairman and CEO.

- *James Carey*.  Carey is President of Stone Point and serves on the Board of Focus. Carey has been a longtime director of Stone Point portfolio company Enstar. Affiliates of Goldman Sachs acquired a 19.9% stake in Enstar in 2011, later selling their stake in 2016.

- *David Wermuth*.  Wermuth is Chief Operating Officer of Stone Point.  He was formerly a corporate attorney with Cleary, Gottlieb, Steen & Hamilton LLP, which counts Goldman as a client.

- *Nicolas Zerbib*.  Zerbib is Stone Point's Chief Investment Officer.  Zerbib formerly worked for Goldman.

68.     In the two years prior to February 27, 2023, Goldman received compensation of approximately $48 million for financial advisory and/or underwriting services provided to Stone Point and/or its affiliates and portfolio companies.

69.     Additionally, in the two years prior to February 27, 2023, Goldman was retained by CD&R and/or its affiliates and portfolio companies for at least eight different financial advisory and/or underwriting engagements.  In return, Goldman received compensation of approximately *$114 million*.  This amount dwarfs the $5 million Goldman had received from Focus and/or its affiliates in the same two-year period for financial advisory and/or underwriting services.  This disparity raises questions as to whether Focus's stockholders could have relied upon Goldman to squeeze every last penny from CD&R, as Goldman will surely be seeking further lucrative engagements from CD&R in the future.

70.     Moreover, Goldman's fee for advising Focus in the Merger was highly contingent on the consummation of the Transaction.  All but $2 million of the $25.4 million fee was contingent on the consummation of the Transaction, and Goldman may also be entitled to a discretionary fee of up to $6.9 million payable at the Special Committee's discretion.  This arrangement incentivized Goldman to recommend in favor of the Transaction over other valid strategic options, including a standalone strategy, and to push for a bidder that would close the deal regardless of whether the price was fair to Focus stockholders.

71.     Goldman was also conflicted in Focus's sale process because it was already acting as a financial advisor for the sale of Focus's subsidiary NKSFB, along with third-party management company KSFB Management LLC ("KSFB").  This blatant conflict caused Goldman to exclude potential credible bidders from the Focus sale process.

72.     In 2018, KSFB predecessor Nigro Karlin Segal Feldstein & Bolno LLC and its principals sold the assets of their business management firm to Focus, who held the assets via a Delaware entity named NKSFB LLC.  At the same time, the principals of Nigro Karlin Segal Feldstein & Bolno LLC formed management company KSFB to provide management services to NKSFB for a fee based on NKSFB's profits.

73.     In mid-2022, Focus and KSFB contemplated a sale of both NKSFB and KSFB. Focus pushed for KSFB to hire Focus's favorite investment banker—Goldman—to represent KSFB's interests in the deal.  KSFB was initially resistant to hiring Goldman based on the potential for a conflict of interest.  But, based on the assurances of Goldman and Focus that no conflict would arise, KSFB agreed to retain Goldman in September 2022.  The parties agreed that Goldman would "advise and assist [both Focus and KSFB jointly] with respect to" the sale of NKSFB and KSFB, and they executed a non-disclosure agreement prohibiting the use of any information the

parties received for anything other than their efforts to finalize the sale of the NKSFB business. The agreement also required complete transparency among the parties, so that each of the parties would know what the other was doing with respect to the proposed transaction.

74.     Instead of honoring the terms of the joint agreement, Goldman secretly worked with Focus on its parallel sale process, which included the sale of Focus's wholly-owned NKSFB subsidiary.  The potential sale of Focus negatively impacted the attractiveness of KSFB as an acquisition target and was a breach of Goldman's financial advisory contract with KSFB.

75.     In addition, the NKSFB sale process directly affected the potential sale of Focus. The NKSFB process involved a broad market canvas, with Focus, Goldman, and NKSFB identifying over two dozen potential buyers.  At the same time, Goldman and Focus were working together to sell Focus.  Because Goldman did not want to tip-off KSFB that it was also selling Focus, the Focus canvas involved a narrower outreach to potential buyers.  This limited the universe of potential bidders for Focus, artificially suppressing the sale process for the Company. After the Merger with CD&R was announced, the NKSFB sale process collapsed, and KSFB sued Goldman in March 2023.[3]

### 5.     Jefferies' Conflicts of Interest

76.     The Special Committee belatedly recognized that Goldman was conflicted, as Goldman was beholden to Stone Point (and therefore the Board) and CD&R, and because Goldman was simultaneously conducting the NKSFB sale process which constrained Goldman's bidder outreach for Focus.  As a result, in November 2023, the Special Committee considered retaining a

---

[3] *See KSFB Management LLC, et al., v. Focus Financial Partners LLC; and Goldman Sachs & Co. LLC*, No. 23STCV06825 (California Superior Court, Los Angeles County).

second financial advisor to "chaperone Goldman Sachs." November 10, 2022 Special Committee

Meeting Minutes, at FOCAP00000084.

77.     On December 17, 2022, almost six months into the sale process, the Special

Committee decided to retain Jefferies. Like Goldman, Jefferies was also conflicted because it

previously received significant fees from both CD&R and Stone Point. In the two years prior to

February 2023, Jefferies received $18.4 million in fees from CD&R and $3.7 million in fees from

Stone Point. Proxy at 84.

78.     Under its agreement with the Special Committee, Jefferies received $4.5 million

for its work on the Transaction, and possibly received an additional $8 million as a discretionary

reward from the Special Committee, for a total of $12.5 million.

**B.      Consistent With Their Conflicts of Interest, Focus's Directors Negotiated and Approved a Sale to CD&R on Unfair Terms**

79.     The significant conflicts of interest held by the Focus Financial Board, Special

Committee, and Company management infected the sale process and resulted in a Proxy that

contained material misrepresentations and omissions of material fact concerning the Transaction.

**1.      Focus's Directors Prematurely Homed in On a Deal With CD&R Without Adequately Canvassing the Market of Potential Buyers**

80.     As is now evident from the internal Focus documents produced to Plaintiff, the

Company's Board zeroed in on a transaction with CD&R without adequately considering the full

scope of potential acquirors. The Board and Special Committee acquiesced, despite learning that

at least one strategic acquiror ("Party I") conveyed its serious interest in a transaction directly to

Focus CEO, Defendant Adolf.

81.     As early as June 16, 2022, Mr. Adolf met with representatives of CD&R as part of

the Company's initial outreach on a potential transaction. At the meeting, the CD&R

representatives expressed an interest in potentially acquiring Focus. From that point on, neither

24

the Board nor the Special Committee were interested in canvassing the broader market to find strategic buyers willing to pay for Focus.

82.     Indeed, the Company's Board met on June 30, 2022, together with representatives of Goldman to discuss a possible merger transaction and did not discuss even a single potential strategic buyer.  Prior to the meeting, Goldman circulated presentation materials that provided its preliminary analysis of a potential sale process for Focus, including its initial evaluation of CD&R and two other private equity firms as potential acquirors.  Goldman Sachs Presentation to Focus Financial Board dated June 30, 2022, at FOCAP00001070-72.  The presentation materials did not address or evaluate any companies in the wealth management industry as a potential strategic acquiror of Focus.  The Board decided at this meeting that Focus would shun potential strategic acquirors for the Company, and concentrated on potential financial sponsors who could acquire Focus, such as CD&R.

83.     Defendants' failure to adequately consider or approach strategic acquirors continued throughout the sale process.  From July through December 2022, the Board and Special Committee excluded consideration of strategic acquirors as potential merger partners.  In many instances, this was because Company management, Goldman, and Jefferies discouraged consideration of strategic acquirors by the Special Committee and Board.

84.     For example, during a Special Committee meeting on December 14, 2022, Goldman Sachs representative Patrick Fels noted that "***Goldman Sachs did not believe that there was a logical strategic purchaser of the Company***."  December 14, 2022 Special Committee Meeting Minutes, at FOCAP00000003.

85.     Yet, Goldman Sachs was aware that the CEO of a strategic acquiror had been in contact with Defendant Adolf and expressed a concrete interest in merging with Focus.  Upon

information and belief, this strategic acquiror was "Party I" referenced in the Proxy.  The Special Committee only learned about Party I's prior outreach during its meeting on December 28, 2022— after negotiations with CD&R were significantly advanced.

86.    According to the minutes of the December 28 Special Committee meeting, Jeff Haller of Goldman Sachs revealed that "Ruediger Adolf, Chief Executive Officer of the Company, had *previously met* with [redacted] chief executive officer and that [redacted] **had *previously expressed an interest in engaging in a transformative transaction***."  December 28, 2022 Special Committee Meeting Minutes, at FOCAP00001642.  The Goldman and Jefferies slides presented at this meeting further stated under a heading titled "*New Strategics* (Sponsor-Owned)":  "CEO, [redacted] was recently introduced to Rudy ***and has been positioning firm for a transformative opportunity***."  *Id*. at FOCAP00001648.  The fact that this earlier meeting was concealed from the Special Committee indicates that both Goldman and Defendant Adolf wanted to steer the Committee away from consideration of strategic acquirors.  The Proxy wholly omitted these details from its description of the December 28 Special Committee meeting.

87.    The Proxy further failed to disclose that Goldman Sachs and Jefferies continued to discourage the Special Committee's consideration of strategic acquirors as the sale process progressed into January 2023.

88.    For example, at a Special Committee meeting on January 4, 2023, Matthias Kristol of Jefferies discouraged consideration of an alternate bidder believed to be the strategic acquiror Party I.  Mr. Kristol warned that the Committee should be:

> ***cautious with respect to a potential bid from [redacted]*** as [redacted] would need to engage in a significant amount of due diligence work to be in the same position as CD&R, that [redacted] likely had significant financing considerations that it would need to address in any potential acquisition of the Company and that there were additional issues, such as who would manage the pro forma

> entity, that would need to be addressed as part of any agreement reached with [redacted] in respect of a potential acquisition of the Company.

January 4, 2023 Special Committee Meeting Minutes, at FOCAP00001584.

89.    At a Special Committee meeting on January 6, 2023, Mr. Kristol of Jefferies further reported that "Company management's meeting with [redacted], *a strategic competitor* of the Company, had gone well *but that such a transaction would face significant complexity*."  January 6, 2023 Special Committee Meeting Minutes, at FOCAP00001626.

90.    Similarly, at a Special Committee meeting on January 11, 2023, Mr. Fels of Goldman Sachs further discouraged the Committee's consideration of a bid from Party I by warning "that a potential combination involving the Company and [Party I] "*presented a number of significant execution risks*."  January 11, 2023 Special Committee Meeting Minutes, at FOCAP00001531.  This concerted effort against strategic acquirors—even one that was eager and able to negotiate for a merger, tainted the entire sale process.

91.    In addition, Goldman Sachs's very engagement as a financial advisor to the Special Committee served to artificially limit the pool of potential acquirors presented to Focus for consideration.  As noted above, Goldman was concurrently representing Focus and NKSFB in a parallel sale processes that involved many potential bidders for Focus in its entirety.  Patrick Fels, Goldman's lead banker on the engagement team for Focus also led Goldman's engagement team for the NKSFB sale process.

92.    Multiple potential bidders who were contacted in the NKSFB sale process were *not* contacted by Goldman in the initial Focus sale process.  Instead, these promising and relevant bidders were only contacted by Goldman during Focus's "go-shop" period, *after* the CD&R Merger had been announced and the NKSFB sale process had collapsed.

93.     Goldman likely withheld these potential bidders from Focus's Special Committee either because it was incentivized to earn substantial advisory fees upon the sale of both Focus and NKSFB, or because it wanted to keep the Focus sale process secret from KSFB.  Either way, Goldman's concurrent engagement in the parallel sale processes caused an artificial contraction of the Focus sale process and resulted in fewer potential merger partners and the possibility of a resulting bidding war.

94.     While the Proxy makes a passing reference to the NKSFB lawsuit, it wholly omits any of the above facts that further demonstrate the Focus Board and Special Committee were presented with a more limited pool of counterparties for a potential transaction than was actually available.

### 2.     Focus's Directors Unduly Favored CD&R over Party I and Other Potential Buyers, Even After Party I Offered Higher Consideration

95.     In contrast to a strategic acquiror such as Party I, the Focus Board plainly favored CD&R from the inception of the sale process by providing CD&R with extensive due diligence, meetings with management and Stone Point, and exclusivity.

96.     During July and August 2022, senior members of the Company held introductory meetings with CD&R and four other financial sponsor firms, but the Board contacted no strategic acquirors during this period.  On September 14, 2022, CD&R made a non-binding offer to acquire Focus for $50 per share, subject to continued due diligence and the negotiation of definitive transaction documents.  Letter from CD&R to Goldman Sachs dated September 14, 2022, at FOCAP00002151.  In consultation with Goldman, the Board decided on September 21, 2022, to reject CD&R's $50 per share bid as inadequate, but authorized Company management to provide CD&R additional due diligence on a potential transaction.  On September 30, 2022, CD&R representatives were provided access to a virtual data room to review additional non-public

information concerning Focus, including management's long-term financial forecasts from September 27, 2022.

97.     In addition to its data room access, CD&R representatives met in person with members of Focus management for a full-day due diligence meeting on October 6, 2022. Additional due diligence meetings between Focus Financial management and CD&R representatives were held between October 17 and 20, 2022.  Notably, these meetings, and the extensive due diligence provided to CD&R all occurred before the Special Committee's November 1, 2022 formation.

98.     In total, CD&R had at least eleven separate meetings with members of the Focus management team and representatives of Goldman and Jefferies during the sale process.  CD&R also had three meetings with Stone Point to discuss a transaction and Stone Point's equity rollover in a post-Transaction company.  There is no indication that the Board or Special Committee allowed bidders other than CD&R to have a similar level of merger-related discussions with Stone Point, Focus's largest shareholder.

99.     The preferential treatment Defendants showed CD&R continued even after Party I sent Goldman and Jefferies an offer letter on January 17, 2023 that proposed an acquisition price of $51.75 per share, which was higher than CD&R's "best and final" offer on January 5, 2023 of $51.50 per share.  Party I's offer letter further assured Defendants that it was "very interested in a partnership with Focus and [was] prepared to move quickly with our confirmatory due diligence." Letter from Party I to Goldman Sachs and Jefferies dated January 17, 2023, at FOCAP00002158. Goldman and Jefferies presented their evaluation of the competing bids of CD&R and Party I at a Special Committee meeting on January 19, 2023.  Despite offering higher per share consideration, Goldman and Jefferies recommended that a "Key Message[]" to Party I was that its $51.75 per

share proposal was "*not compelling enough* relative to alternatives."  January 19, 2023 Special Committee Meeting Minutes, at FOCAP00001570.

100.    During a Special Committee meeting on January 21, 2023, Mark Morton, an attorney with the Special Committee's outside legal counsel at Potter Anderson & Carroon LLP, noted in discussions concerning Party I's bid that "a strategic buyer may be able to offer more value in a potential acquisition transaction given the availability of synergies."  January 21, 2023 Special Committee Meeting Minutes, at FOCAP00001574.  Nonetheless, the Special Committee withheld additional Focus due diligence information from Party I and agreed to only provide such due diligence and entertain additional transaction discussions with Party I if it submitted a proposal at $55 per share.

101.    Defendants imposed hurdles for Party I even after Party I acquiesced on January 22 and offered the Special Committee $55 per share, contingent on additional due diligence, obtaining financing, and receiving exclusivity from Focus.  Despite meeting the Special Committee's price demand, Mr. Fels of Goldman stated at a Special Committee meeting held on January 28, 2023, that Party I "**had a credible pathway** to executing on a Potential Transaction at a price per share of $55.00 in cash but that there was a **low probability** that [Party I] would be able to execute on a Potential Transaction at that price," and that in Goldman's opinion Party I had "'a long way to go'" to arrange financing for a transaction with Focus.  January 28, 2023 Special Committee Meeting Minutes, at FOCAP00001089.  To cast further doubt on the legitimacy of Party I's superior bid, Mr. Fels speculated that Party I had verbally proposed a $55 per share merger price only "because it was the number that the Committee had conveyed that [Party I] would need to offer to move forward with the process." *Id*.  Rather than test these assumptions about Party I's proposal, which offered Focus shareholders greater per share consideration and which Goldman

acknowledged had a "credible pathway" to execution, the Special Committee denied exclusivity to Party I.

102.    Instead, the Special Committee decided to grant CD&R exclusivity the following day at a meeting on January 29, 2023.  Focus Financial and CD&R executed an exclusivity agreement on January 30, 2023, which ran through February 20, 2023 and was later extended to February 26, 2023 – effectively freezing out Party I from meaningful participation in the remainder of the sale process despite its expressed interest in doing so at a higher price.

### 3.    Defendants Favored The Transaction Given the Enormous TRA Payments Triggered by a Change of Control

103.    Defendants and Stone Point favored a merger given the lucrative TRA Payments they would not otherwise receive if Focus remained a standalone company.

104.    Presentation materials prepared in response to CD&R's offer of $51.50 and circulated to the Special Committee by Goldman and Jefferies at a meeting on January 11, 2023 indicated that "the additional TRA obligation in a change of control scenario would be approximately ***$161 mm*** (assuming full payout)."   January 11, 2023 Special Committee Meeting Minutes, at FOCAP00001540-41.  By contrast,  Goldman and Jefferies calculated that the present value of the existing TRA Payments due to Stone Point and the Officer Defendants without a change in control transaction would be approximately $36.6 million.  *Id*. at FOCAP00001544. This substantial windfall would benefit Stone Point, the Special Committee, the Board, and the Officer Defendants and provided a clear incentive for them to push for an acquisition of Focus rather than remain as a standalone company.

105.    Goldman and Jefferies further informed the Special Committee at the January 11 meeting how potential waivers of the TRAs could increase the purchase price for Focus.  For example,  a "100% cancellation of the [TRAs] reduces [the] TRA payout [to Stone Point and the

Officer Defendants] by ~$160 mm, which represents *$1.85* per [Focus] share." *Id*. at FOCAP00001545. The cancellation of just their payout under the change of control provision "reduces [the] TRA payout by ~$123 million, which represents *$1.42 per share*." *Id*. The Special Committee appreciated that those amounts could be passed on to public shareholders who were not TRA Holders, such as Plaintiff, in the form of higher consideration from CD&R or another acquiror. For this reason, the Goldman and Jefferies presentation made clear that a "TRA paid out in full: [was] most friendly to TRA holders; *least friendly to public shareholders*," and that "[n]egotiating a full or partial cancellation of the TRA – [was] *most shareholder friendly*." *Id*. at FOCAP00001544.

106.    Despite this knowledge, *none* of the Special Committee Defendants agreed to waive their own TRA Payments for the sake of public shareholders. Instead, they opted to receive their lucrative TRA Payments in cash at the close of the CD&R Merger. Stone Point and the Officer Defendants also refused to forego their enormous TRA Payments to support higher Merger Consideration for Focus stockholders. Instead, they merely deferred the receipt of their TRA Payments under the separately executed TRA Waiver Agreements, which actually further harmed shareholders. Under these agreements, Stone Point and the Officer Defendants received promissory notes (the "TRA Notes") that will mature in 2028 and accrue 8% interest per year (with 25% of the original principal to be paid each year), thereby only *increasing* the amounts payable to Stone Point and the Officer Defendants in lieu of a higher Merger Consideration to Focus shareholders in the Transaction.

### 4.    The Final Merger Terms Were Unfair to Focus's Unaffiliated Stockholders

107.    The $53 per share in Merger Consideration paid to unaffiliated Focus shareholders was inadequate. As an initial matter, Party I was prepared to pay $55 per share under certain

standard conditions in merger transactions (*i.e.*, additional due diligence on Focus, exclusivity in deal negotiations, and obtaining appropriate financing).

108.    Rather than explore Party I's higher bid further, Defendants executed an exclusivity agreement with CD&R and agreed to $2 less per share for Focus shareholders.  The undisclosed conflicts of interest created by (a) Stone Point's desire to obtain a lucrative equity rollover with a private equity firm like CD&R unavailable to other shareholders, (b) Goldman's desire to maintain its profitable pipeline of engagements with CD&R and Stone Point, and (c) the desire of the Special Committee, Stone Point and the Officer Defendants to reap their substantial accelerated TRA Payments and unvested equity awards in the Merger undermined Party I's higher bid.

109.    Other factors demonstrate the inadequacy of the Merger Consideration of $53. Focus's stock price had experienced a steady increase during the course of the Transaction's negotiations.  Between May 11, 2022, when the Board initiated a review of potential strategic opportunities, and February 24, 2023, the last trading day before announcement of the Transaction, the Company's stock price increased from $34.18 per share to $50.20 per share.  Even with this significant rise, the Special Committee believed the stock price was undervalued, and concluded at a January 4, 2023 meeting that the "Company's public valuation did not reflect the intrinsic value of the Company."  Proxy at 36.  Furthermore, the Merger Consideration was less than the Company's stock price high from just one year prior.  Indeed, Focus's  share price closed at $54.20 on February 16, 2022, just a year before the Transaction was announced.

110.    The RIABiz journal that provides in-depth coverage of the registered investment advisory industry concluded that the sum of Focus's aggregate wealth advisory partnerships was worth significantly more value than that provided by the Transaction.  In an article published February 2, 2023, just after the exclusivity agreement with CD&R was announced, RIABiz

estimated that Focus's breakup value was $10 billion compared to the $6 billion valuation under the Transaction.

111.    This market information provides a further indication that the Transaction's terms and the $53 per share in Merger Consideration paid to Focus shareholders was inadequate.

### C.    Defendants Announce the Merger and Issue a Materially False and Misleading Proxy Statement to Focus Stockholders

112.    On February 27, 2023, Focus issued a press release announcing that it had entered into a definitive agreement to be acquired by CD&R.  The press release raved that the Transaction would deliver "substantial value to Focus' stockholders, who will receive $53 in cash per share, representing an approximately 36% premium to Focus' 60-day volume weighted average price as of the close on February 1, 2023 (the day prior to public announcement of the potential transaction). . ."  The press release further explained that "[f]unds managed by Stone Point agreed to retain a portion of their investment in Focus and to provide new equity financing as part of the proposed transaction."   In touting the Transaction, the Focus press release also claimed the "transaction results from a robust process conducted by a Special Committee," that the "Special Committee is composed entirely of independent and disinterested directors," and that the "Special Committee of the Board of Directors has unanimously determined that this transaction is fair to and in the best interests of Focus and its unaffiliated stockholders."

113.    On April 25, 2023, focus filed a preliminary proxy relating to the Transaction. Focus filed the definitive Proxy on June 12, 2023 to solicit a shareholder vote on the Transaction. The vote was scheduled for July 14, 2023.

**D.    At the Eleventh Hour, Defendants Issue a Belated Proxy Supplement Revealing Serious Conflicts of Interest—Including Those Harbored by the Special Committee**

114.    On July 6, 2023, over seventy days after Focus filed the preliminary proxy statement—and just six business days before the shareholder vote—Defendants issued the Supplemental Proxy which revealed significant and serious conflicts of interest plaguing the Transaction process, including conflicts harbored by the purportedly "disinterested and independent" members of the Special Committee.

115.    First, the Supplemental Proxy revealed the more than *$130 million* in TRA Payments which influenced the Board and the members of the Special Committee to favor the Transaction over the status quo.  Indeed, Stone Point, the Company's largest shareholder and controller, was slated to receive over $90 million, Defendant Adolf, Focus's CEO and Chairman would receive over $33 million, and Defendant Kodialam, Focus's COO and Director, would gain over $16 million from the TRA Payments.

116.    Each of the Special Committee Defendants was also set to receive significant windfalls via the TRA Payments. Specifically, LeMieux and Neuhoff would each receive $79,375, Morganroth would get $183,307, and Feliciani was set to receive $255,522.

117.    While the Proxy claimed that the TRA Payments were "not material" to the individual Special Committee Defendants, neither the Proxy nor the Supplemental Proxy provided any details about the Special Committee Defendants' income or finances to substantiate that claim.

118.    As discussed in Section II.A above, the TRA payments to the Special Committee Defendants were in fact material.  Between the TRA Payments and the acceleration of unvested awards, each of the Special Committee Defendants received cash payments from the Transaction that ranged from $489,000 to $703,000.  Importantly, the payments from the Transaction alone

provided each member of the Special Committee with income that would rank in the top 1% of all earners in 2023 in the U.S.

119.     Given the substantial payments the Special Committee Defendants gained via the Transaction, this information should have been disclosed along with the Proxy so shareholders could have reasonably assessed the Special Committee's recommendation with all pertinent facts. Even then, without available information about the Special Committee Defendants' financial status, investors had no way to assess whether these payments influenced the Special Committee's recommendation.  Providing the conflict information just days before the vote, and well after most shareholders had surely already analyzed the Transaction, and many had likely already cast their ballots, was insufficient.

> **E.     The Board and Focus Stockholders Approve the Merger**

120.     Six business days after issuance of the Supplemental Proxy, the Transaction achieved the necessary votes to approve the Merger at a special meeting on July 14, 2023.  The Transaction closed on August 31, 2023, with Focus Class A common stockholders receiving $53 per share in cash as Merger Consideration.  The Company's common stock was delisted from NASDAQ that same day and is no longer publicly traded.

## III.     DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMISSIONS OF MATERIAL FACT

> **A.     Misstatements on February 27, 2023**

121.     On February 27, 2023, Focus issued a press release titled "Focus Financial Partners to be Acquired by Clayton, Dubilier & Rice," which it also filed with the SEC on Form 8-K.  The press release claimed that the "Special Committee is composed entirely of independent and disinterested directors," and that the "Special Committee of the Board of Directors has unanimously determined that this transaction is fair to and in the best interests of Focus and its

unaffiliated stockholders."  In addition, the press release quoted Defendant LeMieux as stating that the "transaction results from a robust process conducted by a Special Committee," and "presents the best path forward for Focus and all its stockholders."

122.    The statements in Paragraph 121 were false and misleading when made.  The members of the Special Committee harbored significant financial conflicts of interests through the TRA Payments and acceleration of the unvested equity awards and were therefore, not "independent and disinterested."  Moreover, the Transaction was not "fair" nor was it the result of a "robust process," as the Defendants and Stone Point preferred a transaction with CD&R given Stone Point's lucrative equity rollover, excluded strategic acquirors, including Party I, and Goldman Sachs ran an inadequate outreach process due to its concurrent representation of NKSFB that artificially limited the pool of potential acquirors.

### B.    Misstatements in the Proxy

123.    As detailed below, the Proxy made material misstatements and omissions of material facts that deprived Focus stockholders of a fully informed vote on the Merger.

#### 1.    The Proxy Falsely Reported That the Special Committee Was Independent and Concealed Material Conflicts of Interest Harbored by the Special Committee

124.    The Proxy repeatedly touted the independence and disinterestedness of the four members of the Special Committee who approved and recommended that shareholders vote in favor of the Transaction.

125.    The Proxy reported, for example:

"***The Special Committee has consisted solely of independent and disinterested directors of the Board***.  In connection with appointing such directors to the Special Committee, the Board determined that each member on the Special Committee was independent of Company management, had no material relationship (business, familial or otherwise) with CD&R or any parties that would impair his or her ability to independently consider a potential acquisition of all of the outstanding

shares of Company Common Stock (including all of the equity of Focus LLC) in a cash merger transaction (a "Potential Transaction") ***and did not have a material interest in any Potential Transaction that is different from, or in addition to, the interests of the public stockholders of the Company***."

Proxy at 59.

126.    This critical disclosure was simply false.   As the eleventh-hour Proxy Supplement revealed, each of the four members of the Special Committee harbored significant financial conflicts of interests—different from the interests of the public stockholders of Focus—giving them a substantial personal interest in supporting a sale of the Company regardless of whether it was fair to public stockholders of Focus.

127.    Specifically, the Proxy Supplement revealed that the four members of the Special Committee would each receive total unique proceeds from the completion of the Merger—in the form of TRA Payments as well as the acceleration of unvested units—ranging from $489,467 to $703,690.

128.    Rather than disclose that each Special Committee Defendant would receive enough cash from the Transaction to place them in the top 1% of all earners in the United States, the Proxy expressly claimed the members of the Special Committee had "no material interest in any potential acquisition of all of the outstanding shares of Company Common Stock" (Proxy at 27), that "any TRA Payoff Amount that would become payable in a Potential Transaction to a member of the Special Committee was not material to such member of the Special Committee," (*id*. at 28), and that "the members of the Special Committee do not have an interest in the Mergers different from, or in addition to, that of the Unaffiliated Stockholders."  *Id*. at 61.

129.    While hiding the material and significant interests of the Special Committee, the Proxy encouraged shareholders to support the Transaction specifically because the deal was negotiated and supported by the purportedly disinterested and independent Special Committee.

Indeed, the very first item under the header "Reasons for the Mergers" pointed to the claim that the "Special Committee, comprised of four of the Company's independent and disinterested directors," unanimously determined the Transaction was fair.  Proxy at 54.  Similarly, the first factor provided under the "factors relating to the procedural safeguards" that helped to "ensure the fairness of the Mergers," told shareholders that the Special Committee "consisted solely of independent and disinterested directors" who "did not have a material interest in any Potential Transaction."  *Id*. at 59.  The Proxy unabashedly confirmed that a "material factor" supporting the Board's decision was "that the transaction was negotiated by the Special Committee consisting of four directors who are independent and disinterested… [and] do not have an interest in the Mergers different from or in addition to, that of Unaffiliated Stockholders."  *Id*. at 61.  In fact, the Proxy stated that both CD&R and Stone Point's parent entities considered the Transaction fair based on "the fact that the Special Committee, comprised solely of disinterested and independent members" unanimously recommended it.  *Id*. at 63, 66.

130.    Accordingly, the Proxy touted the Special Committee's independence and disinterestedness as a prime reason to find the Transaction fair and encouraged shareholders to support the go-private transaction all while hiding that the Special Committee stood to receive highly significant cash payments from consummating a merger.

131.    The filing of the Supplemental Proxy did not cure these misstatements. The Supplemental Proxy failed to rescind or otherwise retract any of the Proxy's claims about the independence or disinterestedness of the Special Committee.  Furthermore, the Supplemental Proxy did not provide any financial information about the Special Committee members to assess the materiality of these Transaction-related payments.  In addition, the Supplemental Proxy was filed just eight calendar days and six business days before the shareholder vote, and did not provide

enough time for shareholders to absorb and assess the impact of the Special Committee's significant conflicts.  In short, the Supplemental Proxy was too little, too late.

### 2.    The Proxy Falsely Touted the Adequacy of the Merger Process

132.    The Proxy touted the purported thoroughness of the Special Committee's sale process and represented that the Merger was the best available option for Focus Financial shareholders given that process.

133.    Under a heading titled "*Best Value Reasonably Obtainable*," the Proxy stated that a "material factor" supporting the Special Committee's recommendation of the Transaction to the Board and Focus shareholders was the belief that it obtained the "best terms and the highest price that CD&R was willing to pay for the Company, ***pursuant to a thorough process***. . ."  Proxy at 55.

134.    The Proxy similarly asserted as a "material factor" supporting the Board's recommendation of the Transaction to Focus shareholders the "***procedural fairness of the transaction***."  *Id*. at 61.

135.    These statements were materially false and misleading because they misrepresented that the sale process was on a level playing field for all potential Focus bidders, when the Special Committee minutes demonstrate that Goldman, Jefferies, and Defendant Adolf discouraged consideration of strategic acquirors from the inception.

136.    Contrary to the Proxy's assurance of the purported procedural fairness in the sale process, Focus's internal documents reveal that Goldman and Jefferies repeatedly indicated to the Special Committee that a transaction with a strategic acquiror in the wealth advisory industry, including Party I, represented special challenges and execution risks that served to limit the pool of potential acquirors for Focus.  *See supra* II.B.1.

137.    The Proxy also misrepresented the outreach to and evaluation of alternative strategic acquirors during the sale process.  For example, in describing the Board's June 30, 2022 meeting in the initial phase of transaction considerations, the Proxy stated that:

> [t]he Board determined ***not to reach out to strategic acquirors*** at that time because the Company's unique business model, which emphasizes growth through acquisitions, substantial partner firm autonomy, and sharing economics and ownership with its principals, would likely make it ***a more challenging transaction for a strategic acquiror***, as well as to mitigate potential competitive harm to the Company associated with sharing confidential information with a strategic acquiror too early in the Company's exploration of potential strategic transactions.

Proxy at 25.

138.    Yet, the minutes from this Board meeting reveal no discussion of any strategic acquirors or the challenges they purportedly faced in a transaction with Focus.  June 30, 2022 Board Meeting Minutes.  Nor did Goldman Sachs' presentation materials from the meeting mention any potential strategic buyers or any unique challenges they presented.  Goldman Sachs Presentation to Focus Financial Board dated June 30, 2022.  In fact, the Goldman presentation ***only*** analyzed CD&R and two other private equity firms as potential acquisition counterparties and contained ***no*** analysis of any strategic acquirors to support the statement in the Proxy.

139.    The Proxy further omitted that the strategic acquiror Party I had affirmatively expressed a concrete interest in a transaction directly to Focus's CEO, Defendant Adolf in December 2022.  In describing the Special Committee meeting on December 28, 2022, the Proxy stated that:

> [r]epresentatives of Goldman Sachs also reviewed their prior discussions with Party A, Party B, Party C, Party D, and Party E regarding a potential acquisition of the Company.  The potential list of parties to contact included certain parties that Goldman Sachs had previously contacted as well as new financial sponsor and ***strategic acquirors***.  After discussion at the meeting, the Special Committee authorized the Special Committee Financial Advisors to contact six financial sponsors, Party A, Party B, Party E, Party F, Party G and Party H, ***and one strategic acquiror, Party I***, regarding a potential acquisition of the Company.

Proxy at 35.

140.    In referencing prior contacts with the potential bidders, the Proxy concealed that Party I "***had previously expressed an interest*** [to Defendant Adolf] ***in engaging in a transformative transaction***" with Focus.   December 28, 2022 Special Committee Meeting Minutes, at FOCAP00001642.  The Proxy further omitted that until the meeting on December 28, the Special Committee was unaware of Party I's interest.  Of course, by that time, Defendant Adolf and Goldman had already significantly advanced merger negotiations with their preferred bidder, CD&R.

141.    In fact, only two weeks before the December 28 Special Committee meeting, Goldman had represented to the Special Committee that it "***did not believe that there was a logical strategic purchaser of the Company***."  December 14, 2022 Special Committee Meeting Minutes, at FOCAP00000003.  Yet, Party I was plainly interested in engaging in a transaction and had expressed that interest directly to Focus's CEO.

142.    The Proxy's representation that the Merger was the product of a "procedur[ally] fair[]" sale process was also materially misleading because it failed to inform shareholders that Goldman's concurrent representation of NKSFB in its parallel sales process limited the pool of potential acquirors for Focus.

143.    The Proxy's generic description of the NKSFB lawsuit wholly omitted this material fact.  In a brief section of the Proxy titled "Litigation Relating to the Mergers," the Proxy stated that:

> On March 28, 2023, Mark "Mickey" Segal and KSFB Management, LLC ("KSFB"), the management company for NKSFB, LLC ("NKSFB"), one of the Company's more than 85 partner firms, brought an action against Focus LLC and Goldman Sachs in the Superior Court of California in Los Angeles County.  The complaint alleges, among other things, that Focus LLC's and Goldman Sachs' efforts in respect of a potential sale of the Company to CD&R violated certain

duties and obligations owed to Mr. Segal and KSFB in connection with a separate potential transaction involving the sale of NKSFB and KSFB. Mr. Segal and KSFB are seeking unspecified damages. The Company believes the action is without merit and intends to vigorously contest all allegations.

Proxy at 117.

144. This reference to the NKSFB lawsuit was materially misleading because it failed to disclose that Goldman's process to sell Focus involved a narrower outreach to potential buyers because Goldman sought to avoid parties involved in the NKSFB process. Unbeknownst to shareholders, this limited the universe of potential bidders for Focus and artificially narrowed the sale process for the Company.

### 3. The Proxy Falsely Reported That the Special Committee and Board Believed the Merger Consideration Was More Favorable Than Reasonably Available Alternatives

145. Both the Special Committee and the Board recommended in the Proxy that stockholders vote in favor of the Merger. This recommendation was based on their purported determination that the Merger was more favorable to Focus's shareholders than reasonable alternatives—including remaining a standalone public company or a potential alternative transaction with other parties.

146. Specifically, the Proxy stated "[t]he Special Committee unanimously [] determined that the Merger Agreement and the transactions contemplated thereby, including the Mergers, are ***fair to***, and in the ***best interests of***, the Company and the Unaffiliated Stockholders." Proxy at 54.

147. As to the Board, the Proxy similarly stated that "[t]he Board, acting upon the recommendation of the Special Committee, unanimously [] determined that the Merger Agreement and transactions contemplated thereby . . . are ***fair to***, and in the ***best interests of***, the Company and its stockholders, including the Unaffiliated Stockholders[.]" *Id*. at 61.

148.    The Proxy similarly promoted the Special Committee's "***assessment that other parties likely did not have either the interest in, or capability to acquire the Company on the terms and conditions offered by CD&R***." *Id*. at 55.

149.    The Proxy further stated that the Special Committee rendered an "assessment . . . that **none of the possible alternatives** to the Mergers . . . was reasonably likely to present superior opportunities for the Company to create greater value for the stockholders of the Company[.]" *Id*. at 54.

150.    Each of these statements in the Proxy was false and misleading because they failed to disclose material facts concerning the Transaction, including that (i) the Company's dominant shareholder, Stone Point, preferred a transaction with CD&R, as opposed to Party I who was prepared to offer $2 more per share to Focus shareholders, given Stone Point's interest in obtaining a more lucrative equity rollover into a private equity firm; (ii) the Special Committee Defendants were not disinterested nor independent given their personal financial windfall under the TRA Payments and the acceleration of their unvested equity awards; and (iii) Goldman suffered from numerous conflicts of interest given their extensive prior engagements with CD&R and longstanding ties to Stone Point, as well as their concurrent representation of Focus affiliate NKSFB in a parallel sale process, that together served to limit the pool of potential acquirors considered by the Special Committee, including strategic acquirors like Party I.

## IV.    ADDITIONAL ALLEGATIONS OF SCIENTER

151.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Focus during the Class Period and detailed in Section III above were materially false and misleading.  Defendants knowingly and substantially participated or

acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

152.    As set forth herein, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Focus and the Focus sale process, their control over, receipt, and/or modification of Focus's allegedly materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Focus and the Focus sale process, participated in the fraudulent scheme alleged herein.

153.    In their roles as Directors and Officers of the Company during the Class Period, Defendants directly participated in the management of Focus's operations and, because of their positions at Focus, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Focus's press releases and Proxy in connection with the Transaction.

154.    Defendants also knowingly manipulated the sale process away from strategic acquirors, including Party I, to ensure that Stone Point and Focus management would be able to roll-over equity post-Transaction and ensure that each Defendant received enormous benefits from the Transaction, including the TRA Payments and accelerated equity awards.

155.    Focus acted with scienter because the scienter of its Directors and Officers is imputed to the Company the Defendants spoke on behalf of and controlled.

## V.    LOSS CAUSATION

156.    As described herein, Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants made materially false and misleading statements and omissions of material fact in the Proxy.  Their materially false and misleading statements and omissions as set forth

above caused Plaintiff and other members of the Class to accept Merger Consideration that failed to adequately value Focus's common stock.  As a result, Plaintiff and other Class members suffered damages under Section 14(a) of the Exchange Act.

157.    During the Class Period, Defendants also made materially false and misleading statements and omissions and engaged in a scheme to deceive investors.  Defendants' materially false and misleading statements as set forth above artificially depressed the price of Focus's common stock below the price at which Focus common stock would have traded absent those material misrepresentations and omissions.

158.    Had the market known the full truth about Focus's financial and business prospects and the Focus sales process, Focus's stock price would have been trading at higher prices during the Class Period reflecting the Company's true financial performance and expected growth.

159.    Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on Plaintiff and the Class, and induced Plaintiff and the Class to sell Focus shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration, and thereby caused damage to Plaintiff and the Class.  As a result of their sales of Focus's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under Section 10(b) of the Exchange Act.

## VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

160.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as

forward-looking, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

## VII.   CLASS ACTION ALLEGATIONS

161.   Plaintiff bring this Action on its own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all sellers of Focus common stock who sold their shares from February 27, 2023 through the closing of the Merger (the "Class"), including those stockholders who held Focus common stock on the Record Date and were entitled to vote on the Merger. Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

162.   This Action is properly maintainable as a class action.

163.   The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were more than 66 million shares of Focus Class A common stock outstanding as of June 9, 2023, the Record Date. Upon information and belief, there are hundreds or thousands of members of the Class.

164.   There are questions of law and fact that are common to the Class, including, among others:

(a)     Whether Focus, the Special Committee Defendants, Board Defendants and Officer

Defendants violated Sections 10(b) and/or 14(a) of the Exchange Act and 10b-5 and/or Rule 14a-9 promulgated thereunder;

(b)     Whether the Board and Officer Defendants violated Section 20(a) of the Exchange Act;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether the price of Focus common stock was artificially deflated during the Class Period;

(f)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)     The extent of damage sustained by Class members and the appropriate measure of damages.

165.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class have been damaged by Defendants' wrongful conduct.

166.    Plaintiff will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.  All members of the Class have suffered the same harm.

167.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting

adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

168.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## VIII.   PRESUMPTION OF RELIANCE

169.    Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.  Because this Action involves Defendants' failure to disclose information regarding Focus's business and sale process, among other things, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

170.    In the alternative, Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine because, at all relevant times, the market for Focus securities was open, efficient, and well developed for the following reasons, among others:

(a)     Focus was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Focus filed periodic public reports with the SEC and/or the NASDAQ;

(c)    The price of Focus common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

(d)    Focus regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e)    Focus was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## COUNT I

**Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder**

171.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

172.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to sell Focus securities at artificially deflated prices.

173.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Focus securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

174.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the Company's financial well-being, operations, and prospects, as well as material information concerning the Merger and the sale process.

175.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

176.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent Focus's true financial condition and material information regarding the Merger and the sale process from the investing public and to support the artificially low prices of the Company's securities.

177.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

178.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

179.     Plaintiff incorporates each and every allegation set forth in Paragraphs 1-150, and 156-170 as if fully set forth herein.

180.     Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

181.     The Proxy was prepared, reviewed, and/or disseminated by Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants.   Each of the Defendants authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sale process leading up to the signing of the Merger Agreement.   By virtue of their positions within Focus, these Defendants were aware of the misstated and omitted information alleged herein and their duty to make accurate statements and disclose all material information in the Proxy.

182.     Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants were at least negligent in issuing a false and misleading Proxy.   Plaintiff, while reserving all rights, expressly disclaims and disavows at this time any allegation that could be construed as alleging fraud against Focus, the Special Committee Defendants, Board Defendants and Officer Defendants in connection with this Count.   This claim sounds in negligence based on

the failure of Defendants to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

183.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to Focus shareholders.

184.    The Proxy was an essential link in causing Focus shareholders to approve the Transaction.

185.    By reason of the foregoing, Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

186.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class were harmed by an uninformed shareholder vote approving the Transaction.

187.    This claim is brought within the applicable statute of limitations.

## COUNT III

**Against the Special Committee Defendants, Board Defendants and Officer Defendants for Violations of
Section 20(a) of the Exchange Act**

188.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

189.    Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants disseminated false and misleading statements and a false and misleading Proxy in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

190.    The Special Committee Defendants, Board Defendants and Officer Defendants acted as controlling persons of Focus and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein.  In particular, each of the Special Committee Defendants, Board Defendants and Officer Defendants had direct and supervisory involvement in the day-to-day operations of Focus, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Special Committee Defendants, Board Defendants and Officer Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The statements and the Proxy purport to describe the various issues and information that the Special Committee Defendants, Board Defendants and Officer Defendants reviewed and considered before recommending the Transaction to the Class.

191.    The Special Committee Defendants, Board Defendants and Officer Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Adolf in his position as Chairman and CEO of Focus and Defendant McGranahan, General Counsel of Focus.

192.    The Special Committee Defendants, Board Defendants and Officer Defendants had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Special Committee Defendants, Board Defendants and Officer Defendants are liable pursuant to Section 20(a) of the Exchange

Act.  As a direct and proximate result of the conduct of the Special Committee Defendants, Board Defendants and Officer Defendants, Plaintiff and the Class were harmed by selling their shares at deflated prices and by an uninformed shareholder vote approving the Transaction.

193.    By virtue of the foregoing, the Special Committee Defendants, Board Defendants and Officer Defendants have violated Section 20(a) of the Exchange Act.

194.    This claim is brought within the applicable statute of limitations.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.    Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Focus, the Special Committee Defendants, Board Defendants and Officer Defendants violated Sections 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

C.    Declaring that Focus, the Special Committee Defendants, Board Defendants and Officer Defendants violated Sections 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

D.    Declaring that the Special Committee Defendants, Board Defendants and Officer Defendants violated Sections 20(a) of the Exchange Act;

E.    Awarding damages in favor of Plaintiff and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

F.    Awarding restitution and equitable relief to Plaintiff and the Class;

G.      Directing Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

H.      Awarding Plaintiff pre- and post-judgement interest and the costs of this Action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

I.      Granting such other and further relief as this Court may deem just and proper.

## X.      JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: December 26, 2023                    Respectfully submitted,

**FARNAN LLP**

By:    */s/ Michael J. Farnan*
       Sue L. Robinson (Bar No. 100658)
       Brian E. Farnan (Bar No. 4089)
       Michael J. Farnan (Bar No. 5165)
       919 North Market Street, 12th Floor
       Wilmington, DE 19801
       Telephone: (302) 777-0300
       Facsimile: (302) 777-0301
       Emails: srobinson@farnanlaw.com
               bfarnan@farnanlaw.com
               mfarnan@farnanlaw.com

       *Liaison Counsel for Plaintiff AltShares*
       *Event-Driven ETF*

       Vincent R. Cappucci (*pro hac vice forthcoming*)
       Robert N. Cappucci (*pro hac vice forthcoming*)
       Jonathan H. Beemer (*pro hac vice forthcoming*)
       Jessica A. Margulis (*pro hac vice forthcoming*)
       **ENTWISTLE & CAPPUCCI LLP**
       230 Park Avenue, 3rd Floor
       New York, New York 10169
       Telephone:  (212) 894-7200
       Facsimile:  (212) 894-7272

Email: vcappucci@entwistle-law.com
rcappucci@entwistle-law.com
jbeemer@entwistle-law.com
jmargulis@entwistle-law.com

***Lead Counsel for Plaintiff AltShares***
***Event-Driven ETF***

Thomas Curry (Bar No. 5877)
**SAXENA WHITE P.A.**
824 N. Market St., Suite 1003
Wilmington, DE 19801
Telephone: (302) 485-0483
Facsimile: (888) 424-8566
Email: tcurry@saxenawhite.com

David J. Schwartz (*pro hac vice forthcoming*)
David Wales (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
10 Bank Street, Ste. 882
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
Email: dschwartz@saxenawhite.com
dwales@saxenawhite.com

Adam Warden (*pro hac vice forthcoming*)
Jonathan Lamet (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: awarden@saxenawhite.com
jlamet@saxenawhite.com

***Additional Counsel for Plaintiff AltShares***
***Event-Driven ETF***