**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE FOCUS FINANCIAL PARTNERS INC. SECURITIES LITIGATION | C.A. No. 23-cv-1466-MN<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>**FILED UNDER SEAL** |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................2

JURISDICTION AND VENUE ............................................................................................7

PARTIES ...............................................................................................................................8

    A.      Lead Plaintiffs .......................................................................................................8

    B.      Defendants ............................................................................................................10

           1.      Focus Financial .........................................................................................10

           2.      The Special Committee Defendants ...........................................................10

           3.      The Other Board Defendants ......................................................................11

           4.      The Officer Defendants ..............................................................................12

    C.      Relevant Non-Parties ...........................................................................................12

FACTUAL BACKGROUND ...............................................................................................13

I.      BACKGROUND OF THE MERGER .......................................................................13

    A.      Background of Focus .............................................................................................13

    B.      Stone Point Exercised Significant Control Over Focus and Drove the Sale
           Process for its Benefit ...........................................................................................16

    C.      Defendants Negotiated and Approved a Sale to CD&R on Terms That
           Were Unfair to Focus' Public Shareholders .........................................................21

           1.      Focus' Directors Prematurely Homed in On a Deal With CD&R
                 Without Adequately Considering ▇ and Other Potential Buyers .........22

           2.      Focus Unduly Favored CD&R Even After ▇ Offered Higher
                 Consideration .............................................................................................26

           3.      Defendants Further Favored the CD&R Merger to Secure the
                 Enormous TRA Payments Triggered by a Change of Control .................33

           4.      Goldman Sachs' Concurrent Representation of KSFB Limited the
                 Bidder Pool for Focus ................................................................................35

    D.      Defendants Announce the Merger, Issue a Materially False and
            Misleading Proxy Statement, and at the Eleventh Hour Issue a Belated
            Supplemental Proxy Revealing Serious Conflicts of Interest ...............................38

II.   THE KEY PARTICIPANTS IN THE MERGER PROCESS HARBORED
      SIGNIFICANT CONFLICTS OF INTEREST THAT FAVORED A SALE OF
      FOCUS TO A PRIVATE EQUITY BUYER ...................................................................40

      A.    The Special Committee's Conflicts .........................................................40

            1.    The Special Committee's Financial Conflicts ............................40

            2.    The Special Committee's Personal and Business Conflicts .....................45

      B.    Stone Point's Conflicts of Interest ...........................................................47

      C.    Management's Conflicts of Interest...........................................................49

      D.    Goldman Sachs' Conflicts of Interest ......................................................50

      E.    Jefferies' Conflicts of Interest...................................................................52

III.  DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMISSIONS
      OF MATERIAL FACT...................................................................................54

      A.    Misstatements on February 27, 2023 .......................................................54

      B.    Misstatements in the Proxy and Proxy Supplement .............................55

            1.    The Proxy Falsely Reported That the Special Committee Members
                  Were Independent and Concealed Their Material Conflicts of
                  Interest................................................................................................55

            2.    The Proxy Falsely Touted the Adequacy of the Merger Process..............61

            3.    The Proxy Further Misrepresented the Sale Process By Omitting
                  How CD&R Incentivized Stone Point and Senior Focus
                  Management........................................................................................66

            4.    The Proxy Omitted That Goldman Sachs Limited the Pool of
                  Potential Bidders for Focus As a Result of its Concurrent
                  Engagement on the Competing NKSFB Sale ...........................................69

            5.    The Proxy Falsely Reported That the Special Committee and
                  Board Believed the Merger Consideration Was More Favorable
                  Than Reasonably Available Alternatives...................................................71

            6.    The Proxy Omitted That Jefferies' Discretionary Compensation
                  Was Materially Increased Just Before Its Fairness Opinion Was
                  Issued ..................................................................................................72

      ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................74

LOSS CAUSATION ................................................................................................78

INAPPLICABILITY OF STATUTORY SAFE HARBOR ..........................................79

CLASS ACTION ALLEGATIONS .........................................................................80

PRESUMPTION OF RELIANCE ...........................................................................82

COUNT I ..............................................................................................................83

COUNT II .............................................................................................................84

COUNT III ...........................................................................................................86

PRAYER FOR RELIEF .........................................................................................87

JURY DEMAND ...................................................................................................88

Lead Plaintiffs[1] bring this class action (the "Action") for violations of the federal securities laws against: (i) Focus Financial Partners Inc. ("Focus" or the "Company"); (ii) members of Focus' Board of Directors (the "Board" or "Board Defendants"); (iii) members of the special committee of Focus' Board of Directors (the "Special Committee" or "Special Committee Defendants") established on November 1, 2022 in connection with the merger (the "Merger") of private equity firm Clayton, Dubilier & Rice, LLC (together with its affiliates, "CD&R") and Focus; and (iv) certain senior Focus executives (the "Officer Defendants" and together with Focus, the Board Defendants and Special Committee Defendants, "Defendants"), as defined more fully below.

Lead Plaintiffs' allegations are based upon personal knowledge as to themselves and their own actions and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based upon, *inter alia*, the investigation conducted by, or at the direction of, undersigned counsel for Lead Plaintiffs. This investigation includes, among other things, a review and analysis of: (i) nonpublic, internal Focus documents, including minutes and related materials from relevant meetings of the Focus Board and Special Committee;[2] (ii) publicly filed pleadings in other proceedings; (iii) press releases, presentations and other public statements issued by Focus; (iv) Focus' filings with the U.S. Securities and Exchange Commission ("SEC"), including its Definitive Proxy Statement ("Proxy Statement" or "Proxy") filed on June 12, 2023 in connection with the Merger, and amendments thereto; (v) media and analyst reports about the Company; and (vi) other information and data concerning Focus. Lead Plaintiffs' investigation is

---

[1] Lead Plaintiffs are (i) AltShares Event-Driven ETF, (ii) AltShares Merger Arbitrage ETF, (iii) Kryger Fund Ltd., (iv) Kryger Enhanced Fund Ltd. and (v) ODS Capital LLC.

[2] Citation to bates-stamped documents herein refer to internal Focus documents produced by Focus to Lead Plaintiffs pursuant to their challenge to confidential treatment filed under Delaware Court of Chancery Rule 5.1 in the case captioned *Anchorage Police & Fire Retirement Sys. v. Focus Financial Partners, Inc.*, C.A. No. 2023-0711-SEM (Del. Ch.), and a confidentiality agreement executed between Lead Plaintiffs and Focus. All emphasis herein is added unless otherwise noted.

ongoing, and many of the relevant facts are known only by Defendants or are exclusively within Defendants' custody or control.

## INTRODUCTION

1.    On February 27, 2023, Focus announced it had agreed to be acquired by CD&R for approximately $7 billion.  Upon consummation of the Merger, Focus' public shareholders would be cashed out at a price of $53 per share (the "Merger Consideration").

2.    The Merger Consideration offered to shareholders was inadequate.  Focus' fundamentals were strong and the Company was on an impressive growth trajectory; Wall Street analysts had recently set a "price target" of $62 for Focus stock; and a sophisticated trade publication contemporaneously estimated Focus' break-up value at $10 billion.  Moreover, the Special Committee itself, which was charged with the responsibility of obtaining the highest possible sale price, acknowledged that the Company's stock price was undervalued and that the Company's public valuation did not reflect its intrinsic value.

3.    In spite of these facts, Defendants accepted the $53 per share offer by their preferred bidder, CD&R, and truncated the sale process to preclude even higher bids—including one from a strategic suitor, ███████████████████, which had already made a superior offer that would have provided shareholders ***$2 more per share*** in Merger Consideration.

4.    Defendants told investors that the Merger with CD&R was the best reasonably available transaction and otherwise assured them that the CD&R deal was the only viable option for them to consider.  In public disclosures upon the Merger's announcement, and then in the formal Proxy Statement soliciting shareholder votes for the Merger, Defendants also touted the robustness and reliability of the sale process, the absence of superior alternatives and the independence of the Special Committee that approved the Merger.

5.    The Proxy assured investors, for example:

- that the Merger and the $53 per share consideration represented the "***Best Value Reasonably Obtainable***" for Focus shareholders and was reached "***pursuant to a thorough process***;"

- that all other potential bidders "***did not have either the interest in, or capability to acquire the Company on the terms and conditions offered by CD&R***;" and

- that the Merger resulted from a robust arm's-length negotiating process overseen by an "***independent and disinterested***" Special Committee that "***did not have a material interest in any Potential Transaction that [was] different from, or in addition to, the interests of the public shareholders of the Company***."

6.      But these statements—in addition to myriad other representations Defendants made in selling the Merger to shareholders and the wider market—were materially false and misleading. Defendants could not have reasonably held these views knowing the ▮▮▮ bid was higher, that there were other interested bidders and that the bid and due diligence process was manipulated by Defendants to favor their preferred bidder, CD&R.

7.      Contrary to Defendant's representations, the Merger was ***not*** the result of a fair, "thorough process." It was the result of an utterly deficient process in which pervasive conflicts of interest caused Focus to quickly home in on a deal with CD&R while forgoing outreach to potential strategic buyers in the registered investment advisor ("RIA") sector, and who were likely to offer greater consideration for public shareholders but not the same unique benefits for insiders.

8.      CD&R's $53 per share offer was ***not*** the "best value reasonably obtainable" and there ***were*** alternative bidders with the interest and capability to offer a better deal. Indeed, ▮▮▮ had submitted a superior $55 per share proposal, but was stiff-armed by Defendants. Moreover, the Special Committee unquestionably ***did*** have "material interest[s]" that ***were*** "different from, or in addition to, the interests of the public shareholders of the Company." Indeed, the members of the Special Committee each received unique payments ranging from $729,467 to $943,690 as a result of the Merger.

9.     Contrary to Defendants' public representations in the Proxy and elsewhere, the true story of the Company's sale process leading to the Merger with CD&R is one in which Defendants consistently acted to maximize their own interests and, as a result, failed to maximize value for Focus' public shareholders.

10.     The driving force behind the Merger was Stone Point Capital LLC ("Stone Point"), Focus' single largest and most influential shareholder at the time of the transaction.  It owned approximately 20.6% of the Company's equity and voting power, had placed two of its senior employees on Focus' eight-member Board, and possessed multiple additional contractual levers of influence that augmented its ability to control the Company.  As a private equity firm with a significant investment in Focus, Stone Point also recognized that Focus was undervalued.

11.     In early Summer 2022, consistent with its private equity business model, Stone Point was looking to liquidate part of its investment in Focus through a sale of the Company.  Its incentive to do so was compounded by its interests under Tax Receivable Agreements ("TRAs"), pursuant to which Stone Point stood to receive a lump sum windfall of approximately $90 million in the event of a sale.  Stone Point also wanted to roll over part of its investment in Focus and obtain the right to invest fresh equity capital into the post-sale company.  Stone Point was, accordingly, only interested in a sale to a financial buyer.  A strategic buyer would likely be willing to pay shareholders more money per share in order to capture the value of synergies, but would be much less likely to allow Stone Point to maintain an equity interest post-sale.

12.     Stone Point's interests were consistent with the interests of Focus management.  If the Company was to be sold, management also favored a financial buyer.  Strategic buyers come with their own existing management teams and a desire to reduce executive redundancy following

an acquisition; financial buyers are more likely to keep existing executives *and* incentivize those executives with new equity in the post-sale private company.

13.    Consistent with these interests, Focus limited its outreach to potential financial buyers and utterly failed to canvas potential strategic buyers in the RIA sector.  CD&R, a prototypical financial buyer, quickly expressed interest in a deal.  It also made clear *both* that it wanted Stone Point to remain an investor in Focus post-sale *and* that it wanted to maintain Focus' existing executive management team.  Focus thereafter homed in on a deal with CD&R and embarked on months of exclusive negotiations with CD&R while continuing to forgo any outreach to potential strategic acquirors.

14.    In September 2022, while Focus was still in the early stages of its negotiations with CD&R, ███ CEO contacted Focus' CEO Rudy Adolf about a potential deal.  ███ CEO then met with Adolf in November 2022 to discuss his interest in a "transformative transaction" between the two companies.  Adolf, however, acted to keep ███ at arm's-length.  It was not until late December 2022 that ███ was finally invited to make a proposal.

15.    By then, Focus had been engaged in effectively exclusive deal negotiations with CD&R for five months, giving CD&R a substantial informational advantage over ███ and other potential bidders.  ███ nevertheless quickly proposed to purchase Focus for $55 per share. Despite its plainly superior proposal, the Special Committee followed Adolf in deterring ███.  It refused to provide ███ with access to requested diligence or grant it exclusivity, even though the Special Committee had acquiesced to CD&R's identical demands based on its lower-priced proposal of $53 per share.  Instead, the Special Committee finalized the deal with CD&R.

16.    The Special Committee—comprised of the members of the Board who were not members of management or affiliated with Stone Point—was itself conflicted.  Its members had

personal relationships with Adolf as well as significant financial incentives to go along with Stone Point and management to get a deal done. Through a combination of payments pursuant to the Company's TRAs, accelerated unvested units in the Company, and fees for serving on the Special Committee (which the Committee and Board voted to substantially increase immediately before the Committee approved the Merger), each member of the Committee stood to receive a significant financial payment as a result of the Merger. These payments were different from the Merger Consideration received by public shareholders. The Special Committee members' conflicts were not disclosed in the Proxy, which instead touted their purported independence.

17.    Defendants' conflicts of interest were compounded, moreover, by significant conflicts also harbored by the two financial advisors that assisted in connection with the process leading to the Merger. Goldman Sachs & Co. LLC ("Goldman Sachs"), which initiated the process and helped channel it towards financial buyers, was conflicted by extensive and longstanding business ties to Stone Point and CD&R. To make matters worse, Goldman Sachs was also running a contemporaneous competing sale process for a Focus subsidiary, NKSFB, LLC ("NKSFB"), and its management company KSFB Management, LLC ("KSFB"). As a result, Goldman Sachs limited the pool of potential Focus acquirors during the majority of Focus' sale process to bidders that were not involved in the NKSFB sale process. Goldman Sachs only contacted those bidders *after* the NKSFB sale collapsed and *after* a Merger Agreement with CD&R was already executed. This dynamic was not disclosed in the Proxy. Jefferies LLC ("Jefferies"), which was brought in late to "chaperone" Goldman Sachs in recognition of its conflicts of interest, was incentivized to render a positive assessment of the deal by a massive, last-minute increase in its own fee. This too was not disclosed in the Proxy.

18.     Ultimately, effectively *every* actor involved in the Focus sale process that was supposed to be working on behalf of Focus shareholders was badly conflicted.  This led to an utterly deficient process in which Focus failed to adequately canvass the market and tilted the playing field in favor of CD&R, culminating in the stiff-arming of a potential buyer willing to pay shareholders significantly greater consideration than CD&R.  Defendants acted to conceal all of these facts by issuing public disclosures that consistently omitted or shaded the truth.  Instead, Defendants touted a counterfactual narrative in which the sale process was thorough and reliable, there were no significant conflicts of interest, and CD&R's underpriced $53 per share proposal offered shareholders "the best value reasonably obtainable."  Based on these materially false and misleading statements, Focus shareholders approved the Merger and accepted the Merger Consideration.  Through this Action, Lead Plaintiffs seek to hold Defendants liable for their misrepresentations and recover damages for the harm shareholders incurred as a result thereof.

## JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(a), 78t(a), and Rules 10b-5(a)-(c) and 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 2401.10b-5(a)-(c) and 17 C.F.R. § 240.14a-9.

20.     The claims under Sections 10(b) and 20(a) are brought on behalf of a class (the "Class") consisting of Lead Plaintiffs and all other persons or entities, excluding Defendants (defined more fully below), that sold shares of Focus Financial common stock from February 27, 2023, the announcement date of the Merger, through the close of the Merger on August 31, 2023 (the "Class Period"), including investors that sold their shares of Focus Financial common stock into the Merger and were damaged thereby.

21.     The claims under Sections 14(a) and 20(a) of the Exchange Act, are brought on behalf of Lead Plaintiffs and other Focus shareholders as of the June 9, 2023 record date (the "Record Date") that were entitled to vote on the "take-private" acquisition by CD&R.

22.     This Court has jurisdiction over the subject matter of those claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Personal jurisdiction exists over each Defendant either because: (i) the Defendant conducts business in or maintains operations in this District; or (ii) the Defendant is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  At all relevant times, Focus was incorporated in this District, and many of the acts that constitute the violations of law complained of herein occurred in this District, including the dissemination of false and misleading statements in this District.

25.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### A.     Lead Plaintiffs

26.     Lead Plaintiff AltShares Event-Driven ETF is an exchange-traded investment fund organized under Delaware law.  AltShares Event-Driven ETF is advised by its investment advisor Water Island Capital, LLC, a New York domiciled SEC registered entity.  AltShares Event-Driven ETF held and was beneficial owner of Focus common stock as of the Record Date for the Merger

and was entitled to vote on the Merger. AltShares exchanged its shares in the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

27.     Lead Plaintiff AltShares Merger Arbitrage ETF is an exchange-traded investment fund organized under Delaware law. AltShares Merger Arbitrage ETF is advised by its investment advisor Water Island Capital, LLC, a New York domiciled SEC registered entity. AltShares Merger Arbitrage ETF held and was beneficial owner of Focus common stock as of the Record Date for the Merger and was entitled to vote on the Merger. AltShares Merger Arbitrage ETF exchanged its shares in the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

28.     Lead Plaintiff Kryger Event Fund Ltd. is a Cayman Islands company. Kryger Event Fund Ltd. is advised by its investment advisor Kryger Capital LLC, a Bermuda domiciled SEC registered entity. Kryger Event Fund Ltd. held and was beneficial owner of Focus common stock as of the Record Date for the Merger and was entitled to vote on the Merger. Kryger Event Fund Ltd. exchanged its shares in the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

29.     Lead Plaintiff Kryger Event Fund Ltd. is a Cayman Islands company. Kryger Enhanced Fund Ltd. is advised by its investment advisor Kryger Capital LLC, a Bermuda domiciled SEC registered entity. Kryger Enhanced Fund Ltd. held and was beneficial owner of Focus common stock as of the Record Date for the Merger and was entitled to vote on the Merger. Kryger Enhanced Fund Ltd. exchanged its shares in the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

30.     Lead Plaintiff ODS Capital LLC is a Florida limited liability company based in Jupiter, Florida. ODS Capital LLC held and was beneficial owner of Focus common stock as of

the Record Date for the Merger and was entitled to vote on the Merger. ODS Capital LLC exchanged its shares in the Merger and suffered damages as a result of Defendants' violations of the federal securities laws alleged herein.

### B.    Defendants

#### 1.    Focus Financial

31.    Defendant Focus Financial Partners Inc. (previously defined as "Focus" or "the Company") is a Delaware corporation with a principal place of business located at 875 Third Avenue, New York, New York 10022. Focus common stock traded publicly on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "FOCS" from 2018 until the Merger closed in August 2023, after which Focus common stock was delisted from the exchange. Focus continues to exist as a subsidiary of CD&R. Focus' primary business involves owning and partnering with independent fiduciary wealth management firms in the RIA sector for the purpose of helping their clients achieve personal or professional financial success.

#### 2.    The Special Committee Defendants

32.    Defendant George S. LeMieux ("LeMieux") was appointed to the Focus Board on March 7, 2022, and was a Focus director at the time of the Merger. LeMieux was appointed Chairman of the Special Committee on November 1, 2022, and was a member of the Special Committee through the closing of the Merger.

33.    Defendant Elizabeth R. Neuhoff ("Neuhoff") was appointed to the Focus Board on March 7, 2022, and was a Focus director at the time of the Merger. Neuhoff was also appointed to the Special Committee on November 1, 2022, and was a member of the Special Committee through the closing of the Merger.

34.    Defendant Greg S. Morganroth, M.D. ("Morganroth") was appointed to the Focus Board in September 2020, and was a Focus director at the time of the Merger. Morganroth was

also appointed to the Special Committee on November 1, 2022, and was a member of the Special Committee through the closing of the Merger.

35.     Defendant Joseph Feliciani, Jr. ("Feliciani") was appointed to the Focus Board in April 2019, and was a Focus director at the time of the Merger.  Feliciani was also appointed to the Special Committee on November 1, 2022, and was a member of the Special Committee through the closing of the Merger.

36.     Defendants LeMieux, Neuhoff, Morganroth and Feliciani are collectively referred to herein as the "Special Committee Defendants."

### 3.     The Other Board Defendants

37.     Defendant Ruediger "Rudy" Adolf ("Adolf") was Chairman of the Focus Board and Company CEO at the time of the Merger.  Defendant Adolf had been a Focus Board member since the Company's formation in 2015.

38.     Defendant Rajini Sundar Kodialam ("Kodialam") was a Focus Board member and Company COO at the time of the Merger.

39.     Defendant James D. Carey ("Carey") was a member of the Focus Board at the time of the Merger.  Carey is the President of Stone Point and was a Managing Director of Stone Point at the time of the Merger.  Carey was appointed to the Focus Board by Stone Point in 2018.

40.     Defendant Fayez S. Muhtadie ("Muhtadie") was a member of the Focus Board at the time of the Merger.  Muhtadie is Co-Head of Private Equity at Stone Point and was a Managing Director of Stone Point at the time of the Merger.   Muhtadie was appointed to the Focus Board by Stone Point in 2018.

41.     Defendants Adolf, Kodialam, Carey, and Muhtadie are collectively referred to herein as the "Board Defendants."

### 4.    The Officer Defendants

42.    Defendant James Shanahan ("Shanahan") was Focus' Chief Financial Officer ("CFO") at the time of the Merger, a position he held since the Company's formation in 2015.

43.    Defendant Leonard Chang ("Chang") was a Senior Managing Director and Head of Mergers & Acquisitions at Focus at the time of the Merger.

44.    Defendant J. Russell McGranahan ("McGranahan") was Focus' General Counsel and Corporate Secretary at the time of the Merger, positions he held since the Company's formation in 2015.

45.    Defendants Shanahan, Chang, McGranahan, Adolf and Kodialam are collectively referred to herein as the "Officer Defendants."

### C.    Relevant Non-Parties

46.    CD&R is a Delaware limited liability company headquartered in New York City. Founded in 1978, CD&R is a private equity firm with approximately $58 billion in assets under management.  CD&R specializes in acquiring corporate divisions and family enterprises, as well as whole businesses from other private and public owners.

47.    Goldman Sachs & Co. LLC (previously defined as "Goldman Sachs") is a New York limited liability company that served as a financial advisor to the Special Committee and also advised the Board in connection with the Merger.  Goldman Sachs issued a written fairness opinion in support of the Merger, dated February 27, 2023, that was incorporated into the Proxy.

48.    Jefferies LLC (previously defined as "Jefferies") is a Delaware limited liability company that served as a financial advisor to the Special Committee in connection with the Merger.  Jefferies issued a written fairness opinion in support of the Merger, dated February 26, 2023, that was incorporated into the Proxy.

49.     Stone Point Capital LLC (previously defined as "Stone Point") is a Delaware limited liability company headquartered in Greenwich, Connecticut.  It is a private equity firm that invests in the global financial services industry.  Stone Point also invests in alternative asset classes, including through its Trident Funds (*i.e.*, Trident FFP LP, Trident VI, L.P., Trident VI Parallel Fund, L.P. and Trident VI DE Parallel Fund, L.P., collectively, the "Trident Funds").  At the time of the Merger, Stone Point was Focus' single largest stockholder and owned approximately 20.6% of the outstanding equity and total shareholder voting power in Focus.

50.     Vinson & Elkins L.L.P. ("V&E") is a law firm headquartered in Houston, Texas with other offices in the United States and abroad.  V&E served as outside legal counsel for Focus Financial in connection with the Merger.

51.     Potter Anderson & Corroon LLP ("Potter Anderson") is a law firm headquartered in Wilmington, Delaware that served as outside legal counsel for the Special Committee in connection with the Merger.

## FACTUAL BACKGROUND

### I.    BACKGROUND OF THE MERGER

#### A.    Background of Focus

52.     Focus was founded in 2004 by Defendants Adolf, Kodialam and Chang.  It went public through an initial public offering completed on July 26, 2018.  Thereafter, shares of the Company's Class A common stock traded publicly on the NASDAQ market until the August 2023 closing of the Merger.  Upon the closing the Merger, public shareholders were cashed out and Focus became a privately held company whose shares are predominantly owned by CD&R.

53.     The Company operates in the RIA space, with ownership interests in more than 85 independent wealth management firms that provide investment and financial services to high and

ultra-high net worth individuals and families.  Most of its partner firms are registered with the SEC under the Investment Advisors Act of 1940.

54.     The sale process leading to the Merger commenced in the summer of 2022, when Focus' Board determined to explore available strategic options, including a potential sale.  At all relevant times, however, the sale process was plagued by conflicts of interest harbored by Stone Point (which was the Company's largest shareholder and controlled at least half the Board), the Company's executive management team, and the members of the Company's Board—including the members of a purportedly-independent Special Committee ultimately appointed to oversee the Merger process.   These insider conflicts of interest were, moreover, compounded by serious conflicts of interest harbored by the financial advisors engaged to assist with the process, who were more concerned with their own financial interests than with ensuring that any sale appropriately maximized value for Focus shareholders.   The conflicts—detailed at length in Section II, *infra*—produced an utterly deficient sale process that benefited insiders but was inconsistent with maximizing value for Focus' public shareholders.

55.     As an initial matter, the timing of the process was suspect. Focus was operating from a position of strength as a standalone company and experiencing significant ongoing growth.  It had no immediate need to explore a sale.  As shown in the chart below, its revenue and adjusted EBITDA (earnings before interest, taxes, depreciation, and amortization) were impressive, with each metric more than *doubling* from the time of the Company's 2018 IPO to 2022:

|  | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|
| Revenue (in millions) | $910 | $1,218 | $1,361 | $1,797 | $2,143 |
| Revenue growth (from prior period) | 37.4% | 33.8% | 11.7% | 32.1% | 19.2% |
| Adjusted EBITDA (in millions) | $203 | $269 | $321 | $451 | $537 |
| Adjusted EBITDA growth (from prior period) | 40.1% | 32.7% | 19.2% | 40.3% | 19.1% |

56.     The Company's share price also performed impressively during much of that period. It debuted in July 2018 at $37.55 per share and peaked at a price in excess of $68 per share in November 2021. Like most public companies, the Company's share price declined in the down-market year of 2022. As demonstrated in the chart above, however, the Company's fundamentals remained strong. Indeed, in an earnings call held February 16, 2023—just days before the Merger's announcement—Defendant Adolf touted the Company's 2022 financial results as "solid" and reflecting "our partners excellent job in managing their businesses in advising their clients."

57.     Market analysts also maintained a positive outlook for Focus' performance and share price during the period leading to the Merger. On October 3, 2022, for example, BMO Capital Markets published a target price of *$62 per share* for Focus' publicly traded stock.

58.     RIABiz, a specialist publication providing in-depth coverage of the RIA industry, also acknowledged the strength and significant value of Focus' business during the period leading to the announcement of the Merger. In an article published February 2, 2023, just weeks before the announcement of the Merger, it concluded that Focus' aggregate interests in wealth advisory partnerships were worth significantly more than its then-trading price and, indeed, significantly greater than the valuation of Focus in the Merger. In its February 2, 2023 article, RIABiz estimated

that Focus' breakup value was approximately ***$10 billion***—a greater than 42% premium over the $7 billion valuation on which the Merger (announced just weeks later) would be premised.

59.    Indeed, at the outset of the process that would ultimately culminate in the Merger, Focus was specifically advised that it was not an ideal time for a sale.  In a presentation to the Board delivered June 30, 2022, Goldman Sachs specifically informed the Board that it was then a "challenging market to execute a deal," that there was "limited upside in engaging at this point," and that Focus' "stock/valuation remains under pressure." *See* FOCAP00001073.  Goldman Sachs further advised that signing a nondisclosure agreement ("NDA") with a potential bidder "may create noise in market," and that, in this "challenging financing market; why share info now; can engage later." *Id.*  Ignoring this advice, the Board nevertheless undertook a process to sell Focus, resulting in a deal price that failed to maximize value for its public shareholders.

### B.    Stone Point Exercised Significant Control Over Focus and Drove the Sale Process for its Benefit

60.    The decision to commence a sale process in the bear market of Summer 2022 was not motivated by any business need or by the availability of any particularly attractive opportunity. Indeed, from the perspective of Focus' public shareholders, it would have made sense to heed Goldman Sachs' advice and continue operating the Company as a successful standalone enterprise. But Stone Point had other interests, including a short-term desire to return cash to its investors.  As a private equity firm, Stone Point's business model is to acquire an ownership stake in financial services businesses, operate those businesses alongside their existing management teams for five to ten years, then exit its investments at a premium and return cash proceeds to its investors.[3]  Stone Point originally invested in Focus in April 2017 and, by the Summer of 2022, it was looking for a

---

[3] *See* https://www.stonepoint.com/private-equity/investment-approach/.

way to liquidate at least part of its investment in the Company to return capital.   It was Stone Point's interests that drove the timing, and ultimately the terms, of the Company's sale.

61.     Stone Point enjoyed several levers of influence that allowed it to drive the Company's sale process.  At the time of the Merger, Stone Point owned approximately 20.6% of Focus' shareholder equity and voting power, making it the Company's single largest shareholder and enabling it to exercise significant control over the direction of the Company. Pursuant to a Nominating Agreement executed in connection with the Company's IPO, moreover, Stone Point enjoyed additional levers of influence that augmented its control over Focus.  *First*, the Nominating Agreement empowered Stone Point to nominate two directors to the Board.  Stone Point exercised this right to place Defendants Carey and Muhtadie—two of Stone Point's Managing Directors—on Focus' eight-member Board.  Defendant Muhtadie was appointed as the purported "lead independent director" at Focus.  *Second*, the Nominating Agreement also empowered Stone Point to designate two of the three members of the Board's Compensation Committee.  Defendants Carey and Muhtadie were designated members of, and constituted two-thirds of, the Committee (with Defendant LeMieux serving as the third member).  This gave Stone Point *de facto* control over all significant decisions concerning compensation of Focus' senior executives and, therefore, gave Stone Point an extremely potent lever of influence over the members of the Company's executive management team.

62.     As Focus acknowledged in its April 14, 2022 annual proxy statement, the "Compensation Committee oversees our executive compensation and employee benefit programs, and reviews and approves ***all compensation decisions*** relating to our NEOs [Named Executive Officers]."  The Compensation Committee also, moreover, "approve[d] the amount of [Focus'] annual incentive cash pool, and any and all awards to [the Company's] NEOs from this pool."

Stone Point, therefore, had the power to control the compensation of Focus' senior executives. Those executives included Focus' CEO and COO, Adolf and Kodialam, both of whom were also members of the Board. This arrangement gave Stone Point significant control over those individuals and, combined with its own two Managing Directors serving on the Board, gave Stone Point direct control over at least four of the eight members of the Board at the time of Focus' sale process and resulting Merger.

63.    As yet another lever of influence, Stone Point exercised a significant amount of power in the context of negotiations concerning any merger or acquisition through Focus' First Lien Credit Agreement (the "Credit Document"), which the Company entered prior to its IPO. Section 11.11 of the Credit Document provided that a "Change of Control," in which a third party acquired 35% or more of Focus' voting stock, could trigger an "Event of Default" requiring the acceleration and repayment of Focus' debt. In defining "Change of Control," the Credit Document excluded "Permitted Holders" from those acquirors that would cause a change of control and trigger the acceleration provision. Permitted Holders included Stone Point and members of Focus' management team. The definition also carved out situations where the "Permitted Holders have, at such time, the right or the ability by voting power, contract, or otherwise to elect or designate for election at least a majority of the board of directors of the Borrower."

64.    The effect of this arrangement was to grant Stone Point a tremendous amount of power in negotiations concerning any merger or acquisition. If Stone Point and management did not agree to roll over equity into the surviving company, or if an acquiror did not grant Stone Point and management the right to elect a majority of the Board, then Focus' debt would accelerate under the Credit Document. The acceleration of debt would require the acquiror to find a new source of debt at higher interest rates, increasing the cost of the acquisition for that acquiror. The Proxy

does not quantify these costs, but documents produced by the Company indicate that, if the debt was not "portable," an acquiror would be faced with additional costs of $3.00–$4.00 per share to acquire new debt, based on the deteriorating state of the credit markets at the time. The Proxy also does not disclose that, in order to preserve the Credit Document and avoid acceleration of Focus' debt, Stone Point would be allowed to control the Board following the Merger.

65.     In short, based on its powers under the Credit Document, Stone Point and management could control the sale process, as they would need to agree on the counterparty and participate as an owner of the surviving company—and maintain board control—to ensure the portability of the Company's debt, lowering costs for the potential acquiror. In theory, Stone Point should have been willing to partner with whichever counterparty offered the best deal for shareholders. But, from the outset, Stone Point acted instead to advance its own interests. As detailed below, Stone Point specifically acknowledged to Goldman Sachs that it was "*not agnostic* with respect to potential partners in an acquisition of the Company" and "expressed certain views on potential partners"—tipping its hand that it would use its levers of influence to favor potential acquirors that offered the best deal *for Stone Point*, regardless of whether it was also the best deal for the Company's public shareholders. As also detailed below, CD&R ultimately became Stone Point's favored counterparty by promising to allow Stone Point to rollover some of its equity and invest new equity capital in Focus following the closing of the Merger.

66.     In addition to its interest in liquidating some portion of its large equity investment in Focus, Stone Point also had a keen interest in a sale of Focus because Stone Point—along with the Officer Defendants and all members of Focus' Board, other than Muhtadie and Carey (who themselves stood to benefit indirectly from Stone Point's interest)—had the right to receive significant payments under TRAs previously executed with the Company. Specifically, in 2018

and 2020, Focus entered into three separate TRAs with Stone Point-affiliated funds and other parties (the "TRA Holders").  The TRAs provide for the payment by Focus to each TRA Holder of 85% of the net cash savings in a given year in federal, state, and local income and franchise taxes that the Company realized, or was deemed to realize, with Focus retaining the remaining 15% of the cash savings.  In Focus' 2022 Form 10-K, the Company indicated that it expected future payments to the TRA Holders to be approximately $224.6 million in the aggregate.

67.    The TRAs provided, however, that the TRA Holders would be entitled to an "Early Termination Payment" if Focus were sold, calculated by using the present value of future tax savings payable under the TRAs.  This present value was calculated by using a discount rate of one-year LIBOR plus 150 basis points (*i.e.*, 1.5%), defined as the "Early Termination Rate" under the TRAs.  The application of this lower discount rate to measure the present value of the Company's future tax savings would result in significant additional payments under the TRAs. Furthermore, in a change of control transaction involving Focus, the Company's payment obligations under the TRAs would accelerate and become payable in a lump-sum payment due at the time of the Merger.  Without a sale, the TRA Holders would need to wait more than fifteen years to receive their full TRA Payments, which would also be subject to potential changes in tax laws, subjecting the TRA Payments to additional uncertainty in the ordinary course.

68.    As detailed further below, the TRA Payments that Stone Point, the Special Committee Defendants, and the Officer Defendants stood to receive created significant unique incentives for these parties to push for the Merger, regardless of whether it was truly value-maximizing for Focus' public shareholders.

**C.    Defendants Negotiated and Approved a Sale to CD&R on Terms That Were Unfair to Focus' Public Shareholders**

69.    At the outset of the process, the Board relied on its favored financial advisor, Goldman Sachs, to advise it concerning potential alternatives.  From the very beginning, the Board and Goldman Sachs were determined to pursue only private equity buyers and spurned the idea of selling Focus to a strategic buyer.  CD&R, a private equity firm that was a longstanding and loyal client of Goldman Sachs, was quickly identified as a viable candidate.  This pleased Stone Point and the members of Focus' executive management team, as a private equity buyer would likely allow them to roll over a portion of their Focus equity into the post-Merger Company.  The Board and management negotiated with CD&R for months despite the fact that they were obviously conflicted by their equity rollover aspirations, among other benefits.  Moreover, CD&R was also favored by the Officer Defendants over bidders in the RIA sector because CD&R made it clear that it would retain senior Focus management to run the post-Merger Company.

70.    Indeed, financial buyers (like CD&R) are much more likely to keep existing management in place than strategic buyers.[4]  But strategic buyers (like ███) are often willing and able to pay more for a company than financial buyers because: (i) strategic buyers can realize synergistic benefits through economies of scale and the elimination of duplicate functions; and (ii) strategic buyers are generally larger companies with better access to capital, and can offer stock, cash, or a combination of the two in payment of the purchase price.[5]  This was exactly the dynamic at play here.  When ███ ultimately made its proposal to acquire Focus, it provided no assurance that it would retain Focus' current management team.  In fact, its January 17, 2023 written proposal to acquire Focus for $51.75 (which it later raised to $55.00) suggested otherwise,

---

[4] *See* https://mercercapital.com/article/financial-vs-strategic-buyers/

[5] *Id.*

touting its view that there existed "an opportunity to consolidate management and operations . . . which could result in meaningful cost savings." FOCAP00002157. CD&R, by contrast, signaled its intention to maintain Focus' executive management team early in negotiations.

### 1. Focus' Directors Prematurely Homed in On a Deal With CD&R Without Adequately Considering ▮▮ and Other Potential Buyers

71.     As is now evident from the nonpublic, internal documents produced by the Company to Lead Plaintiffs, the Board zeroed in on a deal with CD&R without adequately considering, let alone canvassing, an appropriately broad array of potential acquirors. As detailed below, the Board and Special Committee ultimately acquiesced to that deal, even after learning that ▮▮ conveyed its serious interest in a transaction directly to Focus CEO, Defendant Adolf. This material fact was not disclosed in the Proxy.

72.     As early as June 16, 2022, Adolf met with representatives of CD&R as part of the Company's initial outreach concerning a potential transaction. At the meeting, CD&R's representatives expressed an interest in potentially acquiring Focus. From that point on, neither the Board nor the Special Committee was interested in canvassing the broader market to find strategic buyers in the RIA sector willing to acquire Focus.

73.     Indeed, the Company's Board met on June 30, 2022, together with representatives of Goldman Sachs to discuss a possible merger transaction and did not discuss even a *single* potential strategic buyer. Prior to the meeting, Goldman Sachs circulated presentation materials that provided its preliminary analysis of a potential sale process for Focus, including its initial evaluation of CD&R and two other private equity firms, ▮▮▮▮▮▮▮▮▮▮ and ▮▮ ▮▮▮▮▮▮, as potential acquirors. *See* Goldman Sachs Presentation to Focus Financial Board dated June 30, 2022, at FOCAP00001070–72. Goldman Sachs' June 30, 2022 presentation materials did not even identify, let alone analyze, any companies in the wealth management

industry as potential strategic acquirors of Focus.  Accordingly, the Board did not contact potential strategic acquirors at that time instead concentrated only on potential financial buyers—buyers like CD&R.

74.    Defendants' failure to consider or engage with strategic acquirors continued throughout the sale process.  From July through December 2022, the Board and Special Committee excluded consideration of strategic acquirors as potential merger partners.  In many instances, this was because Company management, Goldman Sachs, or Jefferies discouraged consideration of strategic acquirors by the Special Committee and Board.  For example, during July and August 2022, Defendant Adolf met exclusively with private equity firms to discuss a potential transaction. In addition to CD&R, Defendant Adolf met with representatives of United States-based private equity firms ████████████████████    ████ and ████  as well as the ████████  ████████████████████████.  Upon information and belief, these funds were identified in the Proxy as "Party A," "Party B," "Party C," and "Party D," respectively.

75.    While each of these funds expressed some interest, they did not concretely engage at the time, primarily because of deal financing issues.  ████  for example, stated it was "[u]ncomfortable putting forth a bid in August due to [the] financing market backdrop," and wanted to "re-engage when financing markets normalize."  ████████  also indicated interest, but informed Adolf it "would like to pursue changes to [the] business model if [Focus is] taken private."  From the perspective of Focus shareholders, these were paths to potentially increasing the sale price of the Company.  From the perspective of Defendants, however, they were nonstarters.  Defendants did not want to wait and they did not want a deal that would not allow Focus' executives to continue in their leadership roles.  CD&R, by contrast, indicated it would leave the Focus business model and senior management in place after a merger.  ████ was only

interested in engaging as a co-investor on any transaction with Focus, and ███ told Adolf it would reach out on a potential Focus transaction after "Labor Day," but ultimately did not do so.

76.     Despite this lack of immediate interest by financial sponsors other than CD&R, Goldman Sachs still discouraged the Board from considering outreach to other companies in the RIA sector as potential strategic acquirors of Focus.  Adolf himself avoided meetings with strategic parties, as such buyers would likely jettison Focus' existing management team.  Indeed, Adolf was initially introduced to ███████████████████ on September 20, 2022 to discuss a potential transaction between the companies, but he avoided a follow up meeting for months.  While ███ attempted to schedule a meeting with Defendant Adolf throughout September and October 2022, Adolf did not agree to meet ███ until November 15, 2022.  By this time, Defendants had been engaging with CD&R concerning a potential merger for five months—giving CD&R a significant process and informational advantage over ███ (described in the Proxy as "Bidder I") or any other bidders.  Indeed, it appears Adolf delayed setting up a meeting with ███ in order to allow negotiations with CD&R to advance without competition.  When Adolf finally met with ███ he informed Adolf that ███ had a concrete interest in engaging in a "transformative transaction" with Focus.  Notably, Defendants never disclosed ███ executive-level contact with Adolf in September and November 2022.

77.     According to the minutes of a Special Committee meeting held December 28, 2022, Jeff Haller of Goldman Sachs revealed at that meeting to Adolf's fellow directors, for the first time, that "Adolf, Chief Executive Officer of the Company, had *previously met* with ███ chief executive officer and that ███ *had previously expressed an interest in engaging in a transformative transaction*."  December 28, 2022 Special Committee Meeting Minutes, at FOCAP00001642.  Slides presented by Goldman Sachs and Jefferies at this meeting further stated

under a heading titled "*New Strategics* (Sponsor-Owned)": "CEO, [redacted] was recently introduced to Rudy **and has been positioning firm for a transformative opportunity**." *Id*. at FOCAP00001648. Negotiations with CD&R were significantly advanced by this point, putting ▮▮▮ at a significant disadvantage it would not have faced had Focus timely engaged with it after ▮▮▮▮▮▮ first informed Adolf of his interest in exploring a "transformative transaction."

78.    The Proxy further failed to disclose that Goldman Sachs and Jefferies continued to discourage the Special Committee's consideration of strategic acquirors as the sale process progressed into January 2023, even in the face of ▮▮▮ interest. At a Special Committee meeting on January 4, 2023, for example, Matthias Kristol of Jefferies discouraged consideration of an alternate bidder, believed to be ▮▮▮. Kristol warned that the Committee should be:

> **cautious with respect to a potential bid from [redacted]** as [redacted] would need to engage in a significant amount of due diligence work to be in the same position as CD&R, that [redacted] likely had significant financing considerations that it would need to address in any potential acquisition of the Company and that there were additional issues, such as who would manage the pro forma entity, that would need to be addressed as part of any agreement reached with [redacted] in respect of a potential acquisition of the Company.

January 4, 2023 Special Committee Meeting Minutes, at FOCAP00001584.

79.    At the Special Committee meeting on January 6, 2023, Kristol further reported that "Company management's meeting with [redacted], *a strategic competitor* of the Company, had gone well but that such a transaction would face significant complexity." January 6, 2023 Special Committee Meeting Minutes, at FOCAP00001626. Given that the meeting had "gone well" and could potentially lead to a value maximizing offer for shareholders, one would expect that any actual risks would be discussed in the proxy or minutes. Tellingly, neither the Proxy nor the meeting minutes elaborate on the nature of this purported "complexity." Defendants' undisclosed concerted efforts to favor CD&R over strategic acquirors—even one that was eager and able to

negotiate for a merger (*i.e.*, ███—tainted the entire Focus sale process, to the detriment of Focus' public shareholders.

### 2. Focus Unduly Favored CD&R Even After ███ Offered Higher Consideration

80.     While ███ was held at arm's-length and Defendants declined to even contact other potential strategic acquirors, the Focus Board bent over backwards to facilitate a deal with CD&R from the inception of the sale process.  It provided CD&R with extensive due diligence, meetings with management and Stone Point, and eventually formal exclusivity in negotiations.

81.     As noted above, senior members of the Company management held introductory meetings with CD&R and four other financial sponsor firms during July and August 2022, while declining to even contact any potential strategic acquirors during that period.  Thereafter, on September 14, 2022, CD&R made an initial non-binding offer to acquire Focus for $50 per share, subject to continued due diligence and the negotiation of definitive transaction documents (the "September 14 Offer").  Letter from CD&R to Goldman Sachs dated September 14, 2022, at FOCAP00002151.  CD&R's offer letter also indicated it would retain Focus' current management team in the post-acquisition company, stating that "[g]iven our investment philosophy and experience base, we believe that CD&R would be an ***outstanding partner for the management team*** as it works to increase the long-term value of the Company."  *Id*. at FOCAP00002152.

82.     CD&R's position was consistent with its overall investment strategy of partnering with the founders and management teams of the companies it acquires.  In fact, CD&R acknowledges that "the foundation of our strategy is to partner with management to create long-term, sustainable value."  *See* Global Reach, Clayton Dubilier & Rice, LLC, at https://www.cdr-inc.com/global-reach.  CD&R further touts that "a critical element of investment success is reward-sharing, which is why we emphasize incentives to support alignment, ***including***

*substantial equity ownership for our portfolio company management teams*."  *See* Firm Profile, Clayton Dubilier & Rice, LLC, https://www.cdr-inc.com/firm-profile.    Thus, the Officer Defendants were incentivized to engage with CD&R over other bidders because they understood CD&R would allow them to retain their leadership positions post-Merger and likely acquire equity in the post-Merger Company.  Stone Point was similarly incentivized to support a transaction with CD&R over other bidders given CD&R's public assertion that it "tailors its investments to meet the needs of founders, family owners, management teams and *significant shareholders*."  *See* Investments, Clayton Dubilier & Rice, LLC, at https://www.cdr-inc.com/investments.

83.    The Board decided on September 21, 2022 to decline CD&R's $50 per share bid, but authorized Company management to continue negotiating with CD&R and to provide CD&R additional due diligence for a potential transaction.    Notably, other senior Stone Point representatives were present at the September 21 meeting aside from Stone Point's Board designees Carey and Muhtadie.  Nikhil Dixit, a Stone Point Director, and Alexander Sarnoff, a Stone Point Vice President, were also present for the entire September 21 meeting, which further demonstrates Stone Point's early influence and control over the sale process.  The presence of additional Stone Point personnel at the September 21 meeting was not disclosed in the Proxy.

84.    Consistent with the Board's decision to grant CD&R additional due diligence, CD&R representatives were provided access to a virtual data room containing additional non-public information on September 30, 2022.  The data room included management's long-term financial forecasts as of September 27, 2022.  CD&R was notably the *only* potential buyer given access to Focus' virtual data room in advance of the "go-shop" period for Merger negotiations.

85.    After receiving data room access, CD&R representatives met in person with members of Focus management for a full-day due diligence meeting on October 6, 2022.

Additional due diligence meetings between Focus management and CD&R representatives were held between October 17 and 20, 2022.  Notably, these meetings and the extensive due diligence provided to CD&R all occurred before the Special Committee's November 1, 2022 formation.

86.    In total, CD&R met at least eleven times with members of the Focus management team and representatives of Goldman Sachs and Jefferies during the sale process.  CD&R also met three times with Stone Point to discuss a transaction and Stone Point's equity rollover.  There is no indication that the Board or Special Committee allowed suitors other than CD&R to have any similar level of merger-related discussions with Stone Point, Focus' largest shareholder.

87.    Notably, the Proxy misstated CD&R's offers by omitting that CD&R proposed additional benefits to Stone Point and the Officer Defendants in its proposals.  On November 9, 2022, for example, CD&R submitted a revised acquisition proposal to Goldman Sachs, which lowered its offer from $50 per share to $45 per share (the "November 9 Offer").  CD&R justified this lower per share price given "recent challenges in the financial and debt financing markets, and the actual costs that would be due under the [TRAs]."  Proxy at 27.  The Proxy further falsely stated that, as of that proposal, "CD&R had an interest in the possibility of Stone Point potentially participating in a Potential Transaction but that this was not a prerequisite for CD&R's engagement."  *Id*. at 27–28. Undisclosed to Focus shareholders, CD&R in fact informed Goldman Sachs that CD&R "would ***require a partner or partners*** in connection with a transaction." FOCAP00001056.  To entice Stone Point to partner with CD&R, and justify its lower per share offer for Focus, CD&R offered unique benefits to Stone Point and the Officer Defendants.  Specifically, CD&R stated that "it was interested in Stone Point and management being a part of the go forward capital structure, participating in the Merger, and by providing [them a] 'material roll-over of equity.'"  The Proxy failed to disclose CD&R's partnership requirement for a

transaction.  Minutes from a November 10, 2022 Special Committee meeting indicate that Stone Point had made clear its interest participating as a bidder with CD&R by that date, though the Proxy also omitted this information.  FOCAP00000084.

88.    On December 1, 2022, CD&R made a revised offer to acquire Focus for $47.50 per share and requested exclusivity in deal negotiations with Focus (the "December 1 Offer").  The December 1 Offer indicated "that all of the Company's debt for borrowed money would remain outstanding following the closing of the proposed transaction" and that there would be a "lower per share price" if "additional costs of borrowing" were necessary.  FOCAP00002618.  CD&R further stated in its December 1 Offer, that it was "extremely impressed in [its] interactions with the Focus management team" and that "supporting the management team" in an acquisition was part of its overall "investment thesis."  *Id.*  CD&R also stated that it would negotiate Focus "management's rollover of its existing [Focus] equity stake in the future," together with management agreements for the post-Merger Company.  *Id.*  Goldman Sachs explained to the Special Committee that CD&R wanted to "incentivize members of Company management to remain with the Company through and after closing."  The Proxy did not disclose any of these details regarding CD&R's December 1 Offer.

89.    CD&R's informational advantage over other potential buyers was also evident on the face of its December 1 Offer.  Specifically, CD&R's December 1 Offer indicated it had completed "a comprehensive diligence process, including calls and in-person meetings with management; detailed review of data room materials; and a broad set of third party workstreams led by advisors such as McKinsey, PricewaterhouseCoopers, and E&Y's Software Services Group."  FOCAP00002617.

90.     On December 2, 2022, the Special Committee held a meeting and authorized Goldman Sachs to inform CD&R that Focus was not interested in pursuing a transaction at the $47.50 per share price stated in the December 1 Offer.  In response, CD&R submitted a revised written proposal on December 10, 2022 to acquire Focus for $50 per share (the "December 10 Offer") and requested exclusivity.  Like the December 1 Offer, CD&R's December 10 Offer provided the same assurances for the Officer Defendants regarding their equity rollovers and post-Merger roles at Focus.  CD&R assured Focus that, pursuant to its December 10 Offer, CD&R planned to further discuss management agreements and equity rollovers with Focus management, which included the Officer Defendants.  The CD&R assurances to the Officer Defendants in the December 10 Offer were not disclosed in the Proxy.

91.     Stone Point's favoritism toward CD&R was also made clear in minutes from a Special Committee meeting on January 4, 2023.  During that meeting, "Mr. Fels [of Goldman Sachs] noted that Stone Point had conveyed that it was ***not agnostic*** with respect to potential partners in an acquisition of the Company and had expressed certain views on potential partners."  FOCAP00001581.  As noted above, Stone Point was intent on partnering with CD&R.  This information was omitted from the Proxy.  Remarkably, the minutes also reflect that Fels explained to the Special Committee that "***since Stone Point may be participating on the buyer side, it was disincentivized to support a higher price per share in a potential acquisition of the Company and the Committee would need to evaluate this as part of its consideration of a Potential Transaction***."  *Id.* (emphasis added).  In other words, Focus' largest and most influential shareholder was now aligned against seeking a higher offer price for Focus' shareholders.  This information was omitted from the Proxy.

92.    On January 5, 2023, CD&R made its purported "best and final" offer to purchase Focus for $51.50 per share (the "January 5 Offer"). The January 5 Offer contemplated an equity rollover by Stone Point and a further equity investment by Stone Point in the post-Merger Company. Both Stone Point and Adolf were supportive of a Transaction price of $51.50 per share.

93.    The Special Committee believed there was a "valuation gap" between CD&R's January 5 Offer and what the Special Committee would be willing to accept for a sale of Focus. To "bridge" that gap, the Special Committee requested that Stone Point and Focus management waive their TRA Payments, which both refused to do. Despite this fact, and with the understanding that such a waiver could result in approximately $1.85 more per share for Focus' public shareholders, Defendants continued to engage with CD&R over other bidders.

94.    By this point in the process, it was obvious that Defendants' favoritism toward CD&R was harming the Company's ability to receive potential value-maximizing offers from competing bidders. Other potential suitors plainly perceived that Defendants were channeling the process toward CD&R and not treating competing suitors equally. At a Special Committee meeting on January 6, 2023, for example, Kristol reported that:

> [O]ne financial sponsor bidder had indicated an interest in participating in a sales process *but only if the process was on a level playing field*, and had further indicated that such sponsor would not participate in a post-signing go-shop. Mr. Kristol reported that the same financial sponsor bidder had indicated that it may be able to submit a preliminary and non-binding proposal with no further dialogue.

FOCAP00001626. Another bidder similarly stated that it did not want to serve as a "stalking horse" in a bidding process. Of course, the Defendants were not interested in providing a "level playing field" to the competing bidders, and true to form, did nothing to encourage these parties to submit a bid. This information is omitted from the Proxy.

95.     At a December 28, 2022 meeting, the Special Committee asked its financial advisors to conduct a limited outreach to potential third party bidders, including ████  ████ promptly submitted an offer.  Remarkably, the preferential treatment Defendants directed to CD&R continued even after ████ sent Goldman Sachs and Jefferies an offer letter on January 17, 2023 that proposed an acquisition price of $51.75 per share, which was higher than CD&R's "best and final" January 5, 2023 Offer of $51.50 per share.  ████ offer letter further assured Defendants that ████ was "***very interested in a partnership with Focus and [was] prepared to move quickly with our confirmatory due diligence***."  Letter from ████ to Goldman Sachs and Jefferies dated January 17, 2023, at FOCAP00002158.  Unlike CD&R's offers, ████ did not need or require a partner such as Stone Point to participate in a deal.  Nor did ████ make assurances of the Officer Defendants' continued employment post-Merger.

96.     Goldman Sachs and Jefferies presented their evaluation of the competing bids of CD&R and ████ at a Special Committee meeting held on January 19, 2023.  Even though ████ was offering higher per share consideration than CD&R, Goldman Sachs and Jefferies recommended that a "Key Message[]" to ████ was that its $51.75 per share proposal was "***not compelling enough*** relative to alternatives."  January 19, 2023 Special Committee Meeting Minutes, at FOCAP00001570.  In contrast, the Special Committee's legal counsel advised that a strategic buyer such as ████ may be able to offer more value to Focus shareholders.  During a Special Committee meeting held two days later, on January 21, 2023, Mark Morton, an attorney with the Special Committee's outside legal counsel at Potter Anderson, noted in discussions concerning ████ bid that "a strategic buyer may be able to ***offer more value in a potential acquisition transaction given the availability of synergies***."  January 21, 2023 Special Committee Meeting Minutes, at FOCAP00001574.  Nonetheless, the Special Committee withheld additional

due diligence information from ███ and agreed to only provide such information and entertain additional transaction discussions with ███ if it submitted a proposal at $55 per share. In contrast, Defendants had willingly provided due diligence to CD&R when their bid was just $50.00 per share.

97.     Demonstrating its serious interest in a deal with Focus and its ability to deliver superior consideration, ███ met that challenge on January 22, 2023. That day, ███ offered to purchase Focus for $55 per share, contingent on additional due diligence, obtaining financing, and receiving exclusivity from Focus. Defendants, however, continued to impose unreasonable hurdles on ███ even then. Instead of engaging with ███ the Special Committee decided to grant CD&R exclusivity following its lower $53.00 bid on January 29, and would invite ███ to participate in the "go shop" process (which, as discussed below, rarely leads to superior offers). Focus and CD&R executed an exclusivity agreement on January 30, 2023, which ran through February 20, 2023 and was later extended to February 26, 2023—effectively freezing out ███ from meaningful participation in the remainder of the sale process despite its expressed interest in doing so at a higher price.

### 3.     Defendants Further Favored the CD&R Merger to Secure the Enormous TRA Payments Triggered by a Change of Control

98.     Defendants and Stone Point also favored the certainty of a merger with CD&R, regardless of the value to be received by public shareholders, because of the lucrative TRA Payments they may not have otherwise received if Focus remained a standalone company.

99.     Presentation materials prepared in response to CD&R's offer of $51.50 and circulated to the Special Committee by Goldman Sachs and Jefferies at a meeting on January 11, 2023 indicated that "the additional TRA obligation in a change of control scenario would be approximately *$161 [million]* (assuming full payout)."   January 11, 2023 Special Committee

Meeting Minutes, at FOCAP00001540.  By contrast, Goldman Sachs and Jefferies calculated that the present value of the existing TRA Payments due to Stone Point and the Officer Defendants **without** a change in control transaction would be approximately $36.6 million.  *Id*. at FOCAP00001544.  This nine-figure windfall would benefit Stone Point, the Special Committee, the Board, and the Officer Defendants and provided a clear incentive for them to push for a sale instead of continuing to operate the Company on a standalone basis.

100.    Goldman Sachs and Jefferies further informed the Special Committee at the January 11 meeting concerning how potential waivers of the TRAs could increase the purchase price for Focus.  For example, a "100% cancellation of the [TRAs] reduces [the] TRA payout [to Stone Point and the Officer Defendants] by ~$160 [million], which represents **$1.85** per [Focus] share."  *Id*. at FOCAP00001545.  The cancellation of just their payout under the change of control provision "reduces [the] TRA payout by ~$123 million, which represents **$1.42 per share**."  *Id*.  The Special Committee appreciated that those amounts could be passed on to public shareholders who were not TRA Holders, such as Lead Plaintiffs, in the form of higher consideration from CD&R or another acquiror.  For this reason, the Goldman Sachs and Jefferies presentation made clear that a "TRA paid out in full: [was] most friendly to TRA holders; **least friendly to public shareholders**," and that "[n]egotiating a full or partial cancellation of the TRA – [was] **most shareholder friendly**."  *Id*. at FOCAP00001544.

101.    Despite this knowledge, **none** of the Special Committee Defendants agreed to waive their own TRA Payments for the sake of public shareholders.  Instead, they opted to receive their lucrative TRA Payments in cash at the close of the Merger.  Stone Point and the Officer Defendants also refused to forego their enormous TRA Payments to support higher Merger Consideration for Focus shareholders.  Instead, they merely deferred the receipt of their TRA

34

Payments under the separately executed TRA Waiver and Exchange Agreements (the "TRA Waiver Agreements"), which further harmed Focus shareholders.

102.    Under the TRA Waiver Agreements, Stone Point and the Officer Defendants received promissory notes that will mature in 2028 and accrue 8% interest per year (with 25% of the original principal to be paid each year), thereby only *increasing* the amounts payable to Stone Point and the Officer Defendants in lieu of higher Merger consideration for Focus shareholders.

### 4.    Goldman Sachs' Concurrent Representation of KSFB Limited the Bidder Pool for Focus

103.    Goldman Sachs' very engagement as a financial advisor to the Special Committee served to artificially limit the pool of potential acquirors presented to Focus for consideration. Goldman Sachs was concurrently representing management company KSFB in a parallel sale of KSFB and Focus subsidiary NKSFB at the very same time that it was also representing the Board and Special Committee concerning a potential sale of Focus.  At least seven potential bidders that were involved in the parallel KSFB–NKSFB sale process were not contacted by Goldman Sachs in connection with the Focus sale process until *after* the KSFB–NKSFB sale collapsed and the Merger Agreement with CD&R had already been executed.

104.    In 2018, KSFB predecessor Nigro Karlin Segal Feldstein & Bolno LLC and its principals sold the assets of their business management firm to Focus, which held the assets via the Delaware wholly-owned subsidiary, NKSFB.  At the same time, the principals of Nigro Karlin Segal Feldstein & Bolno LLC formed management company KSFB to provide management services to NKSFB for a fee based on NKSFB's profits.

105.    In mid-2022, Focus and KSFB contemplated a sale of KSFB to Focus.  Focus and KSFB had an initial agreement whereby Focus would acquire KSFB, and the parties even settled

on a price. By early September 2022, however, Focus backed out of the deal and proposed that the parties team up to pursue a joint sale of both NKSFB and KSFB.

106. Focus pushed for KSFB to hire Focus' favored investment banker, Goldman Sachs, to represent KSFB's interests in a sale. KSFB was initially resistant to hiring Goldman Sachs based on the potential for a conflict of interest. But, based on the assurances of Goldman Sachs and Focus that no conflict would arise, KSFB agreed to retain Goldman Sachs in September 2022. In a carefully negotiated nondisclosure agreement executed on October 25, 2022, the parties agreed that Goldman Sachs would "advise and assist [both Focus and KSFB jointly] with respect to a possible strategic transaction involving [NKSFB]." The NDA also prohibited the use of any information the parties received for anything other than their efforts to finalize the sale of NKSFB and KSFB. The joint agreement further required complete transparency among the parties, so that each of the parties would know what the other was doing with respect to the proposed transaction.

107. Instead of honoring the terms of the joint agreement, Goldman Sachs secretly worked with Focus on its parallel sale process to CD&R, which included the sale of Focus' wholly-owned subsidiary, NKSFB. KSFB had no knowledge that Goldman Sachs and Focus were working on a parallel sale of Focus, which included the sale of NKSFB as a subsidiary, while Goldman Sachs was also meeting with potential acquirors for KSFB and NKSFB. To make matters worse, Goldman Sachs' lead banker on the engagement team for Focus (Patrick Fels) also led Goldman Sachs' engagement team for the KSFB–NKSFB sale process.

108. More importantly for Focus shareholders, the KSFB–NKSFB sale process negatively impacted the potential sale of Focus by limiting the pool of potential acquirors for the Company. The KSFB–NKSFB sale process involved a broad market canvas, with Focus, Goldman Sachs, and NKSFB identifying over two dozen potential buyers. Focus and Goldman

Sachs also had over 300 hours of meetings with KSFB on a potential transaction, sent bid packages to 25 potential bidders for the NKSFB–KSFB business, and had meetings with potential bidders for NKSFB and KSFB.

109.    At the same time, Goldman Sachs was engaged in the Focus sale process. Because Goldman Sachs did not want to tip-off KSFB that it was also shopping Focus, the Focus canvas involved a narrower outreach to potential buyers. This limited the universe of potential bidders for Focus, artificially suppressing the sale process for the Company. After the Merger with CD&R was announced in February 2023, the NKSFB sale process collapsed, and KSFB sued Goldman Sachs and Focus in March 2023.[6] Among other claims, the KSFB Action alleges that Focus and Goldman Sachs violated their NDA and breached their fiduciary duties owed to KSFB in connection with the competing sales of Focus and KSFB–NKSFB.

110.    Multiple potential bidders that were contacted in the KSFB–NKSFB sale process were not contacted by Goldman Sachs in the initial Focus sale process. Instead, these promising and relevant bidders were only contacted by Goldman Sachs during Focus' "go-shop" period, *after* the Merger Agreement between Focus and CD&R had already been executed and the KSFB–NKSFB sale process had collapsed. This included at least seven potential bidders for Focus that were involved in the NKSFB sale process: (i) ██████; (ii) ██████; (iii) ██████; (iv) ██████████; (v) ██████████████; (vi) ████████████████; and (vii) █████ ██████. Predictably, none of these parties made a bid for Focus, as the potential bidders would be required to pay a termination fee to CD&R (effectively acting as a tax on the deal price),

---

[6] *See KSFB Management LLC, et al., v. Focus Financial Partners LLC; and Goldman Sachs & Co. LLC*, No. 23STCV06825 (California Superior Court, Los Angeles County) (the "KSFB Action"). The KSFB Action was re-filed in New York State Supreme Court on February 8, 2024 in a case captioned *KSFB Management LLC v. Focus Financial Partners, LLC*, No. 650688/2024 (NY Sup Ct.).

and CD&R would still have the right to beat any new offers.  For these reasons, "go shops" rarely lead to superior offers.  Indeed, Goldman opined at a Special Committee meeting on December 18, 2022 that "it was rare that a go-shop would ultimately increase the consideration received by the Company's stockholders and that it was also rare to see another private equity bidder submit a topping bid in a transaction already involving a private equity buyer."  FOCAP00000133.

111.    Goldman Sachs undoubtedly withheld these potential bidders because it was incentivized to earn substantial advisory fees upon the sale of both Focus and KSFB–NKSFB. Goldman Sachs also wanted to keep the Focus sale process secret from KSFB to avoid potential liability for breach of the Goldman Sachs–Focus–KSFB NDA and/or breach of fiduciary duty claims owed to KSFB.  Indeed, Goldman Sachs would have received a substantial fee if NKSFB was sold.  Under its financial advisory contract with KSFB, Goldman Sachs was entitled to the greater of $6 million or 1.5% of the aggregate consideration if more than 50% of NKSFB was sold. This equated to an approximate fee of ███████████ for Goldman Sachs based on the initial bids in the NKSFB sale process.

112.    By shrinking the pool of potential bidders, Goldman Sachs ensured that no bidding war for Focus would occur.  While the Proxy makes a passing reference to Goldman Sachs' dual representation and the KSFB Action, it wholly omits any of the above facts, which would have disclosed to shareholders serious deficiencies with the Focus sale process.

## D.    Defendants Announce the Merger, Issue a Materially False and Misleading Proxy Statement, and at the Eleventh Hour Issue a Belated Supplemental Proxy Revealing Serious Conflicts of Interest

113.    On February 27, 2023, Focus issued a press release announcing that it had entered into a definitive agreement to be acquired by CD&R.  The press release raved that the Merger would deliver "substantial value to Focus' shareholders, who will receive $53 in cash per share, representing an approximately 36% premium to Focus' 60-day volume weighted average price as

of the close on February 1, 2023 (the day prior to public announcement of the potential transaction)." The press release further explained that "[f]unds managed by Stone Point agreed to retain a portion of their investment in Focus and to provide new equity financing as part of the proposed transaction." In touting the Merger, the Focus press release also claimed the "transaction results from a robust process conducted by a Special Committee," that the "Special Committee is composed entirely of independent and disinterested directors," and that the "Special Committee of the Board of Directors has unanimously determined that this transaction is fair to and in the best interests of Focus and its unaffiliated shareholders."

114.    On April 25, 2023, Focus filed a preliminary proxy relating to the Merger. Focus filed the definitive Proxy on June 12, 2023 to solicit a shareholder vote on the Merger. The shareholder vote was scheduled for July 14, 2023.

115.    On July 6, 2023, over seventy days after Focus filed the preliminary proxy statement—and just six business days before the shareholder vote—Defendants issued the Supplemental Proxy which revealed significant and serious conflicts of interest plaguing the Merger process. The Supplemental Proxy revealed the more than ***$130 million*** in TRA Payments, which influenced the Board, Officer Defendants and the members of the Special Committee to favor the Merger over the status quo. Indeed, Stone Point, the Company's largest shareholder and controller, would receive over $90 million, Defendant Adolf, Focus' CEO and Chairman would receive over $33 million, and Defendant Kodialam, Focus' COO and Director, would gain over $16 million from the TRA Payments.

116.    The Supplemental Proxy also revealed conflicts harbored by the purportedly "disinterested and independent" members of the Special Committee. These conflicts, discussed in greater detail in the following section, include significant windfalls to the purportedly independent

Special Committee and confirm that the Special Committee's interests were not aligned with the public shareholders. This information should have been disclosed in the June 12 Definitive Proxy so Focus shareholders could have reasonably assessed the Special Committee's recommendation with all pertinent facts. Providing this information just days before the vote, and well after most Focus shareholders had surely already analyzed the Merger and cast their ballots, was insufficient.

117.    Six business days after issuance of the Supplemental Proxy, the Merger achieved the necessary votes to approve the Merger at a special meeting on July 14, 2023. The Merger closed on August 31, 2023, with Focus Class A common shareholders receiving $53 per share in cash as Merger Consideration. The Company's common stock was delisted from NASDAQ that same day and is no longer publicly traded.

## II.    THE KEY PARTICIPANTS IN THE MERGER PROCESS HARBORED SIGNIFICANT CONFLICTS OF INTEREST THAT FAVORED A SALE OF FOCUS TO A PRIVATE EQUITY BUYER

### A.    The Special Committee's Conflicts

#### 1.    The Special Committee's Financial Conflicts

118.    Though depicted as independent and disinterested in the Proxy, the members of the Special Committee stood to receive substantial payments in connection with a sale of Focus. The Proxy represented that the Special Committee was formed because "certain directors of the Company may be deemed to have material interests in a potential take private transaction with CD&R that were different from, or in addition to, the interests of the public holders of Class A Common Stock." Proxy at 27. Notably, none of the four Special Committee Defendants—LeMieux, Neuhoff, Morganroth, and Feliciani—held *any* Focus Class A common stock. This is highly unusual for directors of a publicly traded company and demonstrates that these directors' interests were not aligned with those of Focus' unaffiliated public shareholders.

119.    The Board established the Special Committee by written resolution on November

1, 2022, and designated Defendant LeMieux as Chairman, together with Defendants Neuhoff, Morganroth and Feliciani as additional Special Committee members.  Action By Written Consent of the Board of Directors of Focus Financial, dated November 1, 2022, at FOCAP000000818. Among other things, the November 1 Board resolutions provided a flat fee compensation plan of $80,000 to Defendant LeMieux, and $40,000 each to Defendants Neuhoff, Morganroth and Feliciani for their service on the Special Committee.  *Id.* at FOCAP000000820.

120.    As the Merger negotiations with CD&R neared completion in February 2023, the Special Committee Defendants sought additional personal compensation.  This request was made despite the fact that the Special Committee Defendants had been on the Special Committee for only three months and would already be receiving lucrative change in control compensation in the form of accelerated TRA Payments and unvested equity rewards under the terms of the Merger.

121.    At a Special Committee meeting held February 8, 2023, it was noted by Mark Morton, an attorney with the Special Committee's outside legal counsel at Potter Anderson that "the [Special] Committee believed that the work performed by each of the Committee members and Jefferies on a Potential Transaction was disproportionate to their respective compensation, which had previously been determined based upon factual circumstances and expectations that differed from how the Committee's evaluation of a Potential Transaction had unfolded."  February 8, 2023 Special Committee Meeting Minutes, at FOCAP00001494.

122.    Morton raised similar points about the Special Committee's desire for increased compensation several weeks later at a Special Committee meeting on February 25, 2023.  This was just one day before the Special Committee met on February 26, 2023 to approve the Merger with CD&R.  As reflected in the February 25 meeting minutes, Morton:

> reported on his latest discussions with the representatives of V&E regarding the revised compensation for each Committee member's service on the Committee in

connection with its consideration of a Potential Transaction. Mr. Morton reviewed the outstanding points as it related to such compensation, including feedback that Mr. Morton had received from V&E regarding the quantum and structure for such fees. After discussion, the Committee authorized Mr. Morton to contact the representatives of V&E and convey the Committee's perspective on the fees and fee structure.

February 25, 2023 Special Committee Meeting Minutes, at FOCAP00001110. As detailed further below, the Special Committee also considered a last-minute increase in Jefferies' compensation at this meeting. *See infra*, Section II.5.

123. The Special Committee met on February 26, 2023 to approve the Merger. Unbeknownst to public shareholders, and further evidencing their undisclosed conflicts of interest, the Special Committee Defendants adjourned their meeting for approximately 30 minutes to first execute a written consent that *materially increased their own compensation*. As stated in the February 26 Special Committee meeting minutes:

Mr. Morton reported on his discussions with the representatives of V&E regarding *the revised compensation for each Committee member in connection with his or her service on the Committee during its evaluation of a Potential Transaction*. Mr. Morton reviewed V&E's proposal on the revised compensation and, *after discussion, the Committee stated that it was supportive of such proposal*. Mr. Morton noted that the representatives of Potter Anderson would circulate to the Committee members a written consent of the Board received from V&E and that V&E had requested that *each director execute the consent*. . . .

*After receiving confirmation that the parties had resolved the outstanding transaction items for the transaction documentation, the Committee reconvened its meeting at approximately 9:33 p.m., Eastern Time*.

February 26, 2023 Special Committee Meeting Minutes, at FOCAP00001176–77.

124. The written consent increasing the Special Committee Defendants' compensation was also executed by three of the other Board Defendants (*i.e.*, Adolf, Kodialam, and Carey) during the meeting adjournment. Defendant Muhtadie executed the written consent before the meeting.

125.    Under the written consent, Special Committee Defendant LeMieux voted to increase his personal compensation from $80,000 to $280,000, and Defendants Morganroth, Neuhoff and Feliciani voted to increase their personal compensation from $40,000 to $240,000, respectively, for serving only three-and-a-half months on the Special Committee.  Notably, the Special Committee Defendants executed this lucrative increase in their personal fees just moments before Goldman Sachs and Jefferies provided their oral fairness opinions on the Merger, *and just prior to the Special Committee vote recommending approval of the Merger at the February 26 Special Committee meeting*.  Of course, the timing of this substantial pay increase severely compromised their purported independence.

126.    The chart below summarizes the total unique benefits the Special Committee Defendants received as a result of the Merger:

| Special Committee Member | TRA Payments | Accelerated Unvested Units | Increased Special Committee Fees | Total Unique Proceeds from Transaction |
|---|---|---|---|---|
| LeMieux | $79,375.00 | $410,092.00 | $280,000.00 | $769,467.00 |
| Neuhoff | $79,375.00 | $410,092.00 | $240,000.00 | $729,467.00 |
| Morganroth | $183,307.00 | $520,383.00 | $240,000.00 | $943,690.00 |
| Feliciani | $255,522.00 | $295,183.00 | $240,000.00 | $790,705.00 |

127.    Thus, between the TRA Payments, their self-approved Special Committee fees and the acceleration of unvested equity awards, each of the Special Committee Defendants received cash payments from the Merger that ranged from $729,467 to $943,690.  To put this in perspective, the payments from the Merger alone provided each Special Committee Defendant with income

that would rank in the top 1% of all single earners in the United States for 2023.[7]  The Special Committee Defendants were unmistakenly incentivized to approve the Merger, as the bulk of these proceeds would only be received if a merger were approved.   The fee increase, paid by Focus and approved by the Board, was to ensure the Special Committee's approval of this highly flawed deal.

128.    While the Proxy described these amounts as "not material" for purposes of confirming the Special Committee members' purported independence and disinterestedness, that characterization is not credible given the sums involved.  Moreover, neither the Proxy nor the Supplemental Proxy provided any details about the Special Committee Defendants' income or finances to substantiate the "not material" claim.

129.    According to the minutes from a November 10, 2022 Special Committee meeting, the Special Committee Members "affirmed that [the TRA] payments would represent less than *five percent* of such member's *overall net worth*."  November 10, 2022 Special Committee Meeting Minutes, at FOCAP00000083.  But the Special Committee members did not affirm that these payments were insignificant as compared to their annual income.  Nor did they claim their TRA Payments were minuscule as compared to their overall finances (*e.g.*, less than ███ of their net worth).  Instead, relying on the Special Committee Defendants' own say-so, the Company concluded that these payments were immaterial because they were not more than ███ of each Special Committee member's net worth.

130.    Even assuming that representation was true, TRA Payments ranging from $73,000 to $255,000 would have been material for these Defendants, as all indications are that they were not enormously wealthy.  If these sums were truly immaterial to these Directors, they could have

---

[7] *See "*Who Are the One Percent in the United States by Income and Net Worth?,"* available at: https://dqydj.com/top-one-percent-united-states/.

waived them, just as the Special Committee had asked of Stone Point and Company management, and thereby eliminated any potential appearance of a conflict. In the real world, however, nobody would decline to accept payments that are worth up to ▮ of their overall net worth, demonstrating the materiality of the TRA Payments to the Special Committee Defendants. Indeed, it is easy to see how payments of this size could influence a director's decision-making. They created a classic conflict of interest.

131.    Given the substantial payments the Special Committee Defendants gained via the Merger, this information should have been disclosed in the June 12 Definitive Proxy so Focus shareholders could have reasonably assessed the Special Committee's recommendation with all pertinent facts. Even then, without available information concerning the Special Committee Defendants' individual finances, investors had no way to assess whether these payments could have influenced the Special Committee's recommendation. Providing the conflict information just days before the vote, and well after most of Focus' voting shareholders had surely already analyzed the Merger and cast their votes, was insufficient.

### 2.    The Special Committee's Personal and Business Conflicts

132.    Additionally, the Special Committee director questionnaires and the professional backgrounds of the Special Committee members show that: (a) certain members lacked the requisite experience in M&A, and as such, were ill-suited to be appointed to the Special Committee charged with overseeing the Focus sale process, and (b) had further conflicts of interest that likely influenced their decision-making on the Merger.

133.    Defendant LeMieux was Chairman of the Special Committee and has been a Focus Board member since March 7, 2022. LeMieux is Chairman of the Florida-based law firm of Gunster Yoakley & Stewart, P.A. In the director questionnaire he submitted for appointment to the Focus Board, LeMieux acknowledged that "[m]y law firm represents CD&R in immigration

matters." FOCAP00002633. Accordingly, LeMieux benefits directly from his firm's ongoing business dealings with CD&R. Defendant LeMieux further acknowledged in his director questionnaire that he has "a personal relationship (friendship) with Rudy Adolf." *Id.* Both LeMieux and Defendant Adolf are members of the Young President's Organization, Palm Beach Gold Chapter, an organization that describes itself as "a group of business owners and presidents who all live in the Palm Beach and Ft. Lauderdale area."[8]

134. Defendant LeMieux was also a member of Florida Governor Ron DeSantis' 2018 transition team. In 2018, Defendant Carey, a Stone Point appointee to the Focus Board, donated $10,000 to the Republican Governors Association, an organization that provided funding to Governor DeSantis' political action committee, the Friends of Ron DeSantis. Since Governor DeSantis' election and as of June 30, 2023, the Florida Retirement System ("FRS") has invested over $340 million in Stone Point funds. These FRS investments with Stone Point include the fiscal year 2023 investment of over $3.5 million in the Trident Funds that held Stone Point's 20.6% equity interest in Focus at the time of the Merger.

135. Defendant Neuhoff has been a Focus director since March 7, 2022. Neuhoff has strong personal and business ties to Defendants LeMieux and Adolf. Together with Adolf and LeMieux, Defendant Neuhoff is a member of the Young President's Organization, Palm Beach Gold Chapter. In addition, since 2019, Neuhoff has served as an advisory board member of the LeMieux Center for Public Policy, an organization founded by Defendant LeMieux in 2012.

136. Defendant Morganroth has been a Focus director since 2020. Morganroth is also a neighbor of Defendant Adolf at a private community in Big Sky, Montana. In his Focus director questionnaire, Morganroth acknowledged that he is a "neighbor + friend" of Defendant Adolf.

---

[8] *See* http://www.ypopalmbeach.org

Morganroth Director Questionnaire, at FOCAP00002637-638. Morganroth also disclosed that through the ███████████ he has personal friendships with Defendants Adolf, Muhtadie and Carey. *Id.*[9] Defendants Carey and Muhtadie were Stone Point appointees to the Focus Board at the time of the Merger. Additionally, Morganroth had prior dealings with Goldman Sachs, as it was reported in 2017 that Goldman Sachs provided Morganroth with a loan[10] for his dermatology business "that could eventually convert to an equity stake."[11]

137. None of these business and personal relationships between the Special Committee Defendants and Adolf, CD&R and Stone Point were disclosed in the Proxy when it repeatedly represented that the Special Committee was "comprised solely of disinterested and independent directors." Proxy at 1, 3, 63, 66–67.

### B. Stone Point's Conflicts of Interest

138. Stone Point's interests were not aligned with the Company's unaffiliated public shareholders. As a private equity firm with a significant investment in Focus, Stone Point recognized that Focus was undervalued and would be more valuable as a private entity.

139. Focus' insiders knew the Company could realize greater value as a private entity by increasing its leverage ratio—an option that would be unavailable to Focus as a publicly traded company. The Proxy states that the Company projections of November 28, 2022—prepared by

---

[9] Defendant Morganroth also stated in his Focus director questionnaire that he knows Defendant Carey through another club, but that portion of the questionnaire is indiscernible.

[10] While the size of the loan was not disclosed, Goldman Sachs' private capital investment platform offers junior capital and middle-market companies in North America loans ranging from $20 million to $150 million. *See* https://www.pehub.com/goldman-is-said-to-invest-in-california-skin-institute/.

[11] *See, e.g.*, Heather Perlberg, *How Private Equity Is Ruining American Health Care*, BLOOMBERG (May 20, 2020), https://pe-insights.com/news/2020/05/21/how-privateequity-is-ruining-american-health-care/.

management and shared with the Special Committee, Stone Point, and CD&R—included two scenarios: one which assumed a more substantial amount of merger and acquisition activity with a target net leverage ratio of approximately 4.25x in the projection years, and a second set assuming fewer mergers, ultimately yielding a net leverage ratio of less than 4.25x. Company management determined that operating as a public company with a net leverage ratio of approximately 4.25x in the long term was not feasible. Thus, going private allowed the Company to increase its leverage, engage in more mergers, and outperform a similarly situated public company. The forecasts below compare the projected performance of Focus as a private company versus as a public company:

|  | 2023E | 2024E | 2025E | 2026E | 2027E |
|---|---|---|---|---|---|
| Forecasts with 4.25x leverage (*i.e.* private company) (Adjusted EBITDA in millions) | $628 | $792 | $1,020 | $1,339 | $1,741 |
| Forecasts with lower leverage (*i.e.* public company) | $614 | $778 | $1,013 | $1,279 | $1,579 |
| Difference | $14 | $14 | $7 | $60 | $162 |

140.    Stone Point and Company management understood the upside of the post-Merger Company and thus sought to retain an ownership interest in the Company by rolling over their Focus equity. Stone Point knew that if Focus agreed to be acquired by a strategic buyer in the RIA sector, this option would almost certainly not be made available. Accordingly, Stone Point supported the deal with private equity firm CD&R. In return for agreeing to support the Merger, Stone Point entered into a Support Agreement with CD&R, whereby Stone Point could roll over a portion of its investment in Focus and provide new equity financing for the Merger, which would allow Stone Point to "maintain an interest in the potential future earnings, growth or value realized

by the Company" after the Merger.  Proxy at 99.  This rollover option was not available to the other public shareholders, who would be cashed out as a result of the Merger.

141.    Stone Point also uniquely benefited from the Merger's treatment of the TRAs. Under the terms of the TRAs, a "Change of Control" (which included the Merger) would result in a lump-sum payment generally equal to the present value of hypothetical future payments that would be made by the Company for certain tax benefits.  *Id.* at 100.  As noted, in connection with the Merger, Stone Point and certain members of the Company's senior leadership team entered into the TRA Waiver Agreements, whereby these parties agreed to receive their portion of the TRA Payments in the form of a promissory note at closing of the Merger (the "TRA Note"), with a principal amount equal to their respective portion of the TRA Payments they were otherwise entitled to receive in cash at the closing of the Merger.  *Id.* at 155.  The TRA Note matures on September 30, 2028 and accrues interest at the highly favorable rate of 8% per annum, with the interest payable on each three-month anniversary of the closing and 25% of the original principal amount due on each anniversary of the closing.  It is estimated that Stone Point received approximately $90,265,728 as a result of entering into the TRA Waiver Agreements.

142.    In addition, Directors Carey and Muhtadie are senior executives at Stone Point and therefore will benefit indirectly from the $90 million in TRA Payments to Stone Point.

### C.    Management's Conflicts of Interest

143.    Like Stone Point, the Company's senior executives received unique benefits from the Merger that were not shared by public shareholders.  By entering into the deal with CD&R, a private equity firm that would likely continue to employ existing management, these executives did not risk the employment uncertainty that would accompany an acquisition by a strategic buyer, who may be inclined to terminate management in favor of their own existing leadership.

144.    Like Stone Point, CEO Adolf and COO Kodialam are parties to TRAs with Focus. As a result of entering into the TRA Waiver Agreements in connection with the Merger, Adolf is expected to receive approximately $33,548,882, and Kodialam is expected to receive $16,546,182.

145.    The Merger also caused the acceleration of unvested equity awards previously provided to Focus management. As a result of the acceleration of these unvested units, Adolf will receive $16,441,483, and Kodialam will receive $12,241,887. The chart below summarizes the total unique benefits these executives will receive as a result of the Merger:

| Officer/Director | TRA Payments | Accelerated Unvested Units | Total Unique Proceeds from Transaction |
|---|---|---|---|
| Adolf | $33,548,882.00 | $16,441,483.00 | $49,990,365.00 |
| Kodialam | $16,546,182.00 | $12,241,887.00 | $28,788,069.00 |

146.    Additionally, all of Focus' senior management team were beholden to Stone Point at the time of the Merger. As noted, Stone Point had the right to appoint two directors to the Board, and appointed its President, James Carey, and Managing Director Fayez Muhtadie. Defendants Carey and Muhtadie comprised two of the three members of the Compensation Committee of the Board, with Muhtadie serving as Chair. With Stone Point's Board appointees having voting command over compensation matters, Stone Point wielded significant power over Focus' Board and Officer Defendants, specifically the CEO (Adolf) and COO (Kodialam)—who were fellow Board members—both of whom had significant influence over the Special Committee and corresponding Board meeting presentations and discussions during the sale process.

### D.    Goldman Sachs' Conflicts of Interest

147.    Goldman Sachs' conflicts of interest with respect to the Merger are on an order of magnitude greater than those faced by a financial advisor in a typical corporate transaction. As a

preliminary matter, Stone Point has deep and longstanding ties to Goldman Sachs. The Proxy identified the following owners of the five Stone Point-affiliated single member limited liability companies that own Stone Point's investments in Focus, each of whom have strong ties to Goldman Sachs that were ***not disclosed*** in the Proxy or otherwise during the Class Period:

- *Charles Davis*. Davis is the CEO of Stone Point. He spent 23 years at Goldman Sachs, where he served as Head of Investment Banking Services Worldwide, as Co-Head of the Americas Group, as Head of the Financial Services Industry Group, and as a Member of the International Executive Committee.

- *Stephen Friedman*. Friedman is the Senior Chairman at Stone Point. He spent almost 30 years at Goldman Sachs, where he served as Chairman and CEO.

- *James Carey*. Carey is President of Stone Point and served on the Board of Focus since 2018. Carey has been a longtime director of Stone Point portfolio company Enstar. Affiliates of Goldman Sachs acquired a 19.9% stake in Enstar in 2011, later selling their stake in 2016.

- *David Wermuth*. Wermuth is Chief Operating Officer of Stone Point. He was formerly a corporate attorney with Cleary, Gottlieb, Steen & Hamilton LLP, which counts Goldman Sachs as a client.

- *Nicolas Zerbib*. Zerbib is Stone Point's Co-President and Chief Investment Officer. Zerbib formerly worked for Goldman Sachs. In fact, Zerbib lists Goldman Sachs alone under the "Former Experience" section of his bio on Stone Point's website.[12]

148.    As discussed above, Goldman Sachs was also conflicted in the Focus sale process because it was already acting as a financial advisor for the sale of Focus' subsidiary NKSFB, along with third-party management company KSFB. *See supra* Section I.C.5. Unbeknownst to Focus shareholders, this blatant conflict caused Goldman Sachs to exclude potential credible bidders from the Focus sale process.

---

[12] *See* https://www.stonepoint.com/team/nicolas-d-zerbib/.

149.    While Defendants made a generic statement about the KSFB Action in the Proxy, they concealed that Goldman Sachs was severely conflicted by its concurrent representation of KSFB in a competing sale process that limited the pool of potential bidders for Focus.

150.    Additionally, in the two years prior to February 27, 2023, Goldman Sachs was retained by CD&R and/or its affiliates and portfolio companies for at least eight different financial advisory and/or underwriting engagements.  In return, Goldman Sachs received compensation of approximately ***$114 million***.  This amount dwarfs the $5 million Goldman Sachs had received from Focus and/or its affiliates in the same two-year period for financial advisory and/or underwriting services.  This disparity raises questions as to whether Focus' shareholders could have relied upon Goldman Sachs to squeeze every last penny from CD&R, as Goldman Sachs will surely be seeking further lucrative engagements from CD&R in the future.

151.    Moreover, Goldman Sachs' fee for advising Focus in the Merger was highly contingent on the consummation of the Merger.  All but $2 million of the $25.4 million fee was contingent on the consummation of the Merger, and Goldman Sachs was also entitled to a fee of up to $6.9 million payable at the Special Committee's discretion.  Proxy at 75.  This arrangement incentivized Goldman Sachs to recommend in favor of the Merger over other valid strategic options, including a standalone strategy, and to push for a bidder that would close the deal regardless of whether the price was fair to Focus shareholders.

**E.    Jefferies' Conflicts of Interest**

152.    The Special Committee belatedly recognized that Goldman Sachs was conflicted, as Goldman Sachs was beholden to Stone Point (and therefore the Board) and CD&R, and because Goldman Sachs was simultaneously conducting the NKSFB sale process which constrained Goldman Sachs' bidder outreach for Focus.  As a result, in November 2023, the Special Committee

considered retaining a second financial advisor to "chaperone Goldman Sachs."  November 10, 2022 Special Committee Meeting Minutes, at FOCAP00000084.

153.    Like the conflicted Special Committee Defendants, Jefferies also received a material last-minute increase in its compensation as the second financial advisor to the Special Committee.  Under its initial engagement letter with the Special Committee, Jefferies was to receive $4.5 million for its work on the Merger.  Of this amount, $3 million became payable upon Jefferies' delivery of its fairness opinion to the Special Committee, and $1 million was payable only if the Merger closed.  Jefferies' initial engagement letter also provided for a $1 million discretionary fee, payable at the sole discretion of the Special Committee.  Proxy at 83–84.

154.    Morton of Potter Anderson stated at the Special Committee meeting on February 8, 2023 that the Special Committee believed Jefferies' work as the Committee's financial advisor on the Merger "was disproportionate to their . . . compensation" under the initial engagement letter. February 8, 2023 Special Committee Meeting Minutes, at FOCAP00001494.

155.    Several weeks later, and on the eve of the Special Committee's approval of the Merger, Morton discussed an increase in the discretionary award for Jefferies at the Special Committee meeting on February 25, 2023.  As with the Special Committee Defendants, Morton:

> reviewed that the Committee had previously discussed ***amending Jefferies' engagement letter to provide for a larger discretionary fee*** in recognition of the time and resources expended by Jefferies on the assignment that exceeded the anticipated scope for its engagement. . . . Mr. Morton noted that the representatives of Potter Anderson and Jefferies had reviewed a form of amendment to Jefferies' engagement letter, and he discussed the potential quantum for the maximum discretionary fee in the amendment.

February 25, 2023 Special Committee Meeting Minutes, at FOCAP00001110-11.

156.    Just as they had done for themselves, the Special Committee Defendants agreed to increase Jefferies' Merger-related compensation only moments before Jefferies rendered its

Merger fairness opinion at the February 26, 2023 meeting.  The written Special Committee resolutions presented at its February 26 meeting included a resolution to approve an amendment to the Jefferies engagement letter, referred to in the resolutions as the "Jefferies Engagement Amendment."  February 26, 2023 Special Committee Meeting Minutes, at FOCAP00001254.

157.    A copy of the "Jefferies Engagement Amendment" was attached to the Special Committee resolutions and provided that Jefferies' original engagement letter would be amended to include the following provision:

> (f) At the Special Committee's full and absolute sole discretion, an amount up to $8.0 million, which, if determined to be paid, shall be paid on the closing date of a Transaction.

*Id*. at FOCAP00001257.

158.    Thus, Jefferies' discretionary fee was increased ***eight-fold***, from $1 million to $8 million, just before it opined that the Merger was fair to Focus shareholders.  The discretionary fee increase, approved by the Special Committee, was effectuated to ensure Jefferies' delivery of a favorable fairness opinion for the highly flawed deal.  Like the conflicted Special Committee Defendants, Jefferies was plainly incentivized to render a positive fairness opinion on the Merger in order to receive up to $12.5 million in total compensation under the Merger.  The 800% increase in the discretionary fee payable to Jefferies was not disclosed to Focus shareholders in the Proxy or Supplemental Proxy.

## III.    DEFENDANTS' MATERIALLY FALSE STATEMENTS AND OMISSIONS OF MATERIAL FACT

### A.    Misstatements on February 27, 2023

159.    On February 27, 2023, Focus issued a press release announcing the Merger, titled "Focus Financial Partners to be Acquired by Clayton, Dubilier & Rice." The press release was also filed with the SEC on Form 8-K.  The press release claimed that the "Special Committee is

composed entirely of independent and disinterested directors," and that the "Special Committee of the Board of Directors has unanimously determined that this transaction is fair to and in the best interests of Focus and its unaffiliated shareholders."   In addition, the press release quoted Defendant LeMieux as stating that the "transaction results from a robust process conducted by a Special Committee," and "presents the best path forward for Focus and all its shareholders."

160.    The statements in ¶ 159 were materially false and misleading when made.  The members of the Special Committee harbored significant financial conflicts of interests through the TRA Payments, acceleration of the unvested equity awards, and last-minute compensation increase executed just before they voted to approve the Merger.  Accordingly, they were not "independent and disinterested" as represented in the Focus press release.  Moreover, the Merger was not "fair" nor was it the result of a "robust process," as the Defendants and Stone Point preferred a transaction with CD&R given Stone Point's lucrative equity rollover, excluded strategic acquirors including ████ and Goldman Sachs ran an inadequate outreach process due to its concurrent representation of NKSFB that artificially limited the pool of potential acquirors.

### B.    Misstatements in the Proxy and Proxy Supplement

161.    As detailed below, the Proxy made material misstatements and omissions of material facts that deprived Focus shareholders of a fully informed vote on the Merger.

### 1.    The Proxy Falsely Reported That the Special Committee Members Were Independent and Concealed Their Material Conflicts of Interest

162.    The Proxy repeatedly touted the independence and disinterestedness of the four members of the Special Committee who approved the Merger and recommended that shareholders vote in favor thereof.

163.    The Proxy represented, for example:

***The Special Committee has consisted solely of independent and disinterested directors of the Board***.  In connection with appointing such directors to the Special

Committee, the Board determined that each member on the Special Committee was **independent of Company management**, had no material relationship (business, familial or otherwise) with CD&R or any parties that would impair his or her ability to independently consider a potential acquisition of all of the outstanding shares of Company Common Stock (including all of the equity of Focus LLC) in a cash merger transaction (a "Potential Transaction") **and did not have a material interest in any Potential Transaction that is different from, or in addition to, the interests of the public stockholders of the Company**.

Proxy at 59.

164.    This critical disclosure was simply false.  As the eleventh-hour Supplemental Proxy revealed, each of the four members of the Special Committee harbored significant financial conflicts—with interests differing from those of the public shareholders of Focus—giving them a substantial personal interest in supporting a sale of the Company regardless of whether it was fair to public shareholders of Focus.

165.    Specifically, the Supplemental Proxy revealed that the four members of the Special Committee would each receive total unique proceeds from the completion of the Merger—in the form of TRA Payments as well as the acceleration of unvested units—ranging from $489,467 to $703,690.  However, the Supplemental Proxy said nothing about the Special Committee Defendants' *3.5x–6x* compensation increase (*i.e.*, from $80,000 to $280,000 for Defendant LeMieux, and from $40,000 to $240,000 for Defendants Neuhoff, Morganroth, and Feliciani) that was awarded by the Board and *the Special Committee Defendants themselves* only moments before the Special Committee voted to approve the Merger.  As noted above, under this last-minute, self-awarded compensation increase, each of the Special Committee Defendants received total cash payments from the Merger that ranged from $729,467 to $943,690.

166.    The Proxy also materially misstated the events of the Special Committee's February 26, 2023 meeting, during which the Special Committee Defendants agreed to approve their compensation increase for their three-and-a-half months serving on the Special

Committee.  Specifically, in referencing the February 26, 2023 Special Committee meeting, the Proxy stated:

> On February 26, 2023, the Special Committee held a meeting by videoconference with representatives of each of Potter Anderson, the Special Committee Financial Advisors and V&E in attendance. . . .  With only the Special Committee and representatives of Potter Anderson in attendance, **representatives of Potter Anderson then reviewed the form of Special Committee resolutions that had been previously circulated to the Special Committee.  The Special Committee adjourned and later resumed its meeting following the resolution of the outstanding items on the Merger Agreement**, with the representatives of each of Potter Anderson and the Special Committee Financial Advisors in attendance.

Proxy at 52.

167.    The above statement was materially false and misleading because it wholly omitted that the referenced "Special Committee Resolutions" concerned a *3.5x–6x* increase in personal compensation for the Special Committee Defendants (*i.e.*, from $80,000 to $280,000 for Defendant LeMieux, and from $40,000 to $240,000 for Defendants Neuhoff, Morganroth, and Feliciani).  *See supra* ¶125.  Nor did the statement disclose that the Special Committee Defendants voted (together with the other Board Defendants) to approve this material increase in their personal compensation during the referenced meeting adjournment, and just moments before the Special Committee voted to approve the Merger.  *Id.*

168.    The Section of the Proxy titled "***Special Committee Fees***" was also materially false and misleading.  The Section stated in relevant part that:

> Each member of the Special Committee (other than the Chairman of the Special Committee) received a flat fee of $40,000 for service on the Special Committee and the Chairman of Special Committee received a flat fee of $80,000 for service on the Special Committee.  In addition, for the months of January 2023 and February 2023, each member of the Special Committee (including the Chairman of the Special Committee) received a monthly fee of $35,000 for service on the Special Committee.  For the months starting March 2023 until the later of the No-Shop Period Start Date [April 8, 2023] and the Cut-Off Time [April 18, 2023] (the "Go Shop Fee Accrual Termination Date"), each member of the Special Committee (including the Chairman of Special Committee) received, or will receive, a monthly

fee of $35,000 for service on the Special Committee . . . For the first full month following the Go Shop Fee Accrual Termination Date until the earlier of the consummation of the Mergers and the termination of the Merger Agreement, each member of the Special Committee (including the Chairman of the Special Committee) received, or will receive, a monthly fee of $15,000 for service on the Special Committee.

Proxy at 99.

169.    This statement was materially false and misleading because it once again omitted that certain of the outlined payments to the Special Committee Defendants were in fact approved by the Special Committee Defendants **themselves** just moments before they voted to approve the Merger.  The Proxy thereby concealed from Focus shareholders that the Special Committee Defendants were conflicted given their personal financial incentive to approve the Merger.

170.    Rather than disclose that each Special Committee Defendant worked to ensure they would receive enough cash from the Merger to place them in the top 1% of all earners in the United States, the Proxy expressly claimed the opposite.  Defendants stated in the Proxy that the members of the Special Committee had "***no material interest in any potential acquisition of all of the outstanding shares of Company Common Stock***" *(id.* at 27), that "***any TRA Payoff Amount that would become payable in a Potential Transaction to a member of the Special Committee was not material to such member of the Special Committee***," (*id*. at 28), and that "***the members of the Special Committee do not have an interest in the Mergers different from, or in addition to, that of the Unaffiliated Stockholders***."  *Id*. at 61.

171.    While hiding the material and significant interests of the Special Committee, the Proxy encouraged shareholders to support the Merger specifically because the deal was negotiated and supported by the purportedly disinterested and independent Special Committee.  Indeed, the very first item under the heading "Reasons for the Mergers" pointed to the claim that the "Special Committee, comprised of four of the Company's independent and disinterested directors,"

unanimously determined the Merger was fair.  *Id.* at 54.  Similarly, the first factor provided under the "factors relating to the procedural safeguards" that helped to "ensure the fairness of the Mergers," told shareholders that the Special Committee "***consisted solely of independent and disinterested directors***" who "did not have a material interest in any Potential Transaction."  *Id*. at 59.  The Proxy unabashedly touted that a "material factor" supporting the Board's decision was "that the Merger was negotiated by the Special Committee consisting of four directors who are ***independent and disinterested*** … [and] do not have an interest in the Mergers different from or in addition to, that of the Unaffiliated Stockholders."  *Id*. at 61.  In fact, the Proxy stated that both CD&R and Stone Point's parent entities considered the Merger fair based on "the fact that the Special Committee, comprised solely of disinterested and independent members of the Board" unanimously recommended it.  *Id*. at 63, 66.

172.    These statements were materially false and misleading when made.  The Proxy falsely touted the Special Committee's independence and disinterestedness as a prime reason to find the Merger fair and encouraged shareholders to support the go-private Merger all while hiding that the Special Committee stood to receive highly significant cash payments from consummating the Merger, including their TRA Payments and increased fees awarded just prior to their recommendation to approve the Merger.

173.    In addition to omitting any detail on the Special Committee Defendants' exorbitant personal compensation, or their self-awarded compensation increase that was approved just prior to their vote in favor of the Merger, the Proxy wholly omitted any information demonstrating the Special Committee's business and personal ties to Defendant Adolf, CD&R and Stone Point.  The statements in the Proxy about the purported independence and disinterestedness of the Special

Committee cited in ¶¶ 170-71 were materially false and misleading for the additional reason that they failed to disclose that:

- Defendant LeMieux: (i) is Chairman of the law firm of Gunster Yoakley & Stewart, P.A., which represents CD&R in certain legal matters and undoubtedly receives fees from CD&R for this representation; (ii) acknowledged that he "ha[s] a personal relationship (friendship) with Rudy Adolf"; (iii) is a member with Defendant Adolf in the Young President's Organization ("YPO"), Palm Beach Gold Chapter, an organization of business leaders in Florida; and (iv) was a member of Governor DeSantis' transition team.

- Defendant Carey: (a Stone Point designee to the Focus Board) donated $10,000 to the DeSantis campaign, and the FRS, which is administered under the authority of the Governor's office, has subsequently invested over $340 million in Stone Point investment funds as of June 30, 2023, including over $3.5 million invested in 2023 in the Trident Funds that held Stone Point's 20.6% equity interest in Focus at the time of the Merger.

- Defendant Neuhoff: (i) has been an advisory board member of, and active participant in, the LeMieux Center for Public Policy since 2019, which is an organization founded by Defendant LeMieux in 2012; and (ii) is a member with Defendant Adolf in the YPO.

- Defendant Morganroth: (i) acknowledged in his Board questionnaire that he is a "neighbor + friend" of Defendant Adolf; (ii) Defendants Adolf and Morganroth are neighbors at an exclusive private community in Big Sky, Montana; and (iii) Morganroth acknowledged in his Board questionnaire that he has personal friendships with fellow Board members Carey and Muthadie, both of whom were Stone Point appointees to the Focus Board at the time of the Merger.

174.   The filing of the Supplemental Proxy did not cure any of these misstatements identified in ¶¶ 163, 166, 168, 170–71 above.  The Supplemental Proxy failed to rescind or otherwise retract any of the Proxy's claims about the independence or disinterestedness of the Special Committee.  Furthermore, the Supplemental Proxy did not provide any financial information about the Special Committee Defendants to assess the materiality of their lucrative Transaction-related payments.  In addition, the Supplemental Proxy was filed just eight calendar days and six business days before the shareholder vote, and did not provide enough time for

shareholders to absorb and assess the impact of the Special Committee's significant conflicts. In short, the Supplemental Proxy was both too little and too late.

### 2. The Proxy Falsely Touted the Adequacy of the Merger Process

175. The Proxy touted the purported thoroughness of the Special Committee's sale process and represented that the Merger was the best available option for Focus Financial shareholders given that process.

176. Under a heading titled "***Best Value Reasonably Obtainable***," the Proxy stated that a "material factor" supporting the Special Committee's recommendation of the Merger to the Board and Focus shareholders was the Special Committee's purported belief that it obtained the "best terms and the highest price that CD&R was willing to pay for the Company, ***pursuant to a thorough process*** . . ." Proxy at 55.

177. The Proxy similarly identified the "***procedural fairness of the transaction***" as a "material factor" supporting the Board's recommendation of the Merger. *Id*. at 61.

178. These statements were materially false and misleading because they misrepresented that the sale process was designed to maximize value for Focus shareholders and that the Defendants fostered a level playing field for all potential Focus bidders, when the Special Committee minutes demonstrate that Goldman Sachs, Jefferies and Defendant Adolf discouraged the consideration of strategic acquirors, stiff-armed ▮▮▮▮ and tilted the playing field toward CD&R from the very outset of the Company's sale process.

179. The Proxy also misrepresented the outreach to and evaluation of alternative strategic acquirors during the sale process. For example, in describing the Board's June 30, 2022 meeting in the initial phase of transaction considerations, the Proxy stated that:

> [t]he Board determined ***not to reach out to strategic acquirors*** at that time because the Company's unique business model, which emphasizes growth through acquisitions, substantial partner firm autonomy, and sharing economics and

ownership with its principals, would likely make it ***a more challenging transaction for a strategic acquiror***, as well as to mitigate potential competitive harm to the Company associated with sharing confidential information with a strategic acquiror too early in the Company's exploration of potential strategic transactions.

Proxy at 25.

180.    Yet, the minutes from this Board meeting reveal no discussion of any strategic acquirors or the challenges they purportedly faced in a transaction with Focus to substantiate this statement in the Proxy.  June 30, 2022 Board Meeting Minutes.  FOCAP00001064.  Nor did Goldman Sachs' presentation materials from the meeting mention *any* potential strategic buyers or *any* unique challenges they presented.  Goldman Sachs Presentation to Focus Financial Board dated June 30, 2022.  FOCAP00001065–73.  In fact, the Goldman Sachs presentation ***only*** analyzed CD&R and two other private equity firms as potential acquisition counterparties and contained ***no*** analysis of any strategic acquirors in the RIA sector to support the statement in the Proxy.

181.    The Proxy contained additional material misstatements and omissions concerning ███ early interest in a transaction with Focus.  In its description of a Board meeting on September 21, 2022, the Proxy stated that:

On September 21, 2022, the Board held a regularly scheduled meeting with Board members attending either in person or by videoconference and with representatives of Goldman Sachs, representatives of Vinson & Elkins LLP, outside legal advisor to the Company ("V&E"), and members of Company management in attendance …. Representatives of Goldman Sachs reviewed feedback received from Party A, Party B, Party C, and Party D . . .

Proxy at 26.

182.    This statement was materially misleading because it entirely omitted that just one day prior, on September 20, 2022, ████████, was introduced to Defendant Adolf for a discussion concerning ███ interest in acquiring Focus.  The Proxy's description of the

September 21 Board meeting gave the misleading impression that only Parties A through D were in communication with Focus on a potential transaction, when in fact, the most senior executives at ███ (described in the Proxy as "Party I") and Focus had also communicated on a potential merger.

183.    This statement was also materially false and misleading because it failed to disclose that, in addition to Stone Point's appointees to the Focus Board (Defendants Carey and Muhtadie), other senior Stone Point representatives were present at the meeting. Nikhil Dixit, a Stone Point Director, and Alexander Sarnoff, a Stone Point Vice President, were also present for the entire September 21 Board meeting despite Stone Point's significant conflicts of interest as Focus' largest shareholder. *See supra* Section I.C.2. Focus shareholders were completely unaware that Stone Point had a substantial senior executive presence at the meeting, which further demonstrated Stone Point's substantial influence and control over the merger negotiation process.

184.    Defendants also misstated the status of the Company's communications with ███ in the December 2022 time frame. In describing the Special Committee meeting held on December 12, 2022, the Proxy stated that:

> [t]he representatives of Goldman Sachs also reviewed Goldman Sachs' outreach to other potential acquirors earlier that year, [and] discussed its recent communications with Party E [███████████████████████ .… Representatives of Goldman Sachs also discussed certain potential buyers for the Company, including noting that the ***Company's unique business model would likely make it a more challenging transaction for a strategic acquiror*** . . .

Proxy at 33. In referencing the Special Committee meeting on December 14, 2022 in the Proxy, Defendants similarly stated that "[Focus] management . . . also discussed Mr. Adolf's conversation with Party E ███████ on December 5, 2022." *Id.*

185.    Both statements in the Proxy were materially false and misleading because they entirely omitted any reference to the facts that: (i) the CEO of strategic acquiror ███ was

introduced to Adolf on September 20, 2022 to discuss ██████ interest in acquiring Focus Financial; (ii) ████████████████, attempted to schedule a meeting with Adolf throughout September and October 2022 to discuss an acquisition; and (iii) Adolf and ██████ had in fact met on November 15, 2022, during which meeting ██████ indicated ██████ interest in a "transformative transaction" with Focus. By only referencing Adolf's discussions with ████████ a financial sponsor for a merger—and the challenges purportedly facing potential strategic acquirors of Focus, Defendants gave the false impression that no viable interest from a strategic acquiror in the RIA sector existed or had even been discussed at this point. In truth, ██████ had at this time affirmatively expressed a concrete interest in acquiring Focus, and the CEOs of both companies had already met to discuss such a transaction.

186.    Even in its references to "Party I" (now known to be ██████), the Proxy repeatedly misstated the sale process by omitting that ██████'s CEO had affirmatively expressed a concrete interest in a transaction directly to Focus' CEO, Adolf. In describing the Special Committee meeting on December 28, 2022, the Proxy stated that:

> [r]epresentatives of Goldman Sachs also reviewed their prior discussions with Party A, Party B, Party C, Party D, and Party E regarding a potential acquisition of the Company. The potential list of parties to contact included certain parties that Goldman Sachs had previously contacted as well as [a] new financial sponsor as well as **strategic acquirors**. After discussion at the meeting, the Special Committee authorized the Special Committee Financial Advisors to contact six financial sponsors, Party A, Party B, Party E, Party F, Party G and Party H, **and one strategic acquiror, Party I** ██████, regarding a potential acquisition of the Company.

Proxy at 35.

187.    Once again, in referencing prior contacts with these potential bidders, Defendants concealed that "Party I" ██████ "**had previously expressed an interest** [to Defendant Adolf] **in engaging in a transformative transaction**" with Focus. December 28, 2022 Special Committee

Meeting Minutes, at FOCAP00001642.  By December 28, Adolf, Goldman Sachs and Stone Point had already significantly advanced merger negotiations with their preferred bidder, CD&R.

188.    Defendants further concealed that their favoritism towards CD&R was undermining Focus' ability to receive potential value-maximizing offers from competing bidders. For example, the Special Committee met on January 6, 2023 to discuss CD&R's purported "best and final" January 5 Offer at $51.50 per share.  In describing this meeting and the status of Jefferies' and Goldman Sachs' outreach to other potential acquirors, the Proxy stated:

> At different points in the meeting, the Special Committee Financial Advisors reported on the status of outreach to other potential acquirors, the feedback received from potential acquirors to date, including interest in providing a preliminary and non-binding bid, and the potential impact on the outreach to other potential acquirors of entering into exclusivity with CD&R at this time.

Proxy at 37.

189.    This statement was materially false and misleading because it failed to inform shareholders that certain potential acquirors had already indicated their concern about engaging in deal negotiations given CD&R's favored treatment.  Indeed, the minutes for the January 6, 2023 Special Committee meeting state that one financial sponsor bidder would "only [participate] if the process was on a level playing field, and had further indicated that such sponsor would not participate in a post-signing go-shop."  FOCAP00001626.  Another bidder similarly stated that it did not want to serve as a "stalking horse" in a bidding process.  FOCAP00001589.  These material facts demonstrating how other potential bidders were being deterred from the sale process were not disclosed to shareholders during the class period.

190.    Defendants also provided a misleading rationale for their ultimate decision to grant CD&R exclusivity and choose its final acquisition offer of $53 per share over ████ higher offer

of $55 per share. Specifically, Defendants stated in the Proxy that during the Special Committee's

meeting on January 29, 2023:

> The Special Committee reviewed its rationale for having the Company enter into exclusivity, including that it believed that it had engaged in a rigorous process to achieve the best price reasonably available for all of the stockholders of the Company and that a Potential Transaction at a price per share of $53.00 in cash was, in the Special Committee's view, more likely to be consummated than a transaction with Party I at a preliminary price per share of $55.00 in cash, **_considering, among other things, Party I's remaining due diligence, the risks associated with Party I's need to obtain third-party debt and equity financing_** and each party's ability to consummate a potential acquisition of the Company.

Proxy at 47.

191.    This statement was materially false and misleading because it misrepresented that,

in fact, Defendants' actions during the sale process caused this informational and financing

disadvantage for ███. In the fall of 2022, Defendants failed to engage with ███ despite its

CEO's stated readiness to engage in a "transformative transaction" with Focus. Moreover, it was

*Defendants* who refused to provide additional due diligence to ███ even though ███ and

CD&R had requested the same amount of time to complete their due diligence of Focus. The

statement in the Proxy therefore gave the false impression that ███ was somehow responsible

for its position behind CD&R in the sale process when it was actually the result of Defendants'

own recalcitrance.

### 3.    The Proxy Further Misrepresented the Sale Process By Omitting How CD&R Incentivized Stone Point and Senior Focus Management

192.    Defendants further misstated the sale process by failing to disclose that CD&R

incentivized Defendants Adolf and Kodialam to zero in on its bid to the exclusion of other bidders

by indicating that CD&R would retain Focus' current management team in the post-Merger

company. For example, in describing CD&R's initial acquisition offer on September 14, 2022,

the Proxy stated that:

On September 14, 2022, CD&R submitted a written non-binding offer to acquire all of the outstanding common stock of the Company and all of the Focus LLC equity interests for $50.00 per share (or equity interest, as applicable) in cash. CD&R's proposal indicated that it assumed the full acceleration and satisfaction of the obligations under the Tax Receivable Agreements . . . .CD&R's proposal also contemplated that it expected to fund the acquisition through a combination of equity and debt financing and it was subject to the completion of CD&R's due diligence and the negotiation of definitive transaction documents.

Proxy at 26.

193.    This statement was materially misleading because it failed to disclose the critical fact that CD&R had conveyed its intent to retain senior Focus executives to partner with CD&R in operating the post-Merger Company.  The Proxy omitted that CD&R's September 14 offer letter stated that "[g]iven our investment philosophy and experience base, we believe that CD&R would be an ***outstanding partner for the management team*** as it works to increase the long-term value of Company."  Letter from CD&R to Goldman Sachs dated September 14, 2022, at FOCAP00002152.  This undisclosed incentive to Defendants Adolf and Kodialam, as well as the other Officer Defendants, served to further cement CD&R's position as Defendants' preferred buyer to the exclusion of other bidders, including ██████ throughout the sale process.

194.    In describing CD&R's November 9 Offer, the Proxy stated that on

November 9, 2022, a representative of CD&R contacted a representative of Goldman Sachs to discuss CD&R's interest in a Potential Transaction, during which CD&R orally communicated that it had lowered its proposed offer price from $50.00 to $45.00 per share . . . A representative of CD&R also said that CD&R had an interest in the ***possibility*** of Stone Point potentially participating in a Potential Transaction but that this ***was not a prerequisite for CD&R's engagement***.

Proxy at 27–28.

195.    This statement was materially false and misleading because it failed to disclose that CD&R informed Goldman Sachs that CD&R "would ***require a partner or partners*** in connection with a transaction."  Moreover, the statement omitted the material fact that CD&R had linked its

lowered bid to unique benefits for Stone Point and the Officer Defendants. Specifically, CD&R stated that "*it was interested in Stone Point and management being a part of the go forward capital structure, participating in the [Merger], and by providing [them a] 'material roll-over of equity*." Thus, the statement did not disclose that CD&R had an expectation of a "*material* roll-over of equity" from Stone Point as part of CD&R's bid.

196.    On December 1, 2022, CD&R made a revised offer to acquire Focus for $47.50 per share and requested exclusivity in deal negotiations with Focus (the "December 1 Offer"). The Proxy described the December 1 Offer as follows:

> On December 1, 2022, a representative of CD&R called a representative of Goldman Sachs to communicate CD&R's further revised proposal. In the course of that conversation, the representative of CD&R informed the representative of Goldman Sachs that CD&R had increased its proposed offer price to $47.50 in cash per share. The representative of CD&R also conveyed to the representative of Goldman Sachs CD&R's views on financing and timing for a Potential Transaction. Following this discussion, CD&R delivered a written proposal documenting the foregoing, which was accompanied by a draft exclusivity agreement providing for a period of exclusivity through December 25, 2022, with customary extension provisions.

Proxy at 31–32.

197.    The Proxy's description of CD&R's December 1 Offer was materially misleading because it omitted any reference to CD&R's desire to retain Focus' senior management to operate the post-Merger Company, which served as a further incentive for the Officer Defendants and was not present in ███ subsequent offer. Specifically, the Proxy failed to disclose that in connection with its December 1 Offer, CD&R stated that it was "extremely impressed in [its] interactions with the Focus management team" and that its "investment thesis" was based on "supporting the management team" in an acquisition. FOCAP00002618. CD&R also stated it would further negotiate "the nature of this partnership [with Focus management], management agreements, and management's rollover of its existing [Focus] equity stake in the future" as part of its December 1

Offer.  *Id.*  Goldman Sachs explained to the Special Committee that CD&R wanted to "incentivize members of Company management to remain with the Company through and after closing."  Yet, none of these details were disclosed in the Proxy's description of the December 1 Offer.

198.    The Proxy's description of CD&R's subsequent December 10 Offer was similarly misleading as it merely stated that:

> [On December 10, 2022], CD&R delivered a written copy of a further revised proposal with an offer price of $50.00 per share in cash.  Such proposal also included a list of CD&R's outstanding due diligence items, an expected timetable for executing a definitive transaction agreement and a request for exclusivity between CD&R and the Company that would run through at least January 6, 2023.

Proxy at 33.

199.    Like the Proxy's description of CD&R's December 1 Offer, this description of CD&R's December 10 Offer was materially misleading because it omitted that CD&R wanted to partner with Focus' senior management to run the post-Merger Company.  This was an additional incentive to the Officer Defendants that further served to favor CD&R over potential bidders in the RIA sector such as ███.

### 4.    The Proxy Omitted That Goldman Sachs Limited the Pool of Potential Bidders for Focus As a Result of its Concurrent Engagement on the Competing NKSFB Sale

200.    The Proxy's representation that the Merger was the product of a "procedur[ally] fair[]" sale process was also materially misleading because it failed to inform shareholders that Goldman Sachs' concurrent representation of NKSFB in its parallel sales process limited the pool of potential acquirors for Focus.

201.    The Proxy's generic description of the NKSFB lawsuit wholly omitted this material fact.  In a brief section of the Proxy titled "Litigation Relating to the Mergers," the Proxy stated that:

> On March 28, 2023, Mark "Mickey" Segal and KSFB Management, LLC

("KSFB"), the management company for NKSFB, LLC ("NKSFB"), one of the Company's more than 85 partner firms, brought an action against Focus LLC and Goldman Sachs in the Superior Court of California in Los Angeles County.  The complaint alleges, among other things, that Focus LLC's and Goldman Sachs' efforts in respect of a potential sale of the Company to CD&R violated certain duties and obligations owed to Mr. Segal and KSFB in connection with a separate potential transaction involving the sale of NKSFB and KSFB.  Mr. Segal and KSFB are seeking unspecified damages.  The Company believes the action is without merit and intends to vigorously contest all allegations.

Proxy at 117.

202.    This reference to the NKSFB lawsuit was materially misleading because it failed to disclose that Goldman Sachs' efforts to sell Focus involved a narrower outreach to potential buyers because Goldman Sachs sought to avoid parties involved in the NKSFB process.  It also failed to disclose that Goldman Sachs' Patrick Fels was the lead advisor on both sales processes.  Unbeknownst to Focus shareholders, this limited the universe of potential bidders for Focus and artificially narrowed the list of potential bidders for the Company.

203.    Defendants similarly omitted this material fact when they described Goldman Sachs' formal retention by the Special Committee on November 16, 2022.  In this regard, the Proxy stated that:

As part of engaging Goldman Sachs as a financial advisor to the Special Committee, the Special Committee considered that Goldman Sachs had also started working, even though it had not yet been formally engaged, as a financial advisor to (i) the Company and (ii) a management company of the Company's partner firm in connection with the exploration of a potential sale of such partner firm and its management company.  The Special Committee did not believe that this additional role **would present a material conflict of interest for Goldman Sachs** in serving as a financial advisor to the Special Committee in connection with its evaluation of a Potential Transaction.

Proxy at 29.

204.    Once again, this statement was materially false and misleading because it gave Focus shareholders the erroneous impression that Goldman Sachs' dual engagement with Focus

70

and an undisclosed "management company [KSFB] of the Company's partner firm [NKSFB]" presented no Goldman Sachs conflicts and would not interfere with Focus' sale. In truth, Goldman Sachs' dual representation of Focus and KSFB served to limit the number of potential bidders for Focus—a fact that was never disclosed to Focus shareholders during the Class Period.

205.    It is now known that Goldman Sachs did not contact at least the following seven potential bidders for Focus that were also involved in the parallel NKSFB–KSFB sale process until *after* the CD&R Merger was announced and the Merger Agreement executed: (i) ██████; (ii) ██████; (iii) ██████; (iv) ██████████; (v) ████████████; (vi) ████████; and (vii) ██████████.

### 5. The Proxy Falsely Reported That the Special Committee and Board Believed the Merger Consideration Was More Favorable Than Reasonably Available Alternatives

206.    Both the Special Committee and the Board recommended in the Proxy that shareholders vote in favor of the Merger. This recommendation was based on their purported determination that the Merger was more favorable to Focus' shareholders than reasonable alternatives—including remaining a standalone public company or a potential alternative transaction with other parties.

207.    Specifically, the Proxy stated "[t]he Special Committee unanimously [] determined that the Merger Agreement and the transactions contemplated thereby, including the Mergers, are *fair to*, and in the ***best interests of***, the Company and the Unaffiliated Stockholders." Proxy at 54.

208.    As to the Board, the Proxy similarly stated that "[t]he Board, acting upon the recommendation of the Special Committee, unanimously [] determined that the Merger Agreement and transactions contemplated thereby . . . are ***fair to***, and in the ***best interests of***, the Company and its stockholders, including the Unaffiliated Stockholders[.]" *Id.* at 61.

209.    The Proxy likewise advanced the Special Committee's "*assessment that other parties likely did not have either the interest in, or capability to, acquire the Company on the terms and conditions offered by CD&R*." *Id*. at 55.

210.    The Proxy further stated that the Special Committee determined "that *none of the possible alternatives* to the Mergers . . . was reasonably likely to present superior opportunities for the Company to create greater value for the shareholders of the Company[.]" *Id*. at 54.

211.    Each of these statements in the Proxy cited in ¶¶ 207–210 was false and misleading because they failed to disclose material facts concerning the Merger, including that: (i) the Company's dominant shareholder, Stone Point, preferred a transaction with CD&R, as opposed to ▮▮▮▮ (who was prepared to offer $2 more per share to Focus shareholders), given Stone Point's interest in obtaining a more lucrative equity rollover partnering with a private equity firm; (ii) the Special Committee Defendants were neither disinterested nor independent, given their personal financial windfall under the TRA Payments, their compensation increase awarded just before approving the Merger, and the acceleration of their unvested equity awards; and (iii) Goldman Sachs suffered from numerous conflicts of interest given their extensive prior engagements with CD&R and longstanding ties to Stone Point, as well as their concurrent representation of KSFB in a parallel sale process of KSFB and Focus affiliate NKSFB, that together served to limit the pool of potential acquirors considered by the Special Committee.

### 6.    The Proxy Omitted That Jefferies' Discretionary Compensation Was Materially Increased Just Before Its Fairness Opinion Was Issued

212.    The Proxy contained material representations about Jefferies' purported independence as the Special Committee's second financial advisor, and the significant increase in its discretionary compensation just prior to presenting its fairness opinion on the Merger.

213.    Jefferies is described in the Proxy as an "independent financial advisor" to the Special Committee that was retained only after the Special Committee was satisfied Jefferies was independent.  Proxy at 34 (stating that Jefferies retention was subject to the "Special Committee's satisfaction with the independence of Jefferies").

214.    The Proxy's description of the Special Committee meetings on February 25 and 26, 2023 failed to disclose that Jefferies was awarded an eight-times increase in its discretionary fee before rendering its positive fairness opinion on the Merger.  With respect to the February 25, 2023 Special Committee meeting, the Proxy merely stated that "[o]n February 25, 2023, the Special Committee held a meeting by videoconference with representatives of each of Potter Anderson, the Special Committee Financial Advisors and V&E and members of Company management in attendance," and purports to describe the issues discussed at the meeting.  Proxy at 52.

215.    The Proxy similarly stated that "[o]n February 26, 2023, the Special Committee held a meeting by videoconference with representatives of each of Potter Anderson, the Special Committee Financial Advisors and V&E in attendance," and offered a description of the issues discussed at that meeting, including that "Jefferies rendered [its] oral fairness opinion to the Special Committee[.]"  *Id*. at 52–53.

216.    The statements in the Proxy referenced in ¶¶ 213–15 above were materially false and misleading because they failed to disclose that the Special Committee discussed and approved an increase of Jefferies' discretionary fee as the Board's second financial advisor on the Merger (*i.e.*,  from $1 million to $8 million).  As noted above, during the February 25 Special Committee meeting, Mark Morton of Potter Anderson raised prior Special Committee discussions on "***amending Jefferies' engagement letter to provide for a larger discretionary fee***," and noted that

Potter Anderson and Jefferies had "reviewed a form of amendment to Jefferies' engagement letter." *See supra* Section II.C.

217.    Further omitted was the fact that at its meeting on February 26 to approve the Merger, the Special Committee also approved resolutions to amend the Jefferies engagement letter and adopted a letter amendment that increased Jefferies' discretionary fee from $1 million to $8 million, for a total potential fee of $12.5 million as the Special Committee's second financial advisor. *Id.* While the Proxy referenced the $8 million discretionary fee payable to Jefferies, it wholly omitted the material fact that the fee was increased eightfold before Jefferies issued its fairness opinion in favor of the Merger. This was highly material information that Focus shareholders should have been given before considering Jefferies' fairness opinion.

## ADDITIONAL ALLEGATIONS OF SCIENTER

218.    As alleged herein, Defendants acted with scienter in that Defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Focus during the Class Period and detailed in Section III above were materially false and misleading. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of those statements as primary violators of the federal securities laws.

219.    Defendants participated in the fraudulent scheme alleged herein by virtue of their receipt of information reflecting the true facts regarding Focus and the Focus sale process, their control over, receipt, and/or modification of Focus' materially misleading statements and omissions, and/or their positions with the Company, which made them privy to confidential information concerning Focus and the Focus sale process.

220.    In their roles as Directors and Officers of the Company during the Class Period, Defendants directly participated in the management of Focus' operations and, because of their

positions at Focus, were involved in the drafting, reviewing, publishing and/or disseminating of the materially false and misleading statements and information alleged herein, and possessed the power and authority to control the contents of Focus' press releases and Proxy in connection with the Merger. The Proxy was in fact signed by Defendants Adolf and McGranahan, and issued "By Order of the Board of Directors" of Focus.

221. The allegations detailing Defendants' fraudulent scheme in Sections I–III above are incorporated in this Section by reference and provide evidence of Defendants' scienter. In addition to those facts set forth above, the facts summarized below, viewed collectively, give rise to a strong inference that Defendants acted knowingly, or severely recklessly, when they concealed from the market the following material facts.

222. *First*, the $7 billion Merger was the most significant in the Company's history. The Merger would transform Focus from a publicly traded company to a private company and would cash out the public shareholders while allowing Stone Point to participate on the buy-side of the deal. At all relevant times, Adolf was CEO and Chairman of the Board, Kodialam was the Company's COO and a Board member, and two of Focus' directors (Defendants Carey and Muhtadie) were Stone Point managing directors with personal knowledge of, and involvement in, Stone Point's efforts to steer the Focus sale to CD&R. Accordingly, it is implausible that the senior executives and directors of Focus were unaware of the details of such an important and transformative transaction, including their favoritism of CD&R throughout the process.

223. *Second*, Defendants were well aware of Stone Point's unique position as a significant private equity investor in Focus that, in the short term, needed to return capital to its investors. As noted, two Stone Point managing directors served on Focus' Board at the time of the Merger. Accordingly, Stone Point sought a way to return capital to its investors—via the

TRAs—while also rolling over its Focus equity and participating on the buy-side of the deal. Based on a June 30, 2022 presentation from Goldman Sachs, Defendants knew it was a "challenging market to execute a deal," but Stone Point's needs took precedence over maximizing shareholder value. Defendants knowingly allowed Stone Point's unique financial needs to drive the deal towards their preferred bidder, CD&R.

224. *Third,* the fact that the Merger with CD&R would include the retention of the Company's existing management team further supports scienter. During the merger negotiation process, CD&R made clear in an offer letter that it wanted to retain Focus' senior executives—including Defendant Adolf and the other Officer Defendants—to run the Company after the Merger closed, while also allowing them to roll over their equity into the newly private company. While the Proxy portrays outreach to strategic parties as a fruitless act—stating twice that the Company's unique business model "would likely make it a more challenging transaction for a strategic acquiror"—the Proxy omits the fact that ███████████ had spoken to Adolf in September 2022 about ██████ interest in acquiring Focus, and further omitted numerous other references to ██████ including ██████ failed attempts to schedule meetings with Adolf, and ██████ November 2022 meeting with Adolf in which he indicated ██████ interest in a "transformative transaction" with Focus. An acquisition by a strategic party in the RIA sector, like ██████ would subject Focus management to employment uncertainty, as the acquiror may be inclined to terminate management in favor of the acquiror's own existing leadership. Indeed, unlike CD&R, ██████ made no assurances that it would retain Focus management. Thus, CD&R was favored throughout the process.

225. *Fourth,* the Special Committee members had strong personal and financial motivations to favor a deal with CD&R over a deal with other bidders and to support a sale

generally over continued operation of Focus as a standalone company.  Approving the deal meant that each of the Special Committee Defendants received total cash payments from the Merger that ranged from $729,467 to $943,690, inclusive of the TRA Payments, the acceleration of unvested awards, and the Special Committee fee increase they awarded to themselves moments before approving the Merger.  These payments alone provided each Special Committee Defendant with income that would rank in the top 1% of all earners in 2023 in the U.S., thereby incentivizing the Special Committee Defendants to approve the Merger for personal financial gain.  Moreover, as discussed in Section II, the Special Committee members had a number of personal and financial entanglements with Adolf and Stone Point.  Though Defendants touted the Special Committee as consisting "solely of independent and disinterested directors," the Committee was highly conflicted and motivated to approve the unfair Transaction for reasons other than the deal's merits.

226.    *Fifth,* the Defendants were aware the deal process was flawed because of Goldman Sachs' representation of KSFB in a parallel sale process, which limited the outreach to potential acquirors of Focus.  The Proxy acknowledges that the Special Committee knew Goldman Sachs was engaged simultaneously in both the NKSFB sale process and the Focus sale process, and that the "Special Committee did not believe that this [dual representation] ***would present a material conflict of interest for Goldman Sachs***."  Proxy at 29.  But the Proxy fails to disclose that Goldman Sachs' dual representation was so problematic that at least seven potential bidders for Focus were never contacted before Defendants agreed to the Merger with Focus.  The Defendants' desire to do a deal with CD&R, and Goldman Sachs' desire to maximize its advisory fees, meant that seven potential buyers had no meaningful opportunity to compete with CD&R to maximize value for Focus' public shareholders.

227.    Further, Focus acted with scienter because the scienter of the Officer and Director Defendants is imputed to the Company that these Defendants spoke on behalf of and controlled. The Officer and Directors Defendants each made materially false statements and omissions that misled investors, as detailed in Section III herein.

## LOSS CAUSATION

228.    As described herein, Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants made materially false and misleading statements and omissions of material fact in the Proxy.  Their materially false and misleading statements and omissions as set forth above caused Lead Plaintiffs and other members of the Class to accept the Merger Consideration that failed to adequately value Focus' common stock.  As a result, Lead Plaintiffs and other Class members suffered damages under Section 14(a) of the Exchange Act.

229.    During the Class Period, Defendants also engaged in a scheme to deceive investors. Defendants' materially false and misleading statements as set forth above artificially depressed the price of Focus' common stock below the price at which Focus common stock would have traded absent those material misrepresentations and omissions.

230.    Had the market known the full truth about Focus' financial and business prospects and the Focus sales process, Focus' stock price would have been trading at higher prices during the Class Period reflecting the Company's true strategic opportunities (including a potential deal with ███ or other suitors willing to pay *more* than CD&R), Focus' financial performance, and expected growth.  Instead, based on Defendants' misrepresentations, Focus' stock price became tethered to the underpriced Merger Consideration, as indicated in the following chart:



231.    Defendants' materially false and misleading statements and omissions of material fact operated as a fraud or deceit on Lead Plaintiffs and the Class, and induced Lead Plaintiffs and the Class to sell Focus shares at prices that were below the actual value of those securities, including by selling their shares into the Merger for the inadequate Merger Consideration, and thereby caused damage to Lead Plaintiffs and the Class.  As a result of their sales of Focus' common stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under Section 10(b) of the Exchange Act.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR

232.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking statements. Further, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of the Company who knew that the statement was false when made.

### CLASS ACTION ALLEGATIONS

233. Lead Plaintiffs bring this Action on their own behalf and as a class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of all sellers of Focus common stock who sold their shares from February 27, 2023 through the closing of the Merger on August 31, 2023 (the "Class"), including those shareholders who held Focus common stock on the Record Date and were entitled to vote on the Merger. Excluded from the Class are Defendants and any person, firm, trust, corporation, or other entity related to, or affiliated with, any of the Defendants.

234. This Action is properly maintainable as a class action.

235. The Class is so numerous that joinder of all members is impracticable. According to the Proxy, there were 66,015,587 shares of Focus Class A common stock outstanding as of June 9, 2023, the Record Date. Proxy at 18, 158. Upon information and belief, there are hundreds or thousands of members of the Class.

236. There are questions of law and fact that are common to the Class, including, among others:

(a) Whether Focus, the Special Committee Defendants, Board Defendants and Officer Defendants violated Sections 10(b) and/or 14(a) of the Exchange Act and 10b-5 and/or Rule 14a-9 promulgated thereunder;

(b) Whether the Board and Officer Defendants violated Section 20(a) of the Exchange

Act;

(c)    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)    Whether the price of Focus common stock was artificially deflated during the Class Period;

(f)    Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    The extent of damage sustained by Class members and the appropriate measure of damages.

237.    Lead Plaintiffs' claims are typical of those of the Class because Lead Plaintiffs and the Class have been damaged by Defendants' wrongful conduct.

238.    Lead Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation.  Lead Plaintiffs have no interests that conflict with those of the Class.  All members of the Class have suffered the same harm.

239.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the parties opposing the Class.  Conflicting adjudications for individual members of the Class might be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.  Therefore, a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

240.    The questions of law and fact common to the members of the Class predominate over any questions affecting only its individual members, such that a class action is superior to any other available method for fairly and efficiently adjudicating the controversy.

## PRESUMPTION OF RELIANCE

241.    Lead Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated in part upon material omissions of fact that Defendants had a duty to disclose.  Because this Action involves Defendants' failure to disclose information regarding Focus' business and sale process, among other things, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material such that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

242.    In the alternative, Lead Plaintiffs are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the market doctrine because, at all relevant times, the market for Focus securities was open, efficient, and well developed for the following reasons, among others:

(a)    Focus was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Focus filed periodic public reports with the SEC and/or the NASDAQ;

(c)    The price of Focus common stock reacted to the announcement of the Merger and remained near the estimated per share Merger Consideration during the Class Period;

(d)    Focus regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(e)    Focus was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and

certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

## COUNT I

**Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) Promulgated Thereunder**

243.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

244.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (ii) cause Lead Plaintiffs and other members of the Class to sell Focus securities at artificially deflated prices.

245.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the sellers of the Company's securities in an effort to maintain artificially low market prices for Focus securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

246.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal material information about the Company's financial well-being, operations, and prospects, as well as material information concerning the Merger and the sale process.

247.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

248.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to falsely misrepresent Focus' true financial condition and material information regarding the Merger and the sale process from the investing public and to support the artificially low prices of the Company's securities.

249.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective sales of the Company's securities during the Class Period.

250.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c) promulgated thereunder.

## COUNT II

### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

251.    Lead Plaintiffs incorporate each and every allegation set forth in Paragraphs 1-217 and 228-240 as if fully set forth herein.

252.    Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants disseminated a false and misleading Proxy containing statements that, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, and in light of the circumstances under which they were made, misrepresented or omitted material facts necessary to make the statements therein not materially false or misleading.

253.    The Proxy was prepared, reviewed, and/or disseminated by Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants.  Each of the Defendants

authorized the dissemination of the Proxy, the use of their names in the Proxy, and were involved in the sale process leading up to the signing of the Merger Agreement.

254.    Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants were at least negligent in issuing a false and misleading Proxy. Lead Plaintiffs, while reserving all rights, expressly disclaim and disavow at this time any allegation that could be construed as alleging fraud against Focus, the Special Committee Defendants, Board Defendants and Officer Defendants in connection with this Count. This claim sounds in negligence based on the failure of Defendants to exercise reasonable care to ensure the Proxy did not contain the material misstatements and omissions alleged herein.

255.    The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to Focus shareholders.

256.    The Proxy was an essential link in causing Focus shareholders to approve the Merger.

257.    By reason of the foregoing, Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

258.    Because of the false and misleading statements in the Proxy, Lead Plaintiffs and the Class were harmed by an uninformed shareholder vote approving the Merger.

259.    This claim is brought within the applicable statute of limitations.

## COUNT III

**Against the Special Committee Defendants, Board Defendants and Officer Defendants
for Violations of Section 20(a) of the Exchange Act**

260.     Lead Plaintiffs incorporate each and every allegation set forth above as if fully set forth herein.

261.     Focus, the Special Committee Defendants, Board Defendants, and Officer Defendants disseminated false and misleading statements and a false and misleading Proxy in violation of Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, promulgated thereunder.

262.     The Special Committee Defendants, Board Defendants and Officer Defendants acted as controlling persons of Focus and culpably participated in the Exchange Act violations within the meaning of Section 20(a) of the Exchange Act as alleged herein.  In particular, each of the Special Committee Defendants, Board Defendants and Officer Defendants had direct and supervisory involvement in the day-to-day operations of Focus, and, therefore, had the power to control or influence the particular transaction giving rise to the Exchange Act violations alleged herein, and exercised the same.  The Special Committee Defendants, Board Defendants and Officer Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The statements and the Proxy purport to describe the various issues and information that the Special Committee Defendants, Board Defendants and Officer Defendants reviewed and considered before recommending the Merger to the Class.

263.     The Special Committee Defendants, Board Defendants and Officer Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The

Proxy also expressly stated that it was issued "By Order of the Board of Directors," and was signed by Defendant Adolf in his position as Chairman and CEO of Focus and Defendant McGranahan, General Counsel of Focus.

264.    The Special Committee Defendants, Board Defendants and Officer Defendants had the ability to exercise control over and did control a person(s) who has violated Sections 10(b) and 14(a) of the Exchange Act and Rules 10b-5 and 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, the Special Committee Defendants, Board Defendants and Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the conduct of the Special Committee Defendants, Board Defendants and Officer Defendants, Lead Plaintiffs and the Class were harmed by selling their shares at deflated prices and by an uninformed shareholder vote approving the Merger.

265.    By virtue of the foregoing, the Special Committee Defendants, Board Defendants and Officer Defendants have violated Section 20(a) of the Exchange Act.

266.    This claim is brought within the applicable statute of limitations.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment and relief as follows:

A.    Determining that this Action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Declaring that Focus, the Special Committee Defendants, Board Defendants and Officer Defendants violated Sections 10(b) of the Exchange Act, as well as Rule 10b-5 promulgated thereunder;

C.    Declaring that Focus, the Special Committee Defendants, Board Defendants and Officer Defendants violated Section 14(a) of the Exchange Act, as well as Rule 14a-9 promulgated thereunder;

D.      Declaring that the Special Committee Defendants, Board Defendants and Officer Defendants violated Section 20(a) of the Exchange Act;

E.      Awarding damages in favor of Lead Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest thereon;

F.      Awarding restitution and equitable relief to Lead Plaintiffs and the Class;

G.      Directing Defendants to account to Lead Plaintiffs and the Class for all damages suffered as a result of their wrongdoing;

H.      Awarding Lead Plaintiffs pre- and post-judgment interest and the costs of this Action, including reasonable allowance for Lead Plaintiffs' attorneys' and experts' fees; and

I.       Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Lead Plaintiffs respectfully request a trial by jury on all issues so triable.

Dated: June 4, 2024                              Respectfully submitted,

                                                **FARNAN LLP**

                                        By:   */s/ Brian E. Farnan*
                                                Sue L. Robinson (Bar No. 100658)
                                                Brian E. Farnan (Bar No. 4089)
                                                Michael J. Farnan (Bar No. 5165)
                                                919 North Market Street, 12th Floor
                                                Wilmington, DE 19801
                                                Telephone: (302) 777-0300
                                                Facsimile: (302) 777-0301
                                                Emails: srobinson@farnanlaw.com
                                                       bfarnan@farnanlaw.com
                                                       mfarnan@farnanlaw.com

                                                *Liaison Counsel for Lead Plaintiffs and the Putative Class*

Vincent R. Cappucci (*pro hac vice forthcoming*)
Robert N. Cappucci (*pro hac vice forthcoming*)
Jonathan H. Beemer (*pro hac vice forthcoming*)
Jessica A. Margulis (*pro hac vice forthcoming*)
**ENTWISTLE & CAPPUCCI LLP**
230 Park Avenue, 3rd Floor
New York, New York 10169
Telephone:  (212) 894-7200
Facsimile:  (212) 894-7272
Email:  vcappucci@entwistle-law.com
         rcappucci@entwistle-law.com
         jbeemer@entwistle-law.com
         jmargulis@entwistle-law.com


David J. Schwartz (*pro hac vice forthcoming*)
David Wales (*pro hac vice forthcoming*)
Marco A. Dueñas (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
10 Bank Street, Ste. 882
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile: (888) 631-3611
Email: dschwartz@saxenawhite.com
        dwales@saxenawhite.com
        mduenas@saxenawhite.com

Thomas Curry (Bar No. 5877)
**SAXENA WHITE P.A.**
824 N. Market St., Suite 1003
Wilmington, DE 19801
Telephone: (302) 485-0483
Facsimile: (888) 424-8566
Email: tcurry@saxenawhite.com

Adam Warden (*pro hac vice forthcoming*)
Jonathan Lamet (*pro hac vice forthcoming*)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
Email: awarden@saxenawhite.com
        jlamet@saxenawhite.com

89

*Lead Counsel for Lead Plaintiffs and the
Putative Class*

Vincent Briganti (*pro hac vice forthcoming*)
Raymond Girnys (*pro hac vice forthcoming*)
Andrea Farah (*pro hac vice forthcoming*)
**LOWEY DANNENBERG P.C.**
44 South Broadway, Suite 1100
White Plains, New York 10601
Telephone:  (914) 997-0500
Facsimile:  (914) 997-0035
Email:  vbriganti@lowey.com
           rgirnys@lowey.com
           afarah@lowey.com

*Additional Counsel for Lead Plaintiffs and the
Putative Class*

## CERTIFICATION AND AUTHORIZATION

I, Rahul Patel, on behalf of Kryger Capital LLC, hereby certify as to the claims asserted under the federal securities laws in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), that:

1.  In my capacity as Head of Research & Trading of Kryger Capital LLC, I am personally authorized to enter into and execute this certification on behalf of Kryger Event Fund Ltd. and Kryger Enhanced Fund Ltd. (collectively, "Kryger").  I have reviewed the Complaint to be filed in this action and have authorized its filing by counsel.

2.  Kryger did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.  Kryger is willing to serve as a lead plaintiff and representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary. Kryger fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.  Kryger's transactions in Focus Financial common stock during the Class Period are set forth in the attached Schedule A.

5.  Kryger has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Water Island Event-Driven Fund v. MaxLinear, Inc.*, No. 3:23-cv-01607 (S.D. Cal.).

6.  Kryger has sought to serve as a lead plaintiff or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff appointment, was not appointed lead plaintiff, or the lead plaintiff decision is still pending: *None*.

7.  Kryger will not accept any payment for serving as a representative party on behalf of the Class beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages,) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed this _____ 3rd day of _____ June, 2024.

DocuSigned by:

Rahul Patel
*Head of Research & Trading of Kryger Capital LLC, and authorized signatory for Kryger Event Fund Ltd. and Kryger Enhanced Fund Ltd.*

2

## SCHEDULE A
### Transactions in Focus Financial Partners Inc.

### Kryger Event Fund Ltd.

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 04/11/23 | 161,607 | $51.7500 |
| 04/19/23 | 52,149 | $51.9767 |
| 04/20/23 | 323,213 | $51.9719 |
| 08/30/23 | 274,374 | $52.9648 |
| 08/30/23 | 101,762 | $53.0095 |
| 08/30/23 | 20,352 | $53.0000 |
| 08/30/23 | 20,352 | $53.0000 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 06/30/23 | 11,091 | $52.5113 |
| 08/24/23 | 85,887 | $52.5500 |
| 09/01/23 | 856,831[1] | $53.0000 |

[1] *Shares tendered in merger*

### Kryger Enhanced Fund Ltd.

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 04/11/23 | 104,387 | $51.7500 |
| 04/19/23 | 33,684 | $51.9767 |
| 04/20/23 | 208,775 | $51.9719 |
| 04/28/23 | 3,154 | $51.9450 |
| 05/01/23 | 954 | $51.9408 |
| 06/01/23 | 742 | $51.9979 |
| 08/30/23 | 183,205 | $52.9648 |
| 08/30/23 | 67,948 | $53.0095 |
| 08/30/23 | 13,590 | $53.0000 |
| 08/30/23 | 13,590 | $53.0000 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 06/30/23 | 127 | $52.5113 |
| 08/01/23 | 429 | $52.3007 |
| 08/24/23 | 57,348 | $52.5500 |
| 09/01/23 | 572,125[1] | $53.0000 |

[1] *Shares tendered in merger*

*Shares held as of the 06/09/23 record date*:
 *Kryger Event Fund Ltd.*:      536,969
 *Kryger Enhanced Fund Ltd.*:  351,696

## CERTIFICATION AND AUTHORIZATION

I, Hilary L. Shane, as Managing Member of ODS Capital LLC ("ODS Capital"), hereby certify as to the claims asserted under the federal securities laws in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), that:

1.    I am personally authorized to enter into and execute this certification on behalf of ODS Capital.  I have reviewed the Complaint to be filed in this action and have authorized its filing by counsel.

2.    ODS Capital did not purchase or sell the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3.    ODS Capital is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.  ODS Capital fully understands the duties and responsibilities of the lead plaintiff under the Private Securities Litigation Reform Act of 1995, including the selection and retention of counsel and overseeing the prosecution of the action for the Class.

4.    ODS Capital's transactions in Focus Financial common stock during the Class Period are set forth in the attached Schedule A.

5.    ODS Capital has sought to serve and was appointed as lead plaintiff and/or representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

*S/M Merger Arbitrage, L.P. v. Emisphere Techs., Inc.*, No. 2:23-cv-20898 (D.N.J.).

6.    ODS Capital will not accept any payment for serving as a representative party on behalf of the Class beyond ODS Capital's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _____ day of _____, 2024.

*ODS Capital LLC*

_Hilary Shane_

DocuSigned By: Hilary Shane

Hilary L. Shane, Managing Member

2

DocuSign Envelope ID: 733F99DA-39CB-4929-8532-5576CC8A6304

**SCHEDULE A**

**ODS Capital LLC**

**Transactions in Focus Financial Partners Inc.**

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 03/06/23 | 20,000 | $51.8343 |
| 06/01/23 | 6,000 | $52.0266 |
| 06/02/23 | 6,000 | $52.0930 |
| 06/16/23 | 118 | $52.3800 |
| 07/14/23 | 40,000 | $52.4884 |
| 07/19/23 | 4,293 | $52.2045 |
| 08/10/23 | 9,021 | $52.3845 |
| 08/11/23 | 6,000 | $52.4567 |
| 08/17/23 | 100 | $52.1300 |
| 08/17/23 | 24,000 | $52.2342 |
| 08/28/23 | 208,900 | $52.9885 |
| 08/29/23 | 2,000 | $52.9800 |
| 08/29/23 | 130,000 | $52.9900 |
| 08/29/23 | 82,939 | $52.9894 |
| 08/29/23 | 214,348 | $52.9845 |
| 08/30/23 | 36,000 | $52.9944 |
| 08/30/23 | 75,000 | $52.9945 |
| 08/30/23 | 158,334 | $52.9674 |
| 08/30/23 | 430,871 | $52.9937 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 03/08/23 | 10,000 | $51.8301 |
| 09/01/23 | 1,443,924[1] | $53.0000 |

[1] *Shares tendered in merger*

*Shares held as of the 06/09/23 record date:* 22,000

## <u>CERTIFICATION</u>

I, Jonathon Hickey, on behalf of AltShares Event-Driven ETF and AltShares Merger Arbitrage ETF (collectively, the "Water Island Funds"), hereby certify, as to the claims asserted under the federal securities laws in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint"), that:

     1.     I am the Chief Operating Officer of Water Island Capital, LLC, the investment advisor to the Water Island Funds. I have reviewed the Consolidated Complaint to be filed in this action and have authorized its filing by counsel.

     2.     The Water Island Funds did not acquire any of the securities that are the subject of this action at the direction of their counsel or in order to participate in this action or any other litigation under the federal securities laws.

     3.     The Water Island Funds are willing to serve as Lead Plaintiffs in this action and recognize their duty as such to act on behalf of class members in monitoring and directing the action, and, if necessary, testifying at deposition and trial.

     4.     The Water Island Funds will not accept any payment for serving as representative parties on behalf of the class beyond their *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

     5.     The Water Island Funds have not served or sought to serve as a representative party for a class in any action filed under the federal securities laws within the three-year period prior to the date of this Certification except in *The Arbitrage Fund v. The Toronto-Dominion Bank*, No. 1:23-cv-02763-RBK (D.N.J.).

     6.     The Water Island Funds' relevant transactions in Focus Financial Partners Inc. securities that are the subject of this action are reflected in Schedule A hereto.

               I declare under penalty of perjury that the foregoing is true and correct.

Executed this 3rd day of June 2024

                                          _____

The Water Island Funds
By:  Jonathon Hickey
Chief Operating Officer of Water Island Capital, LLC, investment advisor to The Water Island Funds

**SCHEDULE A**
**AltShares Event-Driven ETF**
**Transactions in Focus Financial Partners, Inc.**

| Common Stock Purchases | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 3/2/2023 | 95 | $51.6665 |
| 3/8/2023 | 905 | $51.8165 |
| 3/9/2023 | 500 | $51.6054 |
| 6/30/2023 | 383 | $52.5341 |
| 7/7/2023 | 508 | $52.4905 |
| 7/19/2023 | 400 | $52.2524 |
| 8/8/2023 | 90 | $52.3800 |

| Common Stock Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 5/17/2023 | 94 | $51.9400 |
| 9/1/2023 | 2,787 [1] | $53.0000 |

[1] *Shares tendered in merger*

**SCHEDULE A**
**AltShares Merger Arbitrage ETF**
**Transactions in Focus Financial Partners, Inc.**

| Common Stock Purchases | | |
|---|---|---|
| Date | Shares | Price |
| 3/8/2023 | 20,000 | $51.8165 |
| 3/9/2023 | 45,069 | $51.7010 |
| 3/9/2023 | 245 | $51.5900 |
| 4/12/2023 | 772 | $52.0165 |
| 5/5/2023 | 507 | $51.9500 |
| 6/7/2023 | 1,470 | $52.3300 |
| 6/26/2023 | 3,744 | $52.4365 |
| 6/29/2023 | 218 | $52.5300 |
| 7/6/2023 | 327 | $52.4900 |
| 7/7/2023 | 1,417 | $52.4400 |
| 7/10/2023 | 545 | $52.4700 |
| 7/11/2023 | 545 | $52.4700 |
| 7/12/2023 | 6,948 | $52.5142 |
| 7/26/2023 | 1,540 | $52.1965 |
| 8/9/2023 | 11,565 | $52.3897 |

| Common Stock Sales | | |
|---|---|---|
| Date | Shares | Price |
| 3/15/2023 | 9,240 | $51.4100 |
| 3/23/2023 | 10,694 | $51.4206 |
| 4/26/2023 | 5,255 | $51.8892 |
| 5/9/2023 | 2,796 | $51.9131 |
| 5/23/2023 | 14,469 | $51.9591 |
| 5/23/2023 | 707 | $51.9900 |
| 6/9/2023 | 1,108 | $52.2531 |
| 8/23/2023 | 10,205 | $52.4341 |
| 9/1/2023 | 40,438 [1] | $53.0000 |

[1] *Shares tendered in merger*

## <u>CERTIFICATE OF SERVICE</u>

I, Brian E. Farnan, hereby certify that on June 4, 2024, a copy of the

Consolidated Class Action Complaint for Violations of the Federal Securities Laws

was served via e-mail on the following:

James M. Yoch, Jr.
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
jyoch@ycst.com

*Attorneys for the Defendants*

Craig Zieminski
Andy Jackson
VINSON & ELKINS L.L.P.
czieminski@velaw.com
ajackson@velaw.com

*Attorney for Defendants*

/s/ *Brian E. Farnan*
Brian E. Farnan (Bar No. 4089)