IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE FOCUS FINANCIAL PARTNERS SECURITIES LITIGATION | ) ) | C.A. No. 23-1466 (MN) |

## <u>MEMORANDUM OPINION</u>

Sue L. Robinson, Brian E. Farnan, Michael J. Farnan, FARNAN LLP, Wilmington, DE – Liaison Counsel for Lead Plaintiffs and the Putative Class

Vincent R. Cappucci, Robert N. Cappucci, Jonathan J. Beemer, Jessica A. Margulis, ENTWISTLE & CAPPUCCI LLP, New York, NY; David J. Schwartz, David Wales, Marco A. Dueñas, SAXENA WHITE P.A., White Plains, NY; Thomas Curry, SAXENA WHITE P.A., Wilmington, DE Adam Warden, Jonathan Lamet, SAXENA WHITE P.A., Boca Raton, FL – Lead Counsel for Lead Plaintiffs and the Putative Class

Vincent Briganti, Raymond Girnys, Andrea Farah, LOWEY DANNENBERG P.C., White Plains, NY – Additional Counsel for Lead Plaintiffs and the Putative Class

James M. Yoch, Jr., Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE; Craig E. Zieminski, Andrew E. Jackson, VINSON & ELKINS LLP, Dallas, TX – Attorneys for Defendants

March 31, 2025
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

Presently before the Court is Defendants' motion to dismiss (D.I. 26) Plaintiffs' Consolidated Class Action Complaint ("the Complaint") (D.I. 19) for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court GRANTS Defendants' motion.

## I.    BACKGROUND

### A.    The Parties

This case is a putative class action brought by five lead plaintiff investment funds: (i) AltShares Event-Driven ETF, (ii) AltShares Merger Arbitrage ETF, (iii) Kryger Fund Ltd., (iv) Kryger Enhanced Fund Ltd. and (v) ODS Capital LLC (together, "Plaintiffs" or "Named Plaintiffs").  (D.I. 19 ¶¶ 26-30).  Plaintiffs allege that they were beneficial owners of Focus common stock as of June 9, 2023, the Record Date for the merger at issue here.  (*Id.*).  Plaintiffs seek to represent a class consisting of "all sellers of Focus common stock who sold their shares from February 27, 2023 through the closing of the Merger on August 31, 2023 [], including those shareholders who held Focus common stock on the Record Date and were entitled to vote on the Merger."  (*Id.* ¶¶ 20, 233).

Defendants are Focus Financial Partners Inc. ("Focus" or "the Company") and three groups of individuals: (1) the Special Committee Defendants[1]; (2) the Board Defendants[2]; and (3) the

---

[1]    The Special Committee Defendants are George LeMieux, Elizabeth R. Neuhoff, Greg S. Morganroth, and Joseph R. Feliciani.  (D.I. 19 ¶ 36).

[2]    The Board Defendants include four members of Focus's Board:  Rudy Adolf, Rajini Sundar Kodialam, James D. Carey, Fayez S. Muhtadie.  (D.I. 19 ¶ 41).

Officer Defendants (together, "the Individual Defendants").[3]  Focus is a Delaware-incorporated, New York-headquartered financial services firm that "owns and partners with fiduciary wealth management firms in the Registered Investment Advisor sector."  (*Id.* ¶ 31).  From 2018 to 2023, Focus traded on the NASDAQ under the ticker symbol "FOCS."  (*Id.*).

### B.    The Merger

This dispute arises from a merger agreement between Focus and Clayton, Dubilier & Rice, LLC, a private equity firm ("CD&R").[4]  On February 27, 2023, Focus announced it would be acquired by CD&R for approximately $7 billion dollars in a take-private transaction ("the Merger").  (*Id.* ¶ 1).  The Merger, which closed on August 31, 2023, paid Focus shareholders $53 per share.  (*Id.* ¶ 113).

In early summer 2022, Focus began canvassing potential bidders on the terms of an acquisition.  (*Id.* ¶ 11-13).  Focus representatives contacted CD&R, among others, and by early September 2022, CD&R had proposed a first bid for Focus at $50 per share and entered into due diligence agreements for further information on the Company.  (*Id.* ¶ 11; D.I. 28-2 at 26).  On November 1, 2022, the Special Committee was formed, and the Special Committee Defendants began managing the work related to Focus' acquisition efforts.  (D.I. 19 ¶ 119).

In later 2022, another bidder emerged: Wealth Enhancement Group ("WEG").  (*Id.* ¶ 14).  By January 17, 2023, pursuant to continued negotiations with both firms, the Special Committee solicited offers at $51.50 and $51.75 per share from CD&R and WEG, respectively.  (*Id.* ¶ 95).

---

[3]    The Officer Defendants include Focus's CEO (Adolf), CFO (James Shanahan), General Counsel (J. Russell McGranahan), and Senior Managing Director and Head of M&A (Leonard Chang).  (D.I. 19 ¶ 45).

[4]    The Complaint details a thorough chronology of many of the events surrounding the transaction in dispute.  (*See* D.I. 19 ¶¶ 52-117).  For brevity, the Court provides a summary of relevant facts and will later refer to facts not restated here but nonetheless alleged in the Complaint.

CD&R's bid was supported by months of prior diligence, but WEG's offer required vetting.  (*Id.* ¶¶ 13, 95-96).

By January 30, 2023, after running the bids up to $53 and $55 per share, the Special Committee entered into an exclusivity agreement with CD&R on its offer.  (*Id.* ¶ 97).  On February 26, 2023, the Special Committee accepted CD&R's offer, and, after announcing the Merger on CD&R's $53 per share proposal, Focus filed a Definitive Proxy on June 12, 2023 ("the Proxy").  (*Id.* ¶ 123).  On July 6, 2023, Focus filed a Supplemental Proxy, and, on July 14, 2023, Focus' shareholders held a proxy vote approving the Merger.  (*Id.* ¶¶ 114-17; D.I. 28-4 at 8).  The Merger closed on August 31, 2023, effecting the $53 per share payout and delisting the Company's stock consistent with the go-private part of the deal.  (D.I. 119 ¶ 117).

The Proxy and other pre-close public filings represented that the Merger was the product of a thorough diligence process, negotiated by an independent and disinterested Special Committee, and priced at the best value reasonably obtainable for Focus' shareholders.  (*Id.* ¶ 5).  Plaintiffs claim these disclosures were false and misleading.  (*Id.* ¶¶ 5-6).  Specifically, Plaintiffs allege, Defendants orchestrated an insider-preferential acquisition to benefit Defendants and Stone Point Capital ("Stone Point") – a private equity firm and Focus' single largest shareholder prior to the Merger.  (*Id.* ¶¶ 7-8).

Contrary to their public representations, Plaintiffs allege, Defendants took various steps to steer the Merger process towards CD&R, closing the door to other opportunities which could have garnered the Focus shareholders better value for their investment.  (*Id*. ¶¶ 9, 11-13).  To that end, Focus management supposedly "homed in" on CD&R as a partner, keeping other buyers at "arm's-length."  (*Id*. ¶¶ 13-14).  These efforts later allegedly included enlisting the aid of financial advisors Goldman Sachs Group, Inc. ("Goldman" or "Goldman Sachs") and Jefferies, LLC ("Jefferies"),

to restrict how many interested buyers would be canvassed and to furnish a positive fairness opinion of the Merger, respectively. (*Id*. ¶ 17). The ultimate effect, allege Plaintiffs, was to craft an "utterly deficient process" that would ensure CD&R succeeded on its $53 per share proposal, enriching the Defendants at the expense of the rest of Focus' shareholders. (*Id*. ¶ 18).

### C.    Procedural History

On June 6, 2024, Plaintiffs filed the Consolidated Class Action Complaint. (*Id*.). The Complaint alleges that Defendants' conduct in sourcing, negotiating, and executing the Merger violated three provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78(a) *et seq*. ("Exchange Act"), and attendant regulations: (i) Section 10(b) and Rule 10b-5 thereunder; (ii) Section 14(a) and Rule 14a-9 thereunder; and (iii) Section 20(a). On July 30, 2024, Defendants moved to dismiss the Complaint. (D.I. 26). Briefing on the motion was completed on October 29, 2024. (D.I. 27, 30, 32). The Court heard argument on the motion on February 10, 2025. (D.I. 41).

## II.    LEGAL STANDARD

### A.    Rule 12(b)(6) Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327 (3d Cir. 2022); *Connelly v. Lane Const. Corp*., 809 F.3d 780, 787 (3d Cir. 2016). Nonetheless, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Lutz*, 49 F.4th at 327. The Court does not accept "bald assertions," "unsupported

conclusions and unwarranted inferences," *Finkelman v. Nat'l Football League*, 810 F.3d 187, 202 (3d Cir. 2016), or allegations "so threadbare or speculative that they fail to cross the line between the conclusory and the factual," *Connelly*, 809 F.3d at 790 (citation omitted). Instead, the pleadings must provide sufficient factual allegations to allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 506 U.S. at 678. In conducting this analysis, the Court may rely on any "document *integral to or explicitly relied* upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (emphasis in original) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

### B.    The Private Securities Litigation Reform Act

"As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995" ("PSLRA"). *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313 (2007). The PSLRA requires a plaintiff "in any private action under [the Exchange Act] . . . [to] specify [in the complaint] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Scienter must similarly be alleged with specificity. *Id.* This is an "exacting," "heightened" standard that "requires plaintiffs to plead the who, what, when, where and how" of their claims in all Section 10(b) and 14(a) cases. *Inst. Invs. Group v. Avaya, Inc.*, 564 F.3d 242, 252-53 (3d Cir. 2009) (citation omitted).

### III.    DISCUSSION

As noted, Plaintiffs challenge the Merger under three sections of the Exchange Act. First, they allege that Defendants knowingly made material misstatements and omissions about the process and value of the Merger, in violation of Section 10(b). (D.I. 19 ¶¶ 243-50). Second, Plaintiffs assert that the Proxy made material misstatements and omissions that duped Focus

shareholders into approving the Merger, in violation of Section 14(a).  (*Id.* ¶¶ 251-59).  And third, Plaintiffs contend that the Individual Defendants are liable as control personnel under Section 20(a) by virtue of their positions within the Company.  The Court will address each claim in turn.

### A.    Exchange Act Section 10(b)

Section 10(b) of the Exchange Act makes it unlawful to use "any manipulative or deceptive device or contrivance" in violation of the securities law.  15 U.S.C. § 78j.  This includes "employ[ing] any device, scheme, or artifice to defraud," and making "any untrue statement of a material fact or [] omit[ting] to state a material fact."  17 CFR § 240.10b–5.

To state a claim under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  Defendants challenge three of those elements here: misstatements or omissions, scienter, and loss causation.

### 1.    The Alleged Misrepresentations and Omissions

Plaintiffs claim that, to secure the Merger, Defendants "made [several] materially false or misleading statement[s] or omitted to state a material fact necessary to make [the] statement[s] not misleading."  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 268 (3d Cir. 2005).  A material fact is one that "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976);  *Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988).

The Complaint details various categories of alleged misrepresentations and omissions, which the Court distills into four: (1) the "fairness" of the Merger and "adequacy" of the sales process; (2) the "independence" of the Special Committee and purported "conflicts of interest";

(3) CD&R's supposed "incentives" to Focus management and Stone Point; and (4) the alleged "conflicts" of interest of Focus' third-party financial advisors. (D.I. 19 ¶ 48). Defendants respond that the challenged statements were opinions that were not false or misleading, and, in any event, were otherwise disclosed in the Company's publicly-circulated Merger filings.[5] (D.I. 27 at 8-9).

The Court finds that none of the foregoing sufficiently alleges a material misstatement or omission.

### a.    The Fairness of the Merger and Adequacy of the Sales Process

First, Plaintiffs allege that certain representations about the fairness of the Merger process were false and misleading. They take issue with statements that the Special Committee "determined that this transaction is fair to and in the best interests of Focus," "believed that . . . [it] obtained the best terms and the highest price that CD&R was willing to pay for the Company, pursuant to a thorough process," and appropriately considered "procedural fairness" in approving the Merger. (D.I. 28-2 at 55, 59; D.I. 19 ¶¶ 113, 159, 175-77, 207-10). Plaintiffs contend that these statements were false and misleading because "the Merger was not 'fair' nor was it the result of a 'robust process.'" (D.I. 19 ¶ 160). Instead, Plaintiffs allege that (i) Defendants discouraged the Company from pursuing any buyer but CD&R, and, (ii) the Proxy misled shareholders by omitting information about a competing bid from strategic acquirer WEG. (*Id.* ¶¶ 175-78, 187).

---

[5]    Plaintiffs object to Defendants' incorporation of various documents in their briefs in support of the motion to dismiss. (D.I. 30 at 9-10). It is well-settled, however, that courts may take judicial notice of matters of public record and documents integral to the complaint, such as the Proxy statement and the Special Committee minutes here, both of which are referenced in the Complaint. *Schmidt*, 770 F.3d at 249; *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002); *Philidor RX Servs. LLC v. Polsinelli PC*, 2023 WL 6290746, at *1 n. 3 (3d Cir. 2023).

### i.    <u>The Company's Opinion Statements</u>

Plaintiffs claim that the Merger was neither "fair" nor the result of a "robust process." (*Id.* ¶¶ 160, 176-91).  To that end, Plaintiffs assert the Proxy's opinion statements misled or omitted from shareholders that "the playing field" was geared "toward CD&R from the very outset," and that, even in the final stages of the sale negotiation, the Proxy "further concealed [] their favoritism towards CD&R."  (*Id.* ¶¶ 178, 188).

An opinion statement may constitute a material misrepresentation when a complaint (a) alleges "that an opinion was wrong" and (b) "call[s] into question the issuer's basis for offering the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 194 (2015).[6]  As such, an opinion statement is only actionable if it: "(i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language." *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023).  Plaintiffs fail to adequately allege that Defendants' opinion statements about the fairness of the Merger were insincere or patently false.

As a potential merger develops, "one bidder may stand out amongst the rest, and a company may find that a merger with, or acquisition by, that company is most desirable." *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 517 (S.D.N.Y. 2019).  To that effect, the Proxy stated that it

---

[6]    The *Omnicare* framework initially established a basis to evaluate opinion falsity under Section 14(a) claims, while the Third Circuit separately developed a materiality standard under Section 11 claims.  *See Jaroslawicz v. M&T Bank Corp*., 962 F.3d 701, 717 n.6 (3d Cir. 2020) ("The Supreme Court's decision in *Omnicare* provides the relevant framework for assessing the falsity of opinion statements under § 14(a).") (internal quotations omitted); *Merck*, 432 F.3d at 273-75.  Since then, the standards for materiality and falsity have been extended to apply to Section 10(b) and Rule 10b-5 cases.  *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 685-86 (3d Cir. 2023) ("*Omnicare's* framework for evaluating opinion falsity applies to claims under § 10(b) . . . § 11 and Rule 10b-5 share[s] the same standard of materiality for misleading statements.").

was "[t]he belief of the Special Committee" that CD&R's offer presented the "*Best Value Reasonably Obtainable*." (D.I. 28-2 at 55). That was an opinion statement governed by *Omnicare*. 575 U.S. at 183 ("An opinion is 'a belief[,] a view,' or a 'sentiment which the mind forms of persons or things.'"). So, if the Committee's proffered preference is alleged to be misleading, it can only have been so if it was either "insincere" or false. *City of Warren*, 70 F.4th at 685. Nowhere, however, do Plaintiffs allege that Defendants' belief in the strength of the CD&R offer was insincerely held. *See id*. at 686. The Complaint does not, for example, point to any statements that undermine the conviction of any of the Special Committee members.

Instead, Plaintiffs claim the Proxy was "untrue" or insufficiently "qualified," *i.e.*, it purposefully omitted information that would have demonstrated the Special Committee's preference for CD&R. *Id*. at 686; (D.I. ¶¶ 176-77). But the Proxy was rife with thoughtful business explanations for the Special Committee's recommendation. (*See* D.I. 28-2). Indeed, over the course of a five-page section called "Reasons for the Merger," the Proxy listed more than a dozen considerations, including that the Merger would be executed at a "Premium to Market Price" of between 36% and 48% per share, provided "Certainty of Value" that was "the Best Value Reasonably Obtainable" for shareholders, and was the optimal choice among the "Potential Strategic Alternatives." (*Id*. at 55-56). It then weighed those pro-Merger factors against another ten "uncertainties, risks and potentially negative factors," as well as a half-dozen more "procedural safeguards." (*Id*. at 58). That calculus led to the ultimate "Recommendation of the Board . . . that the Merger Agreement . . . [is] fair to, and in the best interests of, the Company and its stockholders." (*Id*. at 61). Plaintiffs do not meaningfully take issue with those statements as "untrue factual assertion[s]." *City of Warren*, 70 F.4th at 686.

Further to that point, the Special Committee disclosed that it determined there was not a better deal at hand: "only one other third party bidder submitted a proposal . . . [which] was preliminary and nonbinding and was subject to the completion of due diligence, debt and equity financing contingencies and regulatory approvals, and the Special Committee risked losing the certainty of value offered by CD&R if it permitted the other bidder to move forward at that time on uncertain terms." (D.I. 28-2 at 55). That passage further justified the Special Committee's recommendation to merge with CD&R over WEG. Plaintiffs do not allege this disclosure "omit[ted] appropriate qualifying information," given that the Proxy provided the meaningful business calculations already discussed. *City of Warren*, 70 F.4th at 686.

Thus, even accepting Plaintiffs' allegations that the Special Committee preferred a sale to CD&R, the Proxy disclosed a genuine basis for such treatment and is not materially false or misleading. *See Bartesch v. Cook*, 941 F. Supp. 2d 501, 508 (D. Del. 2013) ("The alleged omissions are contradicted by the company's public disclosures and, therefore, there can be no Section 10(b) claim.").

### ii.    **The WEG Bid**

Plaintiffs next claim that there were material failures of the Proxy to disclose communications with WEG, who Plaintiffs allege would have tendered a better Merger offer but-for the Defendants' alleged misconduct. (D.I. 19 ¶¶ 190-91). Specifically, Plaintiffs claim that the Proxy omitted three things about WEG: (i) a dinner meeting between Focus' CEO and the CEO of WEG on September 20, 2022, at which WEG's CEO expressed interest in a "transformative" merger; (ii) Defendants' rationale for granting CD&R exclusivity over WEG; and (iii) that Defendants imposed an "informational and financing disadvantage" on WEG because Defendants "preferred a transaction with CD&R." (*Id.* ¶¶ 184-191, 211).

Accepting them as true, the Court fails to see how these alleged omissions are actionable. The Proxy clearly disclosed the WEG negotiation process, culminating with its $55 per share offer. (*Id*. 19 ¶ 190; D.I. 28-2 at 45). The alleged dinner meeting took place prior to the offer, meaning that shareholders were, in fact, informed about WEG's merger interest. The Proxy did not disclose the CEO's comment about seeking a "transformative transaction" (D.I. 19 ¶¶ 76, 191), but Plaintiffs fail to explain how that remark (or the dinner at which it was uttered) constitutes "qualifying information" that would have improved a reasonable investor's understanding of the WEG offer. *City of Warren*, 70 F.4th at 686; *Schwartz v. Perseon Corp.*, 175 F. Supp. 3d 390, 402 (D. Del. 2016); *see Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000).

Plaintiffs' other WEG allegations also fail to rise to the level of actionability. The Complaint alleges that the Proxy "gave the false impression that WEG was somehow responsible for its position behind CD&R in the sale process when it was actually the result of Defendants' own recalcitrance." (D.I. 19 ¶ 191). Yet the Proxy disclosed that the Special Committee was "prepared to have the Company provide additional due diligence and to entertain further discussions on a potential acquisition of the Company by" WEG, so long as WEG definitively submitted its $55 per share proposal; WEG countered with a "preliminary and non-binding" $55 per share offer that was "subject to continued due diligence, and [WEG's] receipt of the requisite financing" for the deal. (D.I. 28-2 at 44). Perhaps most importantly, WEG's submission of a hard offer was "contingent" on an exclusivity agreement – meaning that Focus would have had to terminate its ongoing, advanced negotiations with CD&R. (*Id*.). In the absence of exclusivity, the Proxy disclosed, WEG had communicated it "would [only] be willing to continue evaluating a potential acquisition of the Company at a price of $51.75 per share in cash." (*Id*. at 45). That led the Special Committee to opine that the WEG negotiations were "unlikely to result in a definitive

transaction." (*Id.* at 43); *see also Wayne Cnty. Emps. Ret. Sys. v. Mavenir, Inc.*, No. 18-1229 (SB), 2022 WL 958463, at *3 (D. Del. Mar. 30, 2022) ("That was misleading, the shareholders say, because one shopper *did* show interest. But mere interest is not an offer.").

Once again, because that statement expressed the Special Committee's "belief" about the likelihood of a transaction – rather than "an actual happening" – it is an *Omnicare* opinion statement. 575 U.S. at 183. And, just like the other opinion statements considered, Plaintiffs do not argue that this statement was "not sincerely believed" when made. *City of Warren*, 70 F.4th at 686. Nor do they meaningfully argue that the Proxy's disclosures about WEG's exclusivity requirement exposed an "expressly embedded, untrue factual assertion." *Id*. As such, the Proxy's disclosure presents a genuine basis to question WEG's ability to actually execute the transaction on its $55 per share indication of interest, which Plaintiffs do not meaningfully rebut in their allegations.

Thus, where the statements at issue are reflective of opinions, they are not actionable under *Omnicare*. And where they are not, they reflect sufficient disclosure on behalf of the Proxy to arm the shareholder with the necessary decision-making information.

        **b.**      <u>**Special Committee Independence & Disinterestedness**</u>

Next, Plaintiffs assert that, contrary to the Proxy's representations, the four board members of the Special Committee were not "independent and disinterested directors" who held no "material interest in any potential acquisition." (D.I. 19 ¶¶ 163-71; D.I. 28-2 at 59). They make three main points in support of that position. First, they argue that the Proxy failed to disclose a material conflict of interest: the Special Committee received compensation increases just before its approval of the Merger, which raised the Committee members' project-based salaries by $200,000 each. (D.I. 19 ¶¶ 167, 169). Second, Plaintiffs contend that the Proxy's statement that the Special Committee did "not have an interest in the Merger different from or in addition to, that

of the Unaffiliated Stockholders" misled shareholders by intentionally obscuring Tax Receivable Agreement ("TRA") payouts owed to the Special Committee directors should the Merger receive approval. (*Id.* ¶¶ 170-72). Lastly, Plaintiffs argue the Proxy duped shareholders by "wholly omit[ting] any information demonstrating the Special Committee's business and personal ties" to the Board and Officer Defendants, another putative conflict of interest. (*Id.* ¶ 173).

### i.    Special Committee Compensation

The Proxy provided information about the Special Committee's financial incentives. First, in a section called "Special Committee Fees," the Proxy detailed that each member had already been paid "a flat fee of $40,000 for service on the Special Committee," with the Chairman receiving $80,000 for his leadership role. (D.I. 28-2 at 99). Those "flat fees" were to be paid for the Committee's work regardless of which bidder ended up purchasing Focus, or whether a transaction was consummated at all. (*Id.*). The Proxy also disclosed that each member would receive a monthly fee of $35,000 for the duration of the Go-Shop period, subject to certain caveats. (*Id.*). Finally, the Proxy informed shareholders that "[t]he fees received by the Special Committee members are subject to change based on a good faith determination by the Board." (*Id.*).

As for the TRA payments, the Proxy set out that "a Change of Control" of the Company "will result in an obligation of the Company to make a lump-sum payment to the TRA Holders," including the "members of the Board." (*Id.* at 100). Each of the four Special Committee members had been Board members since before the Special Committee's formation. (*See* D.I. 19 ¶¶ 32-36). Thus, the Proxy disclosed, "members of the Board may have certain interests in the Mergers, by virtue of their right to receive the applicable Holder TRA Payoff Amount in cash in connection with closing of the Mergers, that are different from, or in addition to, the interests of the Company's stockholders generally." (*Id.*). These interests were further detailed in the Supplemental Proxy. (*See* D.I. 28-8 at 8-9).

Therefore, despite Plaintiffs' allegations to the contrary, the Proxy disclosed both the project-based amount initially awarded to the Special Committee as well as the monthly raise for work that "exceeded the Company's expectations." (*Id.* at 53, 99). In any event, this compensation did not create a conflict of interest, because, to do so, "[t]he benefits to defendants must go beyond the payments of fees for professional services to include some connection to the securities transaction[] at issue." *Gilmore v. Berg*, 761 F. Supp. 358, 369 (D.N.J. 1991) (internal quotations omitted). Here, however, neither the monthly salary nor the TRA payments were tied to the CD&R transaction – the Special Committee members were due that money no matter which purchaser the Company ultimately selected. And, moreover, because "the proxy . . . warned that executive officers may have interests in the merger[, a]nd it explained those interests in detail," there was no omission under Section 10(b). *Wayne Cnty.*, 2022 WL 958463, at *2 (cleaned up) ("[T]he proxy . . . reminded readers that [the CEO] might be conflicted. So this statement was not misleading either.").

### ii.    <u>Personal Relationships</u>

Much the same logic applies to the Proxy's alleged omission of the Special Committee Defendants' "strong personal and business ties" to the other key players involved here, such as Focus' CEO, CD&R, and Stone Point. (D.I. 19 ¶¶ 132-37). For example, the Complaint alleges that one of the Special Committee Defendants "is a neighbor and friend" of Focus' CEO and lives in the same "private community." (*Id.* ¶ 136). Two others are members of the same "Young Presidents" club and serve on the same policy group advisory board. (*Id.* ¶¶ 134-36).

The Complaint does not spell out, however, how these inter-director relationships "likely influenced their decision-making on the Merger." (*Id.* ¶ 132). And even if it did, "[a]llegations that [the Company's] directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends,'

even when coupled with [strong] voting power, are insufficient, without more, to rebut the presumption of independence." *Freedman v. Redstone*, No. 12-1052 (SLR), 2013 WL 3753426, at *8 (D. Del. July 16, 2013) (citation omitted), *aff'd*, 753 F.3d 416 (3d Cir. 2014); *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004); *Delaware Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015). Accordingly, the Court finds that these relationships do not amount to material conflicts worthy of disclosure. *See Gupta on behalf of Sonim Techs., Inc. v. Wilkinson*, 594 F. Supp. 3d 606, 612 (D. Del. 2022) ("[T]he allegation that the Director Defendants have longstanding business and personal relationships with each other that would render [them conflicted] is without merit.").

The remainder of the conflict allegations are similarly attenuated. As to Special Committee Chairman LeMieux, Plaintiffs ask the Court to draw an inference of impropriety from the fact that he contemporaneously served as the chairman of his law firm, which "represents CD&R in immigration matters." (D.I. 19 ¶ 133). They say, accordingly, that "LeMieux benefits directly from his firm's ongoing business dealings with CD&R." (*Id.*). But these allegations do not claim that LeMieux is an immigration attorney, personally worked on CD&R matters, or explain how he himself was compensated by dint of that representation. Thus, they fail to raise the inference that any benefit was *material* to LeMieux such that he would rubberstamp the $7 billion sale to CD&R. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006).

The Complaint attempts to allege a different conflict of interest for LeMieux through political donations. Plaintiffs say that Board Defendant Carey donated $10,000 to the Republican Governors Association, which in turn "provided funding" in an unspecified amount to Florida Governor Ron DeSantis' political action committee, which in turn (presumably) funded DeSantis' campaign, on which LeMieux served as a member of the 2018 transition team. (D.I. 19 ¶ 134).

Plaintiffs thus ask the Court to infer that LeMieux somehow benefitted from Carey's contribution, without any allegation that any of the $10,000 donation made its way to LeMieux's pocket. (*Id.*). Going another step further, Plaintiffs assert that the Florida state Retirement System (ostensibly – but not allegedly – under the control of DeSantis) invested millions of dollars in Stone Point funds. (*Id.*). According to Plaintiffs, therefore, Stone Point, Focus, LeMieux, and Carey were intertwined in a conflict that bore on the CD&R Merger. (*Id.*); *Basic*, 485 U.S. at 261 n.9 (a link of fraud is "surely . . . far more attenuated" when the relied upon statement and action at issue were 11 months apart) (White, J., concurring). The Court cannot conclude that the Proxy made omissions on the basis of such a "highly speculative chain of events." *Tse*, 297 F.3d at 223; *City of Warren*, 70 F.4th at 680 ("[S]peculative or threadbare allegations along with legal conclusions are disregarded.").

Therefore, Plaintiffs have failed to plausibly allege a material misstatement or omission as to the Special Committee's independence and conflicts of interest.

### c.     <u>The Alleged Insider Incentives</u>

Third, Plaintiffs allege that Stone Point and the Officer Defendants were enticed by undisclosed illicit incentives to ensure that Focus would sell to CD&R: (1) ongoing employment for Focus' management; and (2) roll-over equity for Stone Point. (D.I. 19 ¶¶ 192-93). According to the Complaint, the Proxy omitted CD&R's intention to retain Focus' senior executives after the Merger, thereby concealing management's conflict of interest at the expense of shareholder value. (*Id.*). Additionally, Plaintiffs argue, the Proxy omitted Defendants' knowledge that, if successful in its bid, CD&R would allow for Stone Point to roll-over much of its equity interest from Focus into the post-Merger company. (*Id.* ¶¶ 194-95).

To begin, the Proxy disclosed that keeping Focus' management on after the Merger was a possibility.[7]  (*See* D.I. 28-2 at 102) ("[The post-Merger company] may hold preliminary discussions with certain members of the Company's management team regarding employment."). More germanely, the prospect of continued employment is not an actionable conflict, because "simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 238 (3d Cir. 2004) (citation omitted); *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004).  Consequently, the Court finds that Plaintiffs' allegations regarding Focus' incentives fail, as the statements at issue were neither material nor misleading.

The same is true for the Stone Point allegations.  The Complaint asserts that the Proxy failed to comply with the securities laws because it ought to have "disclose[d] that CD&R had an expectation of a '*material* roll-over of equity' from Stone Point as part of CD&R's bid."[8]  (D.I. 19 ¶ 195).  But, as is the case with many of the alleged misstatements and omissions here, the Proxy

---

[7]     The Complaint stops short of alleging that CD&R *in fact* promised the Officer Defendants jobs, instead alleging that CD&R "would *likely* continue to employ existing management." (D.I. 19 ¶ 143) (emphasis added).  Plaintiffs do not allege that continuing offers of employment for management ever materialized.  And a court in this District has stated that intent to continue employment without a formal offer cannot serve as the basis of a material omission or misrepresentation, because no actual incentive is being conveyed. *Wayne Cnty.*, 2022 WL 958463, *3 ("[I]ntent is one thing; agreement, another.  Plus, the [post-merger company] did *not* retain [the] old CEO.  So the proxy statement was neither false nor misleading." (internal citation omitted)).

[8]     Although somewhat unclear, the Court interprets this as a challenge to the roll-over interest Stone Point received under the Support Agreement.  (D.I. 19 ¶ 140).

disclosed the structure of the Support Agreement, (D.I. 28-2 at 99-100), and so challenges to the omission of that information cannot be actionable. *See Bartesch*, 941 F. Supp. 2d at 508.

Accordingly, the Court finds that Plaintiffs' allegations regarding the Defendants' insider incentives fail, as the statements at issue were neither materially misleading nor omissions.

### d.    The Alleged Financial Advisors' Conflicts

Last, Plaintiffs argue that the Proxy misled Focus shareholders about the role of the Company's financial advisors, Goldman Sachs and Jefferies. First, they say that Defendants omitted to disclose that Jefferies would be paid $8 million in fees for assisting in the Merger. (D.I. 19 ¶¶ 216-17). Second, Plaintiffs argue that Goldman Sachs' parallel banking representation in the acquisition of a Focus subsidiary, NKSFB, created a conflict of interest that unfairly limited the pool of potential bidders. (*Id.* ¶¶ 103-12). To avoid a perceived conflict of interest, says the Complaint, the Proxy omitted to mention that Goldman Sachs declined to market the sale of Focus to as many as seven other potential bidders in connection with the NKSFB representation. (*Id.* ¶¶ 202-05).

The Court again finds these allegations unavailing. The Proxy plainly disclosed that "Jefferies may be entitled to a discretionary fee of up to $8.0 million, payable at the Special Committee's full and absolute discretion." (D.I. 28-8 at 84). It then proceeded to list factors of consideration governing such discretion. (*Id.*). Jefferies was subsequently awarded that $8 million maximum. On that basis alone, there is no "expressly embedded, untrue factual assertion" upon which to base a claim. *City of Warren*, 70 F.4th at 686. If a reasonable investor wished to vote against the merger over the compensation Jefferies received, they were armed with the requisite disclosures to do so. *See TSC Indus.*, 426 U.S. at 449.

Additionally, Plaintiffs allege that minutes from a February 26, 2023, Special Committee meeting show that Jefferies' compensation increase was approved prior to rendering its fairness

opinion as a quid-pro-quo. (D.I. 19 ¶¶ 155-58). In other words, Jeffries only signed off on the Merger as fair once it knew it would be paid its full rate. But the minutes state no such thing. They instead note that, after "Jefferies and Goldman Sachs left the meeting," only then did the Special Committee proceed to vote on Jefferies' compensation increase. (D.I. 27-9 at 3-4) ("The representatives of Goldman Sachs and Jefferies left the meeting at approximately 9:45 p.m., Eastern Time. The Committee then reviewed the presentations made, and matters discussed . . . After further discussion . . . the Committee unanimously adopted the Resolutions."). Because the Proxy clearly disclosed the possible total amount of Jefferies' compensation, and because the documents upon which Plaintiffs rely clearly show Jefferies' increase was approved after its fairness opinion was delivered, not before, the Court finds Plaintiffs' claims inadequately pled. *Bartesch*, 941 F. Supp. 2d at 508.

Plaintiffs' allegations about Goldman Sachs fail for similar reasons. The Complaint acknowledges the Special Committee's opinion that it "did not believe that [Goldman's] additional role [in the sale of NKSFB] would present a material conflict of interest for Goldman," but proffers no challenge to the basis for that opinion. (D.I. 19 ¶¶ 200-03). Under *Omnicare*, a plaintiff must offer "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have" to adequately challenge an opinion statement. *Omnicare*, 575 U.S. at 194. Instead, Plaintiffs make only conclusory statements as to the impact of the alleged omission, at least one of which is contradicted by the Complaint itself.[9] (*See, e.g.*, D.I. 19 ¶¶ 74, 205). These allegations thus do not sufficiently challenge the fairness opinion under *Omnicare*.

---

[9]    For example, Plaintiffs assert that private equity firm TPG, Inc. ("TPG") was allegedly excluded from the process until after the Merger's announcement, yet they also assert that TPG and Focus' CEO held meetings about the Merger months before its announcement. (D.I. 19 ¶¶ 74, 205).

*****

Having assessed each category of alleged misrepresentations and omissions, the Court concludes that, under Section 10(b) of the Exchange Act, Plaintiffs fail to adequately plead a material misrepresentation or omission about the adequacy or fairness of the Merger process.

### 2.     Scienter

Next, the Court turns to the Complaint's allegations of scienter.  "Scienter is a mental state embracing intent to deceive, manipulate, or defraud, . . . and requires a knowing or reckless state of mind."  *Avaya*, 564 F.3d at 252; *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 490 (3d. Cir. 2016).  As with misstatements or omissions, the PSLRA mandates that scienter be pled with particularity.  15 U.S.C. § 78u-4(b)(2)(A) ("[T]he complaint shall . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").  Therefore, in considering "whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences."  *Tellabs*, 551 U.S. at 323 (internal quotations omitted).  If a reasonable person would find an inference of scienter cogent or as compelling as any opposing inference, then scienter is adequately pled.  *See Matrixx Initiatives  v. Siracusano*, 563 U.S. 27, 48 (2011).

Plaintiffs offer three basic types of allegations of scienter.  They assert that the Individual Defendants had: (1) "substantial, personal involvement in the alleged wrongdoing"; (2) "motive and opportunity" to commit the alleged fraud; and (3) involvement in the Company's "core operations."  (D.I. 30 at 25-27).  Each fails for the reasons that follow.

### a.     Personal Involvement

Plaintiffs assert that Defendants acted with scienter because they "had personal knowledge of, and involvement in" the alleged misconduct here.  (D.I. 19 ¶ 222).  The Complaint alleges that among other things, the individual Defendants refused to canvas strategic acquirors, executed their

own compensation increases, harbored undisclosed conflicts of interest, drafted a misleading Proxy, and more.  (*Id.* ¶¶ 74, 76, 123-25, 133, 135-36, 220).  There are several shortcomings with these allegations.

### i.    Group Pleading

First, blanket assertions of scienter across a group of individuals – otherwise known as "group pleading" – cannot satisfy the particularity required under the PSLRA.  *In re Suprema*, 438 F.3d at 282; *Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 176 F. Supp. 3d 387, 396 (D. Del.  2016) ("[T]he Third Circuit has held that the [group pleading] doctrine did not survive the enactment of the PSLRA.").  Instead, "[t]he PSLRA requires plaintiffs to specify the role of each defendant, demonstrating each defendant's involvement in [the alleged] misstatements and omissions."  *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 335-36 (3d Cir. 2007); *Bartesch*, 941 F.2d at 510.

Here, Plaintiffs broadly say that Defendants – without specifying which ones – were "privy to confidential information" that "reflect[ed] the true facts" of the Merger process, "well aware of Stone Point's unique position as a significant private equity investor," and cognizant that "it was a challenging market [in which] to execute a deal."  (D.I. 19 ¶¶ 218, 219, 223).  They do not extrapolate, however, on specifically who knew these things, specifically what information they were privy to, or specifically why it impacted the alleged misstatements and omissions at issue here.

Such "[g]eneralized imputations of knowledge," made "regardless of the defendants' positions within the company," are the type of "blanket allegations against numerous different defendants" that the Third Circuit has routinely found "runs afoul of the particularity requirements of the PSLRA."  *In re Suprema*, 438 F.3d at 282; *Barnard v. Verizon Commc'ns, Inc.*, 451 F. App'x 80, 85 n.6 (3d Cir. 2011) ("[T]he complaint fails to ascribe any given statement to either

defendant particularly.").  Accordingly, the vast majority of the Complaint's allegations of scienter fail as insufficiently particularized as to specific Defendants.

### ii.  Connection to the Misstatements

The allegations that do identify specific Defendants and their personal involvement in the Merger fail as well.  (*See, e.g.*, D.I. 19 ¶¶ 220, 222).  By and large, they do not allege "that the defendant acted with the required state of mind" as to "each act or omission alleged."  15 U.S.C. § 78u-4(b)(2)(A).  In other words, the Complaint's allegations of involvement fail to show "[D]efendants' knowledge of facts or access to information contradicting their public statements." *City of Roseville Employees' Ret. Sys v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404, 424 (D. Del. 2009) (citation omitted).  Nowhere does the Complaint do so.

For example, the Complaint alleges that "[t]he Proxy was in fact signed by Defendants Adolf and McGranahan."  (D.I. 19 ¶ 220).  That is not enough, however.  Defendants "can only be held liable under § 10(b) and Rule 10b-5 for [their] certifications if plaintiffs plead with sufficient particularity that either [defendant] was aware or should have been aware of the [alleged] scheme at the time those certifications were made."  *City of Roseville*, 686 F. Supp. 2d at 420.  The Complaint does not bolster this asserted fact with any allegations that Adolf and McGranahan had specific knowledge of the falsity of any of the statements they were certifying in the Proxy.

Similarly, the Complaint claims that Board members "Carey and Muhtadie[] were Stone Point managing directors with personal knowledge of, and involvement in, Stone Point's efforts to steer the Focus sale to CD&R."  (D.I. 19 ¶ 222; *see also* D.I. 30 at 27 ("Defendants allowed Stone Point's unique financial needs to drive the deal toward their preferred bidder.")).  Once again, though, Plaintiffs are missing the link between this alleged "personal knowledge and involvement" and any of the Company's purported misrepresentations or omissions. *See In re Suprema*, 438 F.3d at 282; *Pennsylvania Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d

458, 478 (D. Del. 2010). Indeed, neither Carey nor Muhtadie were on the Special Committee, and there are no other allegations of their involvement in the direction of the Merger.

Therefore, the Complaint's allegations of "personal involvement and knowledge" are insufficient to raise a strong inference of scienter.

### b.    <u>Motive and Opportunity</u>

Next, Plaintiffs argue that Defendants' motive and opportunity to defraud the Company's investors create an inference of scienter. (D.I. 30 at 26; D.I. 19 ¶¶ 224-25). They say that "the Special Committee members had strong personal and financial motivations to favor a deal with CD&R over a deal with other bidders," because "[a]pproving the deal meant that each of the Special Committee Defendants received total cash payments from the Merger that ranged from $729,467 to $943,690." (D.I. 19 ¶ 225). In addition, Plaintiffs contend, the Individual Defendants "preferred CD&R's transaction proposal over WEG's as it meant the executives would keep their jobs and Stone Point could roll over equity." (D.I. 30 at 26).

### i.    <u>Compensation</u>

To begin, as Plaintiffs concede in their briefing, "allegations of motive and opportunity cannot demonstrate scienter on their own." (D.I. 30 at 26 n.16 ) (internal quotation marks omitted); *Avaya*, 564 F.3d at 277 ("[M]otive and opportunity may no longer serve as an independent route to scienter."); *Stanley Black & Decker Inc. v. Gulian*, 70 F. Supp. 3d 719, 731 (D. Del. 2014). They must also be accompanied by particularized allegations. *In re Hertz Global Holdings Inc*, 905 F.3d 106, 118 (3d Cir. 2018) ("[T]o strengthen an inference of scienter, there must be particularized allegations connecting the [alleged issue] to the alleged fraud.").

At the outset, the Court notes that Plaintiffs' "motive" allegation is implausibly framed. The inference that Plaintiffs ask to Court to draw is that the Special Committee Defendants recommended the CD&R Merger because they were being paid between $240,000 and $280,000

to vet it.  But, as already discussed, the Special Committee's project-based fee – which was disclosed in the Proxy – was not dependent on the outcome of the Merger.  The Special Committee was compensated for their work irrespective of which bidder they selected – or whether they selected any bidder at all.  Thus, Plaintiffs' allegation that "[a]pproving the deal meant that each of the Special Committee Defendants received [certain] cash payments" is incorrect, and it is not plausible that they were motivated to engage in misconduct on that basis.  (D.I. 19 ¶ 225); *see Avaya*, 564 F.3d at 279 ("[T]he motivations to raise capital or increase one's own compensation are common . . . and thus add little to an inference of fraud.") (citation omitted); *In re Burlington Coat Factory*, 114 F.3d at 1423 ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.") (citation omitted).

### ii.      Post-Merger Job Retention

Plaintiffs additionally contend that Defendants were motivated to unfairly preference CD&R over other bidders because "CD&R made clear in an offer letter that it wanted to retain Focus' senior executives . . . to run the Company after the Merger closed."  (D.I. 19 ¶ 224).  By contrast, according to the Complaint, accepting WEG's proposal "would likely jettison Focus' existing management team."  (*Id.* ¶ 76).   Accepting those allegations as true, this theory nonetheless fails as a matter of law.

The Third Circuit has held that "[a]ssertions that a corporate officer or director committed fraud in order to retain an executive position, or retain such a position with the merged company, simply do not, in themselves, adequately plead motive."  *Digital Island*, 357 F.3d at 331 (citation omitted) ("[T]he fact that [management] had executed an employment agreement with the acquirer cannot, in and of itself, establish a strong inference of motive.").  This is because "such a desire can be imputed to all corporate officers."  *Id.* ("Plaintiffs' allegations regarding the [post-merger] employment agreement do nothing to distinguish [management's] motivations from those

surrounding countless other mergers and acquisitions."); *GSC Partners*, 368 F.3d at 237 ("In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent.").  Accordingly, Plaintiffs fail to plausibly allege scienter on this basis.

### c.    Core Operations

"Under the core operations doctrine, when the misrepresentations and omissions involve core matters of central importance to the company and its principal executives, an inference of scienter may arise." *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 489 (D. Del. 2019) (internal quotation marks omitted); *Rahman v. Kid Brands, Inc*., 736 F.3d 237, 246 (3d Cir. 2013).  Because of the magnitude of the Merger in the lifecycle of the Company – a $7 billion take-private deal to cash out investors – Plaintiffs assert that "it is implausible that the senior executives and directors of Focus were unaware of the details of such an important and transformative transaction."  (D.I. 30 at 27).

That flips the pleading burden on its head.  It is Plaintiffs who must allege sufficient facts to plausibly paint a picture that the Individual Defendants knew that their statements were false or misleading – not Defendants' burden to show that they didn't.  *GSC Partners*, 368 F.3d at 239 ("[I]t is not enough for plaintiffs to merely allege . . . [that] defendants 'must have known' their statements were false.").  That is, a "pleading of scienter sufficient to satisfy Rule 9(b) may not rest on a bare inference that a defendant 'must have had' knowledge of the facts or 'must have known' of the fraud given his or her position in the company."  *In re Suprema*, 438 F.3d at 282 (some internal quotation marks omitted); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 399 (D. Del. 2010) ("Mere allegations that a defendant 'should have

known' of fraud because of his supervisory role within a company or because his subordinates were aware of it, are insufficient."), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).

It is doubtless that the Individual Defendants grasped the gravity of the Merger. That is, presumably, why they prepared and issued a multi-hundred-page Proxy. Still, Plaintiffs are missing particularized "allegations of specific information conveyed to management and related to fraud." *Rahman*, 736 F.3d at 246; *Tibbs v. electroCore, Inc*., No. 23-2655, 2024 WL 4987243, at *7 (3d Cir. Dec. 5, 2024) (affirming dismissal for lack of scienter on the basis that "high-level allegations that individual defendants had knowledge of [the Company's core] business, standing alone, were not enough"). Without those links, the Complaint fails to establish the necessary factual basis for scienter – the "first paragraph of any newspaper story." *GSC Partners*, 368 F.3d at 239.

Accordingly, Plaintiffs have failed to adequately allege scienter.

### 3. Loss Causation

The last element of Plaintiffs' Section 10(b) claim that Defendants challenge is loss causation. Loss causation is the "causal connection between the material misrepresentation and the loss" and its burden of proof upon the plaintiff is codified under the PSLRA. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Under Rule 10b-5, causation is two-pronged: the plaintiff must allege that (1) "but for the fraudulent misrepresentation or omission, the investor would not have purchased or sold the security," and (2) "the fraudulent misrepresentation or omission actually caused the economic loss suffered." *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425 (3d Cir. 2007). But "[w]here the value of the security does not actually decline[] as a result of an alleged misrepresentation, it cannot be said that there is in fact an economic loss attributable to that misrepresentation." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000).

There are two types of loss causation claims under Section 10(b): "typical" and "non-typical." *McCabe*, 494 F.3d at 426. "In a typical 'fraud-on-the-market' § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission." *Id.* By contrast, in a "non-typical" action such as this one, the "factual predicates of loss causation fall into less of a rigid pattern," such that the plaintiff must show that "the misrepresentation or omission proximately caused the economic loss." *Id.* at 435-36 ("It is not enough for § 10(b) plaintiffs to show that a misstatement or omission induced them to buy or sell securities at a price less favorable to them than they had been misled into believing. Rather, they must show that the misstated or omitted facts were a substantial factor in causing an economic loss actually incurred by the plaintiffs."). For a misrepresentation or omission to have proximately caused an economic loss, a plaintiff must be able to show that "the misrepresentation touches upon the reasons for the investment's decline in value." *Id.* at 428 (citation omitted). If the plaintiff cannot tie an alleged misrepresentation to a loss in value, then loss causation is not adequately pled. *See Berckeley Inv. Group Ltd. v. Colkitt*, 455 F.3d 195, 223 (3d Cir. 2006).

Plaintiffs assert that Defendants' alleged misstatements caused their economic loss. (D.I. ¶ 231). The Court disagrees. In fact, Plaintiffs do not assert an economic loss at all. By their own admission, Named Plaintiffs were net purchasers of Focus stock (at its allegedly deflated price), who received Merger consideration above their purchase points. (*See* D.I. 19-1, 19-2, 19-3). As a result, the assets in question never actually incurred economic loss.

Likely recognizing their alleged deflation does not fit neatly into securities claims, Plaintiffs cite to *In re MCI Worldcom, Inc. Sec. Litig.*, to suggest the securities laws permit such theories to pass the motion to dismiss stage. (D.I. 30 at 28) (citing 93 F. Supp. 2d 276 (E.D.N.Y.

2000)).  *MCI*, however, concerned a putative class which had already invested in the shares at issue at the time of its alleged deflation.  93 F. Supp. 2d 276 at 277.  The same cannot be said of Plaintiffs, who only purchased their shares once the Merger had been announced, and who were ultimately paid the Merger consideration at the price at which they knew the shares would close. Had Plaintiffs been Focus shareholders prior to the Merger announcement, as others undoubtedly were, their theory might plausibly allege a loss.  But Plaintiffs' investments were made with publicly available information as to when and at what price the shares would ultimately close, and they cannot invoke Section 10(b) to suggest otherwise.

Accordingly, the Court will dismiss Plaintiffs' Section 10(b) claim in its entirety.

### B.    Exchange Act § 14(a)

"Section 14(a) prevents corporate directors or officers from securing shareholder approval for transactions by way of proxy solicitations which contain false or incomplete disclosure of material information."  *Kaufman v. Allemang*, 70 F. Supp. 3d 682, 694 (D. Del. 2014); 15 U.S.C. § 78n(a)(1).  The provision "was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought."  *TSC Indus.*, 426 U.S. at 444; *Seinfeld v. Becherer*, 461 F.3d 365, 369 (3d Cir. 2006).

Rule 14a-9 implements Section 14(a).  *In re Keryx Biopharms., Inc.*, 454 F. Supp. 3d 407, 412 (D. Del. 2020).  It proscribes proxy statements "containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9(a).

"To prevail on a § 14(a) claim, a plaintiff must show that (1) a proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the proxy

28

solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 228 (3d Cir. 2007) (internal quotation marks omitted); *Jaroslawicz*, 962 F.3d at 710.

### 1.    Proxy Misstatement or Omission

Plaintiffs claim that the same alleged misrepresentations and omissions underscoring their Section 10(b) claim support their Section 14(a) claim.  (D.I. 19 ¶¶ 251, 254-55).  Thus, because the Court has already found that there were no misstatements or omissions in the Proxy, their Section 14(a) claim fails.  *See Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 145 n. 9 (3d Cir. 2004) ("[A] ruling that the PSLRA particularity requirements have not been satisfied compels dismissal of claims made pursuant to both of these provisions.").

### 2.    Loss Causation

As with Section 10(b), Defendants argue that the Complaint fails to allege the second element of a Section 14(a) violation, injury or loss causation.  (D.I. 27 at 29).  And they challenge it for substantially for the same reasons they did under Section 10(b) – that a "bad deal" theory cannot serve as the basis for causing a loss.  *See In re Resolute Energy Corp. Sec. Litig.*, 2021 WL 327385, at *3 (D. Del. 2021), *aff'd*, 2022 WL 260059 (3d Cir. Jan. 27, 2022); *Water Island Merger Arbitrage Inst. Commingled Master Fund, LP v. Cornerstone Bldg. Brands, Inc.*, 2024 WL 4361992, at *1 (D. Del. 2024).  Plaintiffs, on the other hand, contend that they have adequately alleged loss causation under the "lost opportunity" doctrine.  (D.I. 30 at 29).

On the law, Plaintiffs have it right.  The Third Circuit recognizes "lost opportunity" as a viable theory under Section 14(a).  *See In re Resolute Energy Corp. Sec. Litig.*, No. 21-1412, 2022 WL 260059, at *3 (3d Cir. Jan. 27, 2022).  In other words, a shareholder plaintiff may adequately allege an economic injury on the basis that management's misstatements or omissions led to the "loss of a possible profit or benefit, [or] to the value of [his] investment."  *Gould v American-*

*Hawaiian S. S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976); *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 542 (D. Del. 2012). There is a caveat, however. "[P]laintiffs may rely on a 'lost opportunity' theory only where *the fact of loss* is not wholly speculative." *Tse v. Ventana Med. Systems, Inc.*, 297 F.3d 210, 213 (3d Cir. 2002) (emphasis added); *Resolute II*, 2022 WL 260059, at *2. Thus, lost opportunity damages must be based on "certain, fixed and demonstrable profits thwarted by a defendant's alleged fraud." *Tse*, 297 F.3d at 223 n.4 (citation omitted); *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 627 (D. Del. 2003).

Here, Plaintiffs do not adequately allege that they stood to gain "certain, fixed and demonstrable profits" from any other deal. They do assert that Focus would have accepted WEG's superior $55 per share offer but for Defendants' improper proxy recommendation to accept CD&R's offer at $53 per share. (D.I. 19 ¶¶ 97, 230). But their theory is rendered implausible by the Proxy's disclosure that the WEG offer was "unlikely to result in a definitive transaction" because it was "preliminary and nonbinding and was subject to the completion of due diligence, debt and equity financing contingencies and regulatory approvals." (D.I. 28-2 at 43, 55). Indeed, Plaintiffs acknowledge that point in the Complaint. (*See* D.I. 19 ¶ 97) ("WEG offered to purchase Focus for $55 per share, ***contingent on additional due diligence, obtaining financing, and receiving exclusivity***." (emphasis added)). Those hurdles are not trivial. And even accepting the facts and inferences in the light most favorable to Plaintiffs, they allege only that WEG was willing to move quickly on due diligence regarding its original $51.75 per share offer, not that there was a substantial likelihood that the deal could close. (D.I. 19 ¶ 95; D.I. 41 at 27). Thus, "the very fact of loss in this case is 'wholly speculative.'" *Tse*, 297 F.3d at 223.

Plaintiffs' framework is akin to *Kuebler v. Vectren Corp.*, 13 F.4th 631 (7th Cir. 2021), which Defendants cite to in their Reply Brief. (D.I. 32 at 15). There, the Seventh Circuit

considered an appeal to a dismissal of a Section 14(a) claim for lack of loss causation. 13 F.4th at 646. In the first instance, a group of shareholders challenged a merger in part because two bidders had rendered preliminary interest above the final accepted offer. *Id*. ("Plaintiffs point out that in February 2018, Bidders A and B submitted indications of interest at prices above the final $72.00 price from CenterPoint.). In its analysis, the Circuit found that, although the "interest indications" were higher than the final accepted price, they were nonbinding and therefore "speculative." *Id.* at 646-47 ("[W]ithout an allegation that [the company] turned down an *available* superior offer, that citation, too, invites only speculation.") (emphasis added). Analogizing to a prior holding of its own, the Seventh Circuit reasoned that allegations of economic loss cannot support a Section 14(a) claim where they are "heavy on hindsight and speculation, and light on verifiable fact." *Id*. at 647.

The facts at hand are similar to those in *Kuebler*. Again, as the Complaint concedes, WEG's $55 per share offer was "contingent on additional due diligence, obtaining financing, and receiving exclusivity." (D.I. 19 ¶ 97). And, as in *Kuebler*, Plaintiffs allegations of a higher offer (WEG's) are missing allegations that it was as (or more) certain than the competing offer ultimately accepted (CD&R's). *See* 14 F.4th at 646 (non-binding indication of interest is not a binding offer). That WEG was "prepared to move quickly with its confirmatory due diligence," was immaterial given that WEG had yet to place the nonbinding $55 offer and the Special Committee was engaged with a bidder willing to provide a binding offer that provided a "certainty of value." (D.I. 19 ¶ 95; D.I. 28-2 at 55).

Consequently, the Complaint fails to state with the particularity necessary that WEG's $55 per share offer was a "certain" or "demonstrable" profit sufficient to satisfy loss causation under Section 14(a), and accordingly, the Court will dismiss the Section 14(a) claim.

C.    <u>Exchange Act Section 20(a)</u>

Finally, the Complaint asserts claims against the Individual Defendants for control person liability under Section 20(a).  *See* 15 U.S.C. § 78t(a).  "Section 20(a) imposes liability on controlling persons who aid and abet violations of the [Exchange] Act."  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 285 (3d Cir. 2010).  A predicate element of a Section 20(a) claim is a separate underlying violation of the Exchange Act.  *Rahman*, 736 F.3d at 247.  In other words, executive individuals can only be liable for aiding and abetting where the company has itself committed a primary violation.  *Id.*; *Aetna*, 617 F.3d at 285.  Here, however, the Court has already held that Plaintiffs' Section 10(b) and 14(a) claims fail.  Thus, "[b]ecause [Plaintiffs] have failed to adequately plead a predicate [securities] violation, their section 20(a) claim must be dismissed."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 177 (3d Cir. 2014); *Cal. Pub. Emps.' Ret. Sys.*, 394 F.3d at 159 n.21.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion to dismiss (D.I. 26) the Consolidated Class Action Complaint (D.I. 19) is GRANTED.  An appropriate order will follow.